MICHAEL W. BIEN – 096891
mbien@rbgg.com
VAN SWEARINGEN – 259809
vswearingen@rbgg.com
KARA J. JANSSEN – 274762
kjanssen@rbgg.com
MICHAEL S. NUNEZ – 280535
mnunez@rbgg.com
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:  (415) 433-6830
Facsimile:  (415) 433-7104

HABEN GIRMA – 293667
contact@habengirma.com
405 El Camino Real #209
Menlo Park, California  94025-5240
Telephone:  (510) 210-3714

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED SPINAL ASSOCIATION; NOT DEAD YET; INSTITUTE FOR PATIENTS' RIGHTS; COMMUNITIES ACTIVELY LIVING INDEPENDENT AND FREE; LONNIE VANHOOK; INGRID TISCHER, <br><br> Plaintiffs, <br><br> v. <br><br> STATE OF CALIFORNIA; GAVIN NEWSOM, in his official capacity as Governor; ROBERT BONTA in his official capacity as Attorney General; CALIFORNIA DEPARTMENT OF PUBLIC HEALTH; TOMAS J. ARAGON, in his official capacity as Director and State Public Health Officer; CALIFORNIA DEPARTMENT OF HEALTH CARE SERVICES; MICHELLE BAASS, in her official capacity as Director; MENTAL HEALTH SERVICES OVERSIGHT AND ACCOUNTABILITY COMMISSION; MARA MADRIGAL-WEISS, in her official capacity as Chair; MEDICAL BOARD OF CALIFORNIA; KRISTINA D. LAWSON, in her official capacity as President; DISTRICT ATTORNEY'S OFFICE FOR LOS ANGELES COUNTY; GEORGE GASCON, in his official capacity as District Attorney; and DOES 1 through 20, inclusive, <br><br> Defendants. | Case No. 2:23-cv-03107 <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> (1)  Americans with Disabilities Act <br><br> (2)  Rehabilitation Act <br><br> (3)  14th Amendment Equal Protection <br><br> (4)  14th Amendment Due Process |

[4276502.1]

**TABLE OF CONTENTS**

Page

INTRODUCTION ............................................................................ 1

JURISDICTION ............................................................................. 7

VENUE ......................................................................................... 7

THE PARTIES .............................................................................. 8

FACTUAL ALLEGATIONS ......................................................... 22

I.    Suicidality Is a Common Human Condition that We Now Recognize as a Mental Health Symptom that Should Be Addressed Clinically—Even Among People with Terminal Disabilities ........................................ 22

      A.    Suicide Is a Public Health Concern, Particularly for Older People and Those with Disabilities ................................................... 22

      B.    The Desire for Suicide Among Older Patients and Those with Terminal Illness Is Common, Attributable to Depression, and Treatable .......................................................................... 27

II.   Requests for Physician Assisted Suicide Are Interrelated with Fears About Living with Disability, and Are Best Addressed by Providing Supportive Care and Treatment ................................................ 30

III.  EOLOA Targets People with Disabilities for Death and Stigmatization ....... 32

      A.    The Individual Plaintiffs, Constituents of the Organizational Plaintiffs, and People With "Terminal Diseases" Are All People with Disabilities Who Are Entitled to Protection Under the ADA and the Rehab Act ................................................................ 32

      B.    Physician-Assisted Suicide Laws Are Grounded in a Sordid Legal Framework of Eugenic Discrimination Against People with Disabilities ............................................................... 33

      C.    The ADA and Section 504 Prohibit Public Entities from Excluding Persons with Disabilities from Public Services ................. 35

      D.    Medical Bias Against People with Disabilities Remains Pervasive ...................................................................... 36

      E.    Medical Bias Against People with Disabilities Intersects with Pre-Existing Bias in the Medical Profession Based on Race and Class ................................................................................ 38

      F.    EOLOA Advances the Idea that Disabled Lives Are Not Worth Living .......................................................................... 40

IV.   EOLOA Draws an Irrational Distinction Between People with Terminal Disabilities and Everyone Else, Including People with Other

Disabilities and People without Disabilities ................................................ 41

A. There Is No Rational Basis for the Act's "Terminally Disease" Classification ................................................................................... 41

B. EOLOA's Definition of "Terminal Disease" Includes People with Terminal Disabilities Who Can Live for Years with Adequate Treatments and Supports ...................................... 43

C. Terminal Prognoses Are Arbitrary, Uncertain, and Often Wrong ........ 43

V. Defendants Deny People with Terminal Disabilities Equal Access to State-Based Programs and Services, in Violation of the ADA, Section 504, and Equal Protection Clause ...................................... 46

A. Defendant State Agencies and Officials Administer Suicide Prevention Programs and Services from Which They Exclude People Who Seek Physician-Assisted Suicide on the Basis of Their Terminal Disabilities ................................................ 46

1. California Operates Suicide Prevention Programs and Services ................................................................... 46

2. EOLOA Denies People with Terminal Disabilities the Equal Benefit of Suicide Prevention Programs and Services ................................................................... 48

B. The Medical Board of California and its President Deny People With Terminal Disabilities the Medical Licensing and Regulatory Protections Available to Everyone Else in California ....... 50

C. Defendant Law Enforcement Agencies and Officers Deny People with Terminal Disabilities the Protection of California's Criminal Laws as Well as Civil Protections for the Elderly and Vulnerable ................................................................... 52

1. Criminal Laws Relating to Assisting Suicide Are Meant to Protect People .................................................... 52

2. EOLOA Denies the Protection of Criminal Laws From People with Terminal Disabilities ...................... 53

D. EOLOA Denies People with Terminal Disabilities the Equal Benefit of Civil Laws Protecting Older People, People with Disabilities, and Suicidal People ........................................ 56

VI. EOLOA Unlawfully Steers People with Terminal Disabilities Toward Suicide ................................................................................... 57

A. Defendants' Failure to Provide Supportive Services Steers People with Terminal Disabilities Towards Physician-Assisted Suicide ................................................................................... 58

B. Insurance Providers Steer People with Terminal Disabilities Towards Physician-Assisted Suicide ...................................... 62

C.    Medical Care Providers Steer People with Terminal Disabilities Towards Physician-Assisted Suicide ...................................................... 64

D.    Family and Caregiver Pressures Steer People with Terminal Disabilities Towards Physician-Assisted Suicide ................................ 66

VII.   EOLOA Unconstitutionally Deprives People with Terminal Disabilities of Due Process Protections ........................................................ 67

A.    EOLOA's Vague Definition of "Terminal Disease" Fails to Ensure an Adequate Process to Determine Physician-Assisted Suicide Eligibility ....................................................................... 68

B.    No Meaningful Mental Health Assessment or Treatment Is Required Under the Act ......................................................................... 70

C.    EOLOA Fails to Include Any Safeguards To Ensure that People Are Not Judgment-Impaired or Unduly Influenced at the Time of Death ................................................................................... 73

D.    EOLOA Fails to Provide Viable Alternatives to Suicide, Fails to Require Consideration or Exhaustion of Less Restrictive Alternatives to Suicide, and Lacks Independent Oversight ................ 74

E.    Prescribing Physicians Often Lack a Patient-Provider Relationship with the People for Whom They Prescribe Lethal Drugs .................................................................................................. 75

F.    Physician-Assisted Suicide Drug Cocktails Are Unregulated Under EOLOA, and Place People at Risk of Distressing Deaths ......... 76

G.    What Safeguards Exist Are Being Methodically Stripped From EOLOA and Safeguards In Place Now May Not Be Present For Long ........................................................................................... 77

CLAIMS FOR RELIEF ........................................................................................ 78

PRAYER FOR RELIEF ....................................................................................... 91

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**INTRODUCTION**[1]

1.     The Plaintiff organizations and individuals bring this action to stop the Defendant government agencies and officials from running a deadly system that steers people with terminal disabilities[2] away from necessary mental health care, medical care, and disability supports, and towards death by suicide under the guise of "mercy" and "dignity" in dying.

2.     Physician-assisted suicide is not only a revival of old eugenic ideologies, it also violates federal disability rights laws and federal constitutional provisions which protect persons with disabilities from discrimination, exclusion, and life-threatening governmental laws and policies.  Under federal law, a public entity may not withhold services or make services available on unequal terms on the basis of disability.  The State and local government Defendant agencies and officials named in this action fund and operate systems of public health, social services, medical profession regulation, and law enforcement to provide protective services for people who express suicidality, and to prevent medical professionals, caregivers, and family members from taking advantage of or encouraging a person's impulse for self-harm or suicide.  Through the State's physician-assisted suicide law, however, that entire protective network of services is withheld from the Plaintiffs and their members—solely on the basis of a doctor's "good faith" diagnosis of terminal disability.

3.     Nine U.S. states and the District of Columbia have passed laws legalizing physician-assisted suicide (Montana also permits the practice through a

---

[1] This lawsuit addresses suicide.  Suicidal thoughts or actions (even in very young children, older adults, and people with life-threatening illness/disability) are a sign of extreme distress and should not be ignored.  If you or someone you know need immediate help, call or text the Suicide & Crisis Lifeline at 988.

[2] This complaint uses the term "people with terminal disabilities" to describe people who have a medical condition that some doctors would describe as an incurable and irreversible disease that has been medically confirmed and will, within reasonable medical judgment, result in death within six months—with or without medical care.

state supreme court decision).  All of these laws are modeled after the nation's first physician-assisted suicide law, Oregon's Death With Dignity Act, which went into effect in 1997.  California's End of Life Option Act ("EOLOA" or "the Act"), was enacted in 2016.  All of these laws permit physicians to prescribe lethal drugs to people who, in the opinion of the physician, have six months or less to live.  Under EOLOA and all other similar laws, a person's perceived physical health is the critical legal determinant of whether their doctor may help them live or die.

4.      Plaintiffs United Spinal Association, Not Dead Yet, Institute for Patients' Rights, Communities Actively Living Independent and Free, Lonnie VanHook, and Ingrid Tischer bring this lawsuit challenging EOLOA's discriminatory scheme, which creates a two-tiered medical system in which people who are suicidal receive radically different treatment responses by their physicians and protections from the State depending on whether the person has what the physician deems to be a "terminal disease"—which, by definition, is a disability under the Americans with Disabilities Act.  Plaintiffs are all organizations with members who have disabilities, individual persons with disabilities, and/or organizations that advocate for persons with disabilities.

5.      EOLOA is situated within a long history of American state laws and practices directly harming and discriminating against people with disabilities on the grounds that *those peoples' lives* are not as worthy of protecting as others.  Prominent disability activist and author Alice Wong has discussed how the COVID-19 pandemic recently revealed how certain groups of people are considered disposable by the State, such as older, disabled, and chronically ill people, as well as how people are even more disproportionately impacted by State-based medical discrimination policies if they are economically marginalized or a person of color.  Black people, for example, are particularly at risk from EOLOA because racist health care policies lead to limited choices and poorer outcomes, and make it more likely that doctors will "write off" patients as terminal and not worthy of life-

preserving care.  As California's official health care policy, EOLOA steers

vulnerable people to their deaths instead of providing care and supportive services.



6.      The vast majority of people with terminal disabilities who seek a

hastened death have depression, which often interferes with decision making.

People with new, or newly diagnosed, disabilities also often go through a period of

initial depression including suicidal feelings.  For example, Plaintiff United Spinal's

members with spinal cord injuries at times experience depression and suicidal

thoughts as they must adjust to living with their disability after injury.  Most people

with life-threatening conditions who say that they want to die are actually asking for

assistance in *living*—that is, for help in dealing with the symptoms and practical

necessities common to living with a terminal disability:  depression, anxiety about

the future, grief, inadequate care options, dependence, lack of control, fear about

physical suffering, and spiritual despair.[3]

---

[3] Susan D. Block, & J. Andrew Billings, *Patient Requests for Euthanasia and*

7.     Publicly-reported data show that people in the United States who have died by physician-assisted suicide sought suicide primarily out of fears related to losing autonomy, loss of the ability to engage in enjoyable activities, loss of dignity, losing control of bodily functions, and becoming a burden on caregivers. Appropriate attention to fears about living with disabilities reduces suicidal ideation and results in dramatic improvement in quality of life—even as people approach the end of their lives.[4]

8.     Defendant California agencies and officials are cynically "generous" in providing the freedom to choose death by suicide, but drastically restrict the provision of appropriate palliative, hospice, in-home care, and other supportive and protective services such that the actual supply and availability of alternatives to physician-assisted suicide is woefully inadequate to meet the demands of its aging, disabled, and chronically ill population.  Instead of ensuring viable, appropriate mental and medical health care options that promote patient well-being and true autonomy, EOLOA presents a false choice of living without necessary health care or dying by suicide with the "help" of a physician.

9.     EOLOA discriminates against people with terminal disabilities by depriving them of protections afforded other persons under California law in violation of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act of 1973 ("Section 504").  The State's suicide prevention programs are designed to ensure that a person's expression of suicidal ideation is sufficient in itself to trigger mental health care, irrespective of whether they want

---

*Assisted Suicide in Terminal Illness: The Role of the Psychiatrist*, 36 PSYCHOSOMATICS 445 (1995), https://www.sciencedirect.com/science/article/pii/S0033318295716255.

[4] Herbert Hendin, *Suicide, Assisted Suicide, and Medical Illness*. 60 J. CLIN. PSYCH. (Suppl. 2) 46, (1999), https://www.psychiatrist.com/read-pdf/20371/.

treatment.[5]  EOLOA deprives Plaintiffs and their members access to these life-preserving interventions because of their disabilities.  Medical professionals are immunized and cannot be held civilly liable nor criminally prosecuted for assisting the suicide of a person with terminal disabilities so long as they comply with the Act's minimal requirements.  Yet the same doctor is subject to criminal and civil liability for providing a far less dangerous dose of opioids to a non-terminal patient in pain who later overdoses and dies.  EOLOA shields physician-assisted suicide deaths from law enforcement investigation and prosecution, solely because the person who died by suicide had a terminal disability.

10.     EOLOA does not reasonably advance its claimed purposes of enabling autonomous choices in dying and relieving suffering, and violates the Equal Protection Clause of the Fourteenth Amendment by treating differently people with terminal disabilities as compared to everyone else who expresses a wish to die to their medical doctor (both groups include people who want to, and do, die by suicide).  There is no rational basis for EOLOA's "terminal" classification given that physicians often misdiagnose some patients as having terminal diseases, physicians' prognosis of six months to live is often fallible, and the "terminal" classification includes people who can live a longer life span with treatment and supports (i.e., a diabetic taking insulin) but not without them.  EOLOA's very purpose and core requirement—providing an early death to someone who will die from a terminal illness within six months—is irrational, unreliable, and discriminatory, in violation of both the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment.

11.     EOLOA further violates the Due Process Clause of the Fourteenth

---

[5] Plaintiffs support voluntary mental health treatment and services that are comprehensive, community-based, recovery-oriented, and culturally and linguistically competent.  Nothing in this complaint should be construed as recommending or supporting involuntary treatment of any kind.

Amendment by failing to include sufficient safeguards to ensure that a judgment-impaired, or unduly influenced person does not receive and/or ingest lethal physician-assisted suicide drugs without adequate due process in waiving their fundamental right to live.  The Act's failure to require an exhaustion, or at least evidence of an informed rejection, of less restrictive alternatives to assisted suicide––including suicide prevention services, palliative care, hospice care, and other personal support services currently provided by the State—also violates the Due Process Clause of the Fourteenth Amendment.  The Act creates an unregulated zone, which allows a free-for-all with no independent or public oversight into whether people who die by physician-assisted suicide are actually close to death, have a treatable mental disorder, are coerced into death by another person, or lack feasible alternatives.

12.     The U.S. Supreme Court has observed that the State has an "unqualified interest in the preservation of life," including "an interest in protecting vulnerable groups—including the poor, the elderly, and disabled persons—from abuse, neglect, and mistakes," given "the real risk of subtle coercion and undue influence in end-of-life situations."[6]  This interest "goes beyond protecting the vulnerable from coercion; it extends to protecting disabled and terminally ill people from prejudice, negative and inaccurate stereotypes, and 'societal indifference.'"[7]  By implementing and enforcing EOLOA, Defendants have pinpointed the very population they know to have the most risk factors for suicide—characterized by old age, illness, and disability—and given them the equivalent of a loaded gun, instead of providing the protective, supportive, and compassionate services that this population requires to continue living.

---

[6] *Washington v. Glucksberg*, 521 U.S. 702, 728 (1997) (finding no constitutional right to assisted suicide).

[7] *Id.* at 732.

13.     Plaintiffs ask the Court to (1) declare EOLOA unlawful and unconstitutional; and (2) enjoin Defendants from enforcing EOLOA.

## JURISDICTION

14.     An actual, present, and justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a).

15.     This Court has jurisdiction over Plaintiffs' claims arising under the United States Constitution and 42 U.S.C. § 1983 pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

16.     This Court has jurisdiction over Plaintiffs' claims arising under Title II of the Americans with Disabilities Act ("ADA"), and Section 504 of the Rehabilitation Act ("Rehab Act") and the regulations promulgated thereunder, pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).  42 U.S.C. § 12202 (ADA, Title II) and 42 U.S.C.A. § 2000d-7(a) (Rehab Act) both waive states' Eleventh Amendment immunity and provide that civil actions asserting claims under these statutes may be brought in federal court.

17.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, by 42 U.S.C. §§ 12101 *et seq.*, 29 U.S.C. § 794 and by the general legal and equitable powers of this Court.  This Court also has authority under the ADA (42 U.S.C. § 12205), Section 504 of the Rehabilitation Act (29 U.S.C. § 794a(b)) and 42 U.S.C. § 1988 to award Plaintiffs their reasonable attorneys' fees, litigation expenses, and costs.

## VENUE

18.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) because at least one plaintiff resides in this district, one or more defendants reside in this district, and a substantial part of the events or omissions giving rise to the claims occurred in this district.

# THE PARTIES

19.     Plaintiff United Spinal Association ("United Spinal") is a national 501(c)(3) nonprofit membership organization that was founded by paralyzed veterans in 1946.  United Spinal is run by a Board of Directors, the majority of whom are people with disabilities, and staff that includes people with spinal cord injuries.  United Spinal is dedicated to empowering and advocating for people living with spinal cord injuries and disorders ("SCI/D") and all wheelchair users, including veterans, to obtain greater independence and quality of life.  United Spinal expends substantial time and resources on work to advance opportunities, social equity, and disability rights for all people living with a spinal cord injury or disease.  This includes work on issues such as increasing access to quality affordable health care and independent living services; enhancing and reforming government benefit systems; and preserving social security benefits—including in California.  United Spinal has approximately 60,000 members nationally, and over 5,000 members in California served by four chapters.  More than 2,000 of United Spinal's California members self-identify as having a spinal cord injury.

20.     Spinal cord injuries are devastating to the injured and their families. Newly injured members of United Spinal have faced and will continue to face significant challenges including loss of independence, depression, isolation, loss of self-confidence, and anxiety about what the future will bring.  Many have been suicidal on occasion.  Many have also been depressed after injury and while living in the community.  In response to these needs, United Spinal operates a peer mentor support program that brings together people who have experience living with spinal cord injuries with others who are navigating similar challenges.  United Spinal peer mentors provide information and support to members about suicide prevention.

21.     While United Spinal helps its members live independently and effectively in the community, some members are unable to do so because of systemic problems in the healthcare and benefits systems as well as discrimination

on the basis of disability.  Many of United Spinal's members have directly experienced discrimination by medical professionals, including denial and delay of necessary medical services, by being told that their quality of life is poor, as well as by being delayed or denied basic services and supports necessary for living at home with paralysis.  People with spinal cord injuries generally consider themselves as having a static disability, one that can be addressed with the right care, services, and supports.  Some members have been told by doctors that their condition is "terminal," and that they have a limited amount of time to live—yet the dire predictions proved wrong.  As a result of being perceived as terminally ill by their physicians, some of United Spinal's members qualify for physician-assisted suicide and are particularly vulnerable to (and United Spinal is fearful of) being steered towards physician-assisted suicide in a state of despair or depression.  United Spinal members in California have discussed, considered, and on information and belief, accessed lethal medications and/or committed suicide by means of EOLOA.  The Act places United Spinal's members at risk of dying by using physician-assisted suicide during a period of depression and difficulty.  United Spinal brings this action on behalf of its members because the interests at stake are germane to United Spinal's purpose of empowering and advocating for people living with spinal cord injuries and disorders to obtain greater independence and quality of life.

22.     United Spinal has been injured as a direct result of Defendants' actions and omissions alleged herein.  In addition to placing United Spinal members at risk of death by physician-assisted suicide, Defendants' actions and omissions have frustrated the organization's mission to empower and advocate for people with spinal cord injuries to obtain better quality of life and greater independence.  United Spinal has diverted resources to address and counteract concerns about physician-assisted suicide in California as well as advocate for its members and constituents who are placed at risk of harm by EOLOA and/or at risk of being steered toward utilizing physician-assisted suicide.  United Spinal has expended resources on

1   education and outreach campaigns targeted at addressing physician-assisted suicide.
2   This includes publishing a position statement opposing physician-assisted suicide
3   and a message from the organization's CEO about the dangers of the practice.
4   United Spinal has held public information discussions to inform its members
5   concerning assisted suicide laws and their impact on equality, dignity, and access to
6   care for people with disabilities.  United Spinal monitors reports from peer support
7   mentors concerning physician-assisted suicide, and has surveyed an online group of
8   individuals with spinal cord injuries about their experiences with the practice.
9   United Spinal is unable to devote these resources to its other critical programs.  By
10  steering people with spinal cord injuries towards physician-assisted suicide, EOLOA
11  impedes United Spinal's mission to support their members in obtaining greater
12  quality of life.  Neither the claims asserted nor relief requested by United Spinal
13  requires the participation of individual members in the lawsuit.

14          23.     Plaintiff Not Dead Yet ("NDY") is a national disability rights
15  organization formed in 1996 to articulate and organize the disability rights
16  opposition to the legalization of physician-assisted suicide, to oppose public policies
17  that allow the involuntary withholding of life-sustaining medical treatment, and to
18  advocate for equal protection of the law in cases of homicides of disabled persons.
19  NDY is headquartered in Rochester, New York and operates under the fiscal
20  sponsorship of The Center for Disability Rights, Inc., a non-profit, community-
21  based advocacy and service organization for people with all types of disabilities.

22          24.     NDY expends substantial time and resources on work to advance the
23  rights of people with disabilities.  Its advocacy work includes advocating that the
24  withholding or withdrawal of life-sustaining medical treatment be truly voluntary
25  and based on informed consent with meaningful alternatives, including long-term
26  services and supports to live in the community; opposing futility policies involving
27  unilateral or involuntary health care provider decisions to withhold or withdraw life-
28  sustaining medical treatment; and advocating for equal protection of the law in

1  homicide cases when the victim is old, ill, or disabled.

2      25.    NDY has been injured as a direct result of Defendants' actions and

3  omissions alleged herein.  Defendants' actions have frustrated its mission to oppose

4  public policies that allow the involuntary withholding of life-sustaining medical

5  treatment, to oppose bioethics policies such as Quality Adjusted Life Years

6  ("QALY") that pose risks to the healthcare and lives of disabled people, to advocate

7  for equal protection of the law in cases of homicides of disabled persons, and

8  oppose assisted suicide bills in states that have not legalized the practice.  NDY has

9  been forced to expend resources to address community concerns and advocate for

10 people with disabilities who are harmed by or at risk of harm by EOLOA, and is

11 therefore unable to devote these resources to its other critical efforts addressing the

12 impact of discriminatory health care policies on the lives of people with disabilities.

13 Not Dead Yet spent resources on press advocacy as well as organizing people with

14 disabilities in California to oppose EOLOA's passage.  Since the enactment of

15 EOLOA, NDY has had to expend resources supporting people with disabilities in

16 California by advocating against, organizing against, and educating the public about

17 the ongoing removal of safeguards from EOLOA.

18     26.    Plaintiff Institute for Patients' Rights ("IPR") is a national, 501(c)(3)

19 organization that conducts and supports research and public education on healthcare

20 disparities in the context of end-of-life issues.  IPR advocates to protect individuals'

21 rights in numerous healthcare contexts, including by providing information about

22 the discriminatory effects of physician-assisted suicide laws and the dangers those

23 laws pose to vulnerable individuals; opposing discriminatory crisis standards of care

24 put in place during the COVID-19 pandemic that placed people with disabilities at

25 risk of harm; advocating against the use of the QALY metric, which discriminates

26 against and diminishes the value of the lives of people with disabilities; educating

27 the public about disparities in healthcare access and outcomes, including those based

28 on race, age, and/or disability; and advocating for improvements to the quality of

hospice and palliative care services, as well as for expanded access to these key services.  IPR staff and board members regularly give presentations on these issues and engage with the press to raise awareness and educate the public on these topics.

27.     IPR has been injured as a direct result of Defendants' actions and omissions alleged herein.  Defendants' actions have frustrated its mission by placing at risk of death individuals that IPR seeks to educate and advocate on behalf of. Defendants' actions have further frustrated IPR's mission by eliminating safeguards that work to ensure equal access to healthcare.  Due to the enactment and implementation of EOLOA, IPR has been forced to expend resources addressing community concerns and advocating for its constituents who are placed at risk of harm by EOLOA.  In response to EOLOA, IPR developed and obtained accreditation for continuing legal and medical education courses specific to EOLOA.  IPR hired a consultant to assist in its development of a California-specific advanced directive that is now used to protect Californians from the dangers of EOLOA.  IPR developed community workshop training materials about EOLOA. By expending resources on these and other EOLOA-specific activities, IPR is unable to devote these resources to its other critical programs addressing the impact of discriminatory healthcare policies.  For example, IPR was unable to comment on recent congressional legislation that would have prohibited the use of QALYs in federal programs because it was too busy opposing EOLOA and the potential expansion of EOLOA.

28.     IPR is a sister organization of the Patients' Rights Action Fund ("PRAF"), a national, non-partisan single-issue 501(c)(4) organization that protects the rights of patients, people with disabilities, older adults, and economically-disadvantaged people from deadly harm and discrimination inherent in physician-assisted suicide laws.  PRAF lobbies and advocates in state legislatures and Congress for patient access to high-quality multidisciplinary end-of-life care, and works against efforts that devalue and deprioritize healthcare for vulnerable

people—such as QALYs and physician-assisted suicide.

29.     Plaintiff Communities Actively Living Independent and Free ("CALIF") is an independent living center, non-profit 501(c)(3), community-based organization that provides services and advocacy by and for people with disabilities, including people with terminal disabilities, who reside in Los Angeles County. CALIF was founded in 2001 by people with disabilities and is run by a Board of Directors and staff, the majority of whom are people with disabilities.  CALIF is based in Los Angeles, California.

30.     CALIF's mission is to:  (1) achieve greater input, participation, and control over policies and services for people with disabilities; (2) address discrimination against people with disabilities; (3) encourage the meaningful participation of persons with disabilities in mainstream activities that enhance the positive image and experience of disability; and (4) empower people with disabilities by encouraging ongoing education and a broad knowledge of the history and heritage of the Disability Movement.

31.     CALIF expends substantial time and resources on work to advance the rights of people with disabilities.  Its advocacy work includes helping individuals select, acquire, and use assistive technology; assisting individuals with disabilities in resolving issues related to their applications and/or appeals for public services or benefits; housing advocacy; and systems change advocacy which entails monitoring government systems and programs, laws, and local ordinances that affect people with disabilities in their formulation and implementation to ensure their access, quality of life, participation, and independence in all parts of life.  CALIF's peer counseling program provides one-on-one peer counseling as well and group mentoring for individuals who are dealing with disability related issues and problems.  CALIF provides training in the day-to-day independent living skills necessary for self-directed and empowered living.  CALIF participates very closely with the Personal Assistance Services Council, which helps people with disabilities

access the State's In-Home Supportive Services Program and develop skills in interviewing, hiring, management, and self-evaluation of personal assistants, interpreters, readers, and drivers.  CALIF connects people with disabilities with long term care services and supports to allow them to stay in their homes and receive the services required to support their needs.  CALIF also provides various education, training, and volunteer opportunities.  In fiscal year 2021, CALIF provided direct services to approximately 860 consumers with disabilities, over half of whom are over the age of 60.  CALIF further provided resources and support through its Information and Referral Services Program to over 6,000 consumers with disabilities.

32.     CALIF has been injured as a direct result of Defendants' actions and omissions alleged herein.  The interests CALIF seeks to protect through this litigation are germane to its mission and purpose.  By furthering the deaths of constituents that would have sought out and benefitted from CALIF's services, Defendants' actions and omissions have frustrated CALIF's mission and undermined the effectiveness of the programs and services they provide.  Due to EOLOA, CALIF has been forced to expend resources to address community concerns and advocate for people with disabilities who are harmed by or at risk of harm by EOLOA, and CALIF has therefore been unable to devote these resources to its other critical programs.  CALIF expended resources to oppose the passage of EOLOA and to educate the public on the risks that physician-assisted suicide poses to people with disabilities, including CALIF's constituents.  Following the passage of EOLOA, CALIF provided additional educational programs to counteract the de-valuing of disabled lives under EOLOA.  In order to combat the impact of EOLOA, CALIF has diverted already scarce resources to identify, investigate, and address its impact on CALIF's constituents, including by offering suicide prevention peer support services as well as by providing presentations and other educational materials on the value of the lives of people with disabilities.  Because EOLOA

threatens the lives of people with disabilities, CALIF is compelled to spend substantial time to provide enhanced peer counseling and case management to ease the anxiety and fears regarding consumers' end of life decisions.  EOLOA's "better off dead than alive" mentality contributes to the frightening trend of bullying and criminal behavior toward the disabled so much that CALIF found it necessary to join "LA versus Hate," a group that supports Los Angeles County residents and communities targeted for hate acts, in 2022.

33.     Plaintiff Lonnie VanHook is a resident of Oakland, California, a veteran of the United States Navy, and a member of United Spinal.  Diagnosed as a C-5 quadriplegic as a result of a spinal cord injury, he has lost the ability to move his arms and legs.  Mr. VanHook has also previously been diagnosed with Rhabdomyosarcoma, a rare form of cancer that forms in soft tissue including skeletal muscle tissue and hollow organs such as the bladder.  Subsequent to his spinal cord injury and cancer diagnosis, both of his legs were amputated.  Mr. VanHook is a person with multiple disabilities as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B).

34.     Mr. VanHook's ability to engage in major life activities is substantially limited, and he is mostly dependent on in-home health services.  He requires in-person assistance with basic life activities including eating, drinking, and cleaning.  Mr. VanHook requires being physically turned by another person in order to avoid having his skin break down.  He lives with substantial, and at times, excruciating pain.  Mr. VanHook would rapidly die without medical treatments and home health care supports.  He has been told his conditions are "terminal," and he believes the medical system would prefer him dead.  As a result of interactions with doctors and medical professionals, Mr. VanHook removed the organ donor indication from his driver's license for fear he was being targeted for organ harvesting rather than treatment.  Pursuant to EOLOA, Mr. VanHook has a terminal disease and is eligible for physician-assisted suicide.

35.     Mr. VanHook has been diagnosed with chronic depression, and has experienced suicidal thoughts during episodes of depression.  Mr. VanHook has been placed on emergency psychiatric holds pursuant to California Welfare and Institutions Code Section 5150.  After learning about the availability of physician-assisted suicide in Oregon, Mr. VanHook took steps to travel to Oregon to request and receive lethal drugs—including withdrawing money for the trip, physician-assisted suicide services, and experiences for his final journey—but was ultimately unsuccessful.  During this same period of time while placed on a 5150 hold in California when Mr. VanHook was experiencing depression, he requested that his medical providers let him perish from ceasing to ingest water and food. Mr. VanHook's doctors agreed to this request.  After a period of time not eating or drinking, Mr. VanHook decided to continue living with the support of his long-time physician who has followed Mr. VanHook's medical care for over 33 years.

36.     Mr. VanHook wants to continue living; he would not choose assisted suicide while exercising sound judgment and does not want to die from physician-assisted suicide even knowing that the process is readily available in California. Mr. VanHook is an African American male with limited resources and substantial medical, mental health, and in-home health care needs—a person at serious risk of racism and ableism in his contacts with the medical system.  He has experienced discrimination by several of his medical providers and currently is unable to obtain the level of in-home care support that is required due to insufficient allocation of in-home health care resources by Defendant California Department of Health Care Services.  Based on past and ongoing medical discrimination, the ongoing risk of lacking the balance of quality of life, and his continued inability to obtain critical in-home supports, Mr. VanHook experiences anxiety and depression.  Mr. VanHook fears that he will again become suicidal while depressed, that he will seek and obtain physician-assisted suicide services without making an informed choice, and that he will be provided with and subsequently ingest lethal medication.  He also

fears that medical providers who view his quality of life to be very low will steer him towards physician-assisted suicide instead of provided life-sustaining treatment, and that he will die after consuming lethal medication.

37.     Plaintiff Ingrid Tischer is a resident of Berkeley, California and a member of United Spinal.  Ms. Tischer has been diagnosed with scoliosis, muscular dystrophy, Dejerine-Sottas Subtype III and polyneuropathy that has caused quadriplegia and led to sleep apnea/chronic respiratory insufficiency, depression, and anxiety.  Ms. Tischer was born with a type of muscular dystrophy, a progressive neuro-muscular disease, that causes neurodegeneration and muscle weakness over time and substantially limits her ability to breathe, the use of her arms and hands, and her ability to walk and move about.  Ms. Tischer uses a walker and a wheelchair for mobility and uses a type of ventilator known as a bilevel positive airway pressure ("BiPap") machine to help her breathe at night.  She is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B).

38.     Ms. Tischer, a White woman, has experienced medical discrimination based upon her disability, including by her doctor affirmatively challenging her quality of life and denying Ms. Tischer medical services on the basis of her disability.  Based in part on past and ongoing medical discrimination, Ms. Tischer experiences anxiety and depression, and fears that she will die either at a hospital due to improper care or misclassification as "medically futile," or at a skilled nursing facility where there is a substandard level of care.  Ms. Tischer's condition is a progressive one and as she ages her medical needs and daily living supports will increase.  If Ms. Tischer loses access to her Bi-Pap machine, her condition would immediately worsen due to the lack of oxygen, causing physical and mental exhaustion and confusion, severe headaches, possibly pneumonia, and ultimately death due to carbon dioxide narcosis.  Ms. Tischer believes she qualifies and is eligible for physician-assisted suicide pursuant to EOLOA because she would die within six months without medical supports.  Ms. Tischer would not choose assisted

suicide while exercising sound judgment and does not want to die from physician-assisted suicide.  Based upon her medical history and experience, she is fearful that her medical providers will steer her towards physician-assisted suicide in lieu of providing life-sustaining treatment during a time when she is has impaired judgment due to anxiety and/or depression.  During a previous medical crisis, she considered physician-assisted suicide to be a desirable choice given the absence of meaningful and appropriate alternatives.

39.     Defendant State of California ("State" or "California") is the legal and political entity responsible for enacting and enforcing State laws and legislation, including EOLOA.

40.     Defendant Gavin Newsom is sued in his official capacity as Governor of the State of California.  He is vested with the supreme executive power of the State and has the duty to see that the State's laws are faithfully executed.  Cal. Const. art. V, § 1.  He has the authority to direct the attorney general to assist any district attorney in the discharge of the duties of that office, and the attorney general exercises its duties subjected to the powers and duties of Governor Newsom.  *Id*. art. V, § 13.  Governor Newsom possesses the authority to supervise and assign functions among executive officers and agencies, other than elective officers and agencies administered by elective officers.  *See id*. art. V, § 6; Cal. Gov't Code § 12010.  Governor Newsom is tasked with appointing thirteen of fifteen members of the Medical Board of California, subject to Senate confirmation.  *See* Cal. Bus. & Prof. Code § 2001.  Governor Newsom has authority to remove from office members of the Medical Board of California for neglect of duty, incompetency, or unprofessional conduct.  *Id*. § 2011.  Governor Newsom also has the power to appoint twelve of sixteen commissioners to the Mental Health Services Oversight and Accountability Commission.

41.     Defendant Robert Bonta is sued in his official capacity as the Attorney General of California.  As the chief law officer of the State, one of his duties is to

1  enforce the laws of the State.  Cal. Const. art. V, § 13.  He has direct supervision

2  over various law enforcement officers, including every district attorney and sheriff

3  in the State.  *Id*. art. V, § 13.

4      42.    Defendant California Department of Public Health ("CDPH") is a

5  department within the California Health and Human Services Agency.  CDPH's

6  mission is to advance the health and well-being of the people of California.  CDPH

7  is responsible for enforcing various provisions of the Health and Safety Code,

8  Welfare and Institutions Code, and other State laws and regulations.  CDPH's Office

9  of Suicide Prevention (OSP) is responsible for coordinating statewide suicide

10  prevention efforts and resources through planning and collaboration across diverse

11  partners and systems.  Cal. Health & Safety Code § 131300.  By statute, OSP is

12  responsible for implementing suicide prevention efforts consistent with the Mental

13  Health Services Oversight and Accountability Commission's Suicide Prevention

14  Report "Striving for Zero."  Cal. Health & Safety Code § 131315(a).

15      43.    CDPH facilitates physician-assisted suicide in part by making available

16  on its website the forms physicians must complete when participating under the Act.

17  Cal. Health & Safety Code § 443.22.  CDPH also collects and reviews

18  documentation submitted by physicians pursuant to EOLOA, including physician-

19  assisted suicide requests and physician forms, and publishes a report based on the

20  information collected.  *Id*. § 443.19.  CDPH receives federal funds and has received

21  such funds at all times relevant to this complaint.

22      44.    Defendant Tomás J. Aragón is sued in his official capacity as the

23  Director of CDPH and State Public Health Officer.  In these positions, he has

24  control over the CDPH.  He is appointed by the Governor, and his authority is

25  delegated to him by California Health and Safety Code § 131005.

26      45.    Defendant California Department of Health Care Services ("CDHCS")

27  is a department within the California Health and Human Services Agency.  CDHCS

28  finances and administers certain health care service delivery programs for low

income and underserved individuals, including the California Medical Assistance Program ("Medi-Cal").  CDHCS is responsible for California suicide prevention activities, including but not limited to providing resources to counties to establish suicide prevention trainings and programs, connecting individuals with county providers for local assistance, and connecting individuals in crisis to the CDHCS Ombudsman to obtain immediate services.  CDHCS facilitates EOLOA by setting and administering billing codes for health care providers who treat and prescribe physician-assisted suicide to patients receiving health care through Medi-Cal, which enable those providers to seek reimbursement for lethal drugs under EOLOA. CDHCS prepares regulations to interpret and provide greater specificity for Medi-Cal services, which may include services provided by Medi-Cal providers under the Act.  CDHCS also provides policy and billing information and guidance for Medi-Cal providers who participate in EOLOA.

46.     Michelle Baass is sued in her official capacity as the Director of CDHCS.  She is appointed by the Governor, and in her role, leads a team of more than 4,000 employees at CDHCS.

47.     Defendant Mental Health Services Oversight and Accountability Commission ("MHSOAC") is an independent State agency that oversees the implementation of the Mental Health Services Act (Proposition 63), which imposed a 1% income tax on wealthy California residents to pay for mental health services and to establish a framework for continuous improvement of mental healthcare in the State.  Partnering with public and private mental health agencies, MHSOAC works to ensure that people obtain the mental health care they need in a timely, comprehensive, effective, and culturally competent manner.  MHSOAC is responsible for the statewide suicide prevention plan, California's Strategic Plan for Suicide Prevention 2020-2025.  MHSOAC publishes information advising that people with terminal disabilities, including people who are older, with disabilities, and with chronic illnesses, have elevated rates of suicide risk factors.  MHSOAC's

1   suicide prevention services explicitly and purposefully abandon people with

2   terminal illnesses who seek physician-assisted suicide.  The 16-member

3   Commission is composed of one Senator, one Assembly member, the State Attorney

4   General, the State Superintendent of Public Instruction, and 12 public members

5   appointed by the Governor.

6        48.   Defendant Mara Madrigal-Weiss is sued in her official capacity as the

7   Chair of MHSOAC.  She was elected Chair by MHSOAC Commission members,

8   and is serving a one year term.

9        49.   Defendant Medical Board of California ("MBC") is a government

10   agency within the California Department of Consumer Affairs.  The MBC's mission

11   is to protect health care consumers through the proper licensing and regulation of

12   physicians, surgeons, and certain allied healthcare professionals, and through

13   enforcement of the Medical Practice Act, which governs the practice of medicine in

14   California.  The MBC also aims to promote access to quality medical care through

15   its licensing and regulatory functions.  The MBC is charged with enforcing the

16   disciplinary and criminal provisions of the Medical Practice Act.  *See* Cal. Bus. &

17   Prof. Code § 2004.  MBC publishes an overview of the requirements of EOLOA,

18   and provides an email address for EOLOA questions.  MBC has the authority to

19   update the forms physicians must complete when participating under the Act, Cal.

20   Health & Safety Code § 443.22, although it reports that it has not done so.  Upon

21   information and belief, MBC has not disciplined any health care provider who has

22   furnished lethal drugs to patients under EOLOA, with the purpose of facilitating

23   their death.

24        50.   Defendant Kristina D. Lawson is sued in her official capacity as the

25   President of the MBC.  Her duties include administering the licensing, regulatory,

26   and disciplinary functions of the MBC.  *See* Cal. Bus. & Prof. Code §§ 2000 *et seq*.

27        51.   Defendant District Attorney's office for Los Angeles County ("DA's

28   Office") is a public entity duly organized and existing under the laws of the State of

1   California.  The DA's Office has the primary authority and responsibility for

2   prosecuting criminal and specific civil cases within its jurisdiction.  The DA's

3   Office receives State and federal funds and has received such funds at all times

4   relevant to this complaint.  Upon information and belief, the DA's Office has not

5   investigated or prosecuted any health care provider who has furnished lethal drugs

6   to patients under EOLOA, with the purpose of facilitating their death.

7          52.     Defendant George Gascón is sued in his official capacity as the District

8   Attorney for Los Angeles County.  He is charged with prosecuting criminal

9   violations of the laws of California.  Cal. Gov't Code § 26500.

10         53.     Plaintiffs are ignorant of the true names and capacities of Defendants

11  sued in this complaint as DOES 1 through 20, inclusive, and therefore sue these

12  Defendants by such fictitious names.  Plaintiffs will amend this complaint to allege

13  their true names and capacities when ascertained.  Plaintiffs are informed and

14  believe, and thereon allege, that each of the fictitiously named Defendants is

15  responsible in some manner for the acts alleged in this complaint.

16         54.     Defendants, collectively and through their respective duties and

17  obligations, are responsible for administering and/or enforcing the Act.  Each

18  Defendant, and those subject to their direction, supervision, and control, has the

19  responsibility to intentionally perform, participate in, aid and/or abet in the

20  administration or enforcement of the Act.

## FACTUAL ALLEGATIONS

**I.    Suicidality Is a Common Human Condition that We Now Recognize as a Mental Health Symptom that Should Be Addressed Clinically—Even Among People with Terminal Disabilities**

   **A.    Suicide Is a Public Health Concern, Particularly for Older People and Those with Disabilities**

26         55.     Suicide is "death caused by injuring oneself with the intent to die."[8]

_____

[8] *Facts about Suicide,* CENTERS FOR DISEASE CONTROL AND PREVENTION ("CDC"),

According to the World Health Organization, more than 800,000 people die due to suicide annually and "[t]here are indications that for each adult who died of suicide there may have been more than 20 others attempting suicide."[9]  Death from suicide disproportionately impacts "the most vulnerable of the world's populations and is highly prevalent in already marginalized and discriminated groups of society."[10]

56.     The Centers for Disease Control and Prevention ("CDC") reports that suicide is "[o]ne of the 10 leading causes of death in the United States."[11] According to the Surgeon General, "suicide rates are rising across the country.[12]  "In 2020, an estimated 12.2 million American adults seriously thought about suicide, 3.2 million planned a suicide attempt, and 1.2 million attempted suicide."[13]  In 2020, there were nearly twice as many completed suicides (45,979) in this country as there were homicides (24,576).[14]  When states legitimize physician-assisted suicide and doctors recommend and normalize suicide as an appropriate "treatment" for addressing end-of-life concerns, the number of suicides increase—not only for individuals with terminal disabilities but for the entire community.[15]

---

https://www.cdc.gov/suicide/facts/index.html (last visited March 8, 2023).

[9] World Health Org., PREVENTING SUICIDE: A GLOBAL IMPERATIVE 9 (2014), https://apps.who.int/iris/bitstream/handle/10665/131056/9789241564779_eng.pdf?sequence=1.

[10] Id. at 3.

[11] U.S. Surgeon General & Nat'l Action Alliance for Suicide Prevention, THE SURGEON GENERAL'S CALL TO ACTION TO IMPLEMENT THE NATIONAL STRATEGY FOR SUICIDE PREVENTION ("Surgeon General's Call to Action") 11 (2020), https://www.hhs.gov/sites/default/files/sprc-call-to-action.pdf.

[12] Id.

[13] Facts About Suicide, supra note 8.

[14] Suicide, Statistics, NAT'L INST. MENTAL HEALTH, https://www.nimh.nih.gov/health/statistics/suicide (last visited March 9, 2023).

[15] David Albert Jones & David Paton, How Does Legalization of Physician-Assisted Suicide Affect Rates of Suicide?, 108 S. MED. J. 599 (2015), https://www.researchgate.net/publication/282609275_How_Does_Legalization_of_

57.     The CDC observes that "[a]dults aged 75 and older have the highest suicide rate compared to any other age group."[16]  Military veterans make up approximately 14 percent of all suicides in the U.S., and more than half of all veterans who die from suicide are 55 years of age or older.[17]  People with disabilities are significantly more likely than those without disabilities to report suicidal ideation, suicide planning, and suicide attempts.[18]  People with cognitive, complex activity (defined as self-care and/or independent living tasks), and multiple disabilities have the highest risk of suicidal thoughts, suicide planning, and suicide attempts.[19]  In 2021, "adults with disabilities were three times more likely to report suicidal ideation in the past month compared to persons without disabilities."[20]

58.     Suicide is "a major public health concern in California," according to

---

Physician-Assisted_Suicide_Affect_Rates_of_Suicide; *see also* David Albert Jones, *Euthanasia, Assisted Suicide, and Suicide Rates in Europe*, 11 J. ETHICS MENTAL HEALTH, 1, 27 (2022), https://jemh.ca/issues/open/documents/JEMH%20article%20EAS%20and%20suicide%20rates%20in%20Europe%20-%20copy-edited%20final.pdf (concluding that "there have been very steep rises in suicide" [both physician-assisted suicides and other suicides] after the legalization of physician-assisted suicide in four European countries).

[16] *Disparities in Suicide,* CDC, https://www.cdc.gov/suicide/facts/disparities-in-suicide.html (Nov. 2, 2022).

[17] Cal. Mental Health Servs. Oversight & Accountability Comm'n, *Striving for Zero: California's Strategic Plan for Suicide Prevention* 2020-2025 ("California's Strategic Plan") 62, https://mhsoac.ca.gov/sites/default/files/Suicide%20Prevention%20Plan_Final.pdf.

[18] Nicole M. Marlow, Zhigang Xie, Rebecca Tanner, Ara Jo, & Anne V. Kirby, *Association Between Disability and Suicide-Related Outcomes Among U.S. Adults*, 61 AM. J. PREVENTATIVE MED. 852 (2021).

[19] Nicole M. Marlow, Zhigang Xie, Rebecca Tanner, Molly Jacobs, Michaela K. Hogan, Thomas E. Joiner, Jr., & Anne V. Kirby, *Association Between Functional Disability Type and Suicide-Related Outcomes Among U.S. Adults with Disabilities in the National Survey on Drug Use and Health, 2015-2019*. 153 J. PSYCHIATR. RES. 213 (2022).

[20] *Disparities in Suicide, supra* note 16.

Defendant CDPH.[21]  "[A]n average of 1,115,000 Californians over the age of 18 – about 3.8 percent of all adults – reported having serious thoughts of suicide in the past year."[22]  In 2017, "18,153 Californians visited or were admitted to an emergency department for intentional self-harm."[23]  In California, people over the age of 65 have historically had the highest rates of suicide,[24] and the 85 and older age group has "the highest rates of suicide compared to any other age group."[25]

59.     Serious illness[26] and chronic pain[27] are important risk factors for suicide.  Social factors, "such as isolation and the feeling of being a burden to others," may increase suicide risk.[28]  Other risk factors include "a breakdown in the ability to deal with acute or chronic life stresses, such as financial problems."[29]  California recognizes that very high suicide rates among older adults "may be driven by factors such as use of highly lethal means; unmet health, mental health, and substance use disorder needs, especially late-life onset of depression; personality

---

[21] CDPH, *Older Adult Suicide in California in 2019* (2022), at 1, https://www.cdph.ca.gov/Programs/CCDPHP/DCDIC/SACB/CDPH%20Document%20Library/Suicide%20Prevention%20Program/OlderAdultSuicideCADataBrief_2019.pdf.

[22] California's Strategic Plan, *supra* note 17, at 56.

[23] *Id.*

[24] *Id.* at 61.

[25] CDPH, *California Suicide and Self-Harm Trends in 2020* (Feb. 21, 2021), at 1, https://www.cdph.ca.gov/Programs/CCDPHP/DCDIC/SACB/CDPH%20Document%20Library/Suicide%20Prevention%20Program/SuicideAndSelfHarmIn2020-DataBrief-ADA.pdf.

[26] *Risk and Protective Factors,* Suicide Prevention, CDC, https://www.cdc.gov/suicide/factors/index.html (Nov. 2, 2022).

[27] PREVENTING SUICIDE: A GLOBAL IMPERATIVE, *supra* note 9, at 40 ("Suicidal behaviour has been found to be 2−3 times higher in those with chronic pain compared to the general population").

[28] Surgeon General's Call to Action, *supra* note 11, at 19.

[29] PREVENTING SUICIDE: A GLOBAL IMPERATIVE, *supra* note 9, at 11.

traits and coping mechanisms; life stressors, such as the loss of loved ones; social disconnection; and impairments in functioning and disability."[30]  Most often, "several risk factors act cumulatively to increase an individual's vulnerability to suicidal behavior."[31]  Depression is the common culprit: "[E]very study that has looked for an association between depression and the desire for death has found one."[32]

60.    A suicide attempt is often referred to as a "cry for help."  "[I]ndividuals who are thinking about suicide, even when they experience strong intent, are often ambivalent about their wish to die."[33]  The World Health Organization and the U.S. Surgeon General ("Surgeon General") agree that suicide is preventable.[34]  Many people who die by suicide do so within weeks or months of seeing a health provider.[35]  Such visits are opportunities to detect risk, address safety, and connect patients with sources of care and support.[36]  Restricting access to the lethal means for suicide is also an effective strategy.[37]

61.    Suicidal crises are often short-lived, and even when there are chronic factors present, a suicidal person can desist from self-harm with help from a health provider.[38]  People who survive suicide attempts are unlikely to later die by suicide.

---

[30] California's Strategic Plan, *supra* note 17, at 61.

[31] PREVENTING SUICIDE: A GLOBAL IMPERATIVE, *supra* note 9, at 30.

[32] Keith G. Wilson, et al., *Mental Disorders and the Desire for Death in Patients Receiving Palliative Care for Cancer*, 6 BMJ SUPPORTIVE & PALLIATIVE CARE, 170 (2016), https://spcare.bmj.com/content/bmjspcare/6/2/170.full.pdf.

[33] Surgeon General's Call to Action, *supra* note 11, at 35.

[34] PREVENTING SUICIDE: A GLOBAL IMPERATIVE, *supra* note 9, at 6.

[35] Surgeon General's Call to Action, *supra* note 11, at 43.

[36] *Id.*

[37] PREVENTING SUICIDE: A GLOBAL IMPERATIVE, *supra* note 9, at 7.

[38] Thomas J. Marzen et al., *Suicide: A Constitutional Right?* 24 DUQ. L. REV. 1,124

[4276502.1]

A meta-analysis of medical studies that followed people who had made suicide attempts that resulted in medical care showed that over 90% of those who survived did not go on to die by suicide at a later date.[39]  Many people who have expressed suicidality or even attempted suicide are now living and grateful for the additional years of life.[40]

### B. The Desire for Suicide Among Older Patients and Those with Terminal Illness Is Common, Attributable to Depression, and Treatable

62.     Older and terminally ill people who express a desire for suicide are almost always experiencing a psychiatric illness, often characterized by major depression and/or hopelessness, in addition to their terminal physical conditions.[41] A 2021 meta-analysis of 24 studies examining the prevalence and predictors of suicide among older adults, which included a total of 306,173 subjects, concluded that "depression is a major reason for suicide in the elderly."[42]  Unfortunately, physiological changes associated with aging into one's later years increases

---

(1985); PREVENTING SUICIDE: A GLOBAL IMPERATIVE, *supra* note 9, at 3, 11, 23-4; Surgeon General's Call to Action, *supra* note 11, at 11, 35; *Attempters' Longterm Survival,* HARV. T.H. CHAN SCH. PUB. HEALTH, https://www.hsph.harvard.edu/means-matter/means-matter/survival/ (last visited Mar. 21, 2023).

[39] David Owens, Judith Horrocks, & Allan House, *Fatal and Non-Fatal Repetition of Self-Harm: Systematic Review*, 181 BRIT. J. PSYCH. 193 (2002).

[40] *See, e.g.*, Anonymous surgeon, *I Tried to Take My Life Five Years Ago. Now I'm Grateful to Be Alive*, THE GUARDIAN (Oct. 8, 2020), https://www.theguardian.com/society/2020/oct/08/take-life-grateful-alive-surgeon-suicide-attempt.

[41] David C. Clark, *"Rational" Suicide and People with Terminal Conditions or Disabilities*, 8 ISSUES LAW MED. 147 (1992).

[42] Gloria Obuobi-Donkor, Nnamadi Nkire & Vincent Agyapong. *Prevalence of Major Depressive Disorder and Correlates of Thoughts of Death, Suicidal Behaviour, and Death by Suicide in the Geriatric Population-A General Review of Literature*, 11 BEHAV. SCI. 142, (2021), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8614881/.

susceptibility to depression.[43]

63.    "Depression is clinically characterized by obvious changes in decision making that cause distress and impairment … and is associated with impaired functioning in ventromedial prefrontal cortex and ventral striatum, two regions known to play critical roles in value-based decision making."[44]  "Difficulty making decisions is a core symptom of depressive illness," and "those with more depressive symptoms make decisions that are less likely to further their interests."[45]  "Studies have shown that depressed, relative to non-depressed persons, make qualitatively different decisions, leading many doctors and psychotherapists to suggest to their patients that they should avoid making major life choices while in a depressed state."[46]

64.    Expressions of the desire for death are common among people with cancer.[47]  A landmark study of the desire for hastened death published in the Journal of the American Medical Association ("JAMA") concluded that "[d]epression and hopelessness are the strongest predictors of desire for hastened death" among terminally ill cancer patients and that those with a major depressive episode were

[43] George S Alexopoulos, *Depression in the Elderly*, 365 THE LANCET 947, 1961-1970, (2005), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(05)66665-2/fulltext.

[44] Dahlia Mukherjee, Sangil Lee, Rebecca Kazinka, Theodore D. Satterthwaite & Joseph W. Kable, *Multiple Facets of Value-Based Decision Making in Major Depressive Disorder*, 10 SCIENTIFIC REPORTS 3415 (2020), https://www.nature.com/articles/s41598-020-60230-z.

[45] Yan Leykin, Carolyn Sewell Roberts, & Robert J. DeRubeis, *Decision-Making and Depressive Symptomatology*, 35 COGN THER RES 333-341 (2011), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3132433/.

[46] Levkin et al., *supra* note 45

[47] Wilson, et al., *supra* note 32; *see also* Guy Maytal, M.D. & Theodore A. Stern, M.D., *The Desire for Death in the Setting of Terminal Illness: A Case Discussion*. 8 PRIM CARE COMPANION J. CLIN. PSYCHIATRY 299, 301 (2006), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1764532/pdf/i1523-5998-8-5-299.pdf (discussing studies finding that the rate of a desire for a hastened death among terminally ill patients ranged from 17% to 45%).

four times more likely to endorse a desire for hastened death than those without depression.[48]  A recent study comparing people with advanced diseases who sought physician-assisted suicide with comparable patients who did not found that those who sought physician-assisted suicide had "significantly higher levels" of depression.[49]

65.     Fortunately, there is a "general consensus that individuals with a major depression can be effectively treated, even in the context of terminal illness."[50] Researchers stress that "[i]mproved detection and early interventions are crucial in preventing suicidal attempts and completed suicides.  Depression which is a vital predictor of suicide must be targeted and treated."[51]  Doctors "should always suspect that an unrecognized psychiatric illness has silently, invisibly influenced the judgment of a [terminally ill] patient opting for suicide."[52]  Recognizing that "[m]ental disorders are a well-recognized comorbidity for many people with cancer, with a disproportionately higher rate of suicide," the editorial board of The Lancet advised in 2021 that efforts to improve cancer care "must focus on ensuring mental health services are an integral and accessible aspect of care for all."[53]

---

[48] William Breitbart, Barry Rosenfeld, Hayley Pessin, et al., *Depression, Hopelessness, and Desire for Hastened Death in Terminally Ill Patients With Cancer*, 284 JAMA 2907, 2907 (2000), https://jamanetwork.com/journals/jama/fullarticle/193350.

[49] Kathryn A. Smith, Theresa A. Harvath, Elizabeth R. Goy, & Linda Ganzini, *Predictors of pursuit of physician-assisted death*, 49 J PAIN SYMPTOM MANAGE. 555 (2015), https://pubmed.ncbi.nlm.nih.gov/25116913/.

[50] Breitbart et al., *supra* note 48.

[51] Obuobi-Donkor et al., *supra* note 42.

[52] Clark, *supra* note 41.

[53] Editorial, *Provision of mental health care for patients with cancer*, 22 THE LANCET ONCOLOGY, 9, 1199 (2021), https://www.thelancet.com/action/showPdf?pii=S1470-2045%2821%2900480-0.

**II.    Requests for Physician Assisted Suicide Are Interrelated with Fears About Living with Disability, and Are Best Addressed by Providing Supportive Care and Treatment**

66.    The physician-assisted suicide legalization movement thrives on anecdotes of people who suffer greatly before death, and the avoidance of pain is often raised as the primary reason for having such laws.  Studies show, however, that pain is not a leading concern of those who choose physician-assisted suicide. Instead, the driving factor is the feeling of being helpless and in need, which is often grounded within society's stigma, fear, disgust, and animus toward people with disabilities.  Addressing fears about dependence helps resolve these concerns.

67.    California and all U.S. states permit the dispensing of sufficient pain medication to maintain comfort at the end of life without intentionally hastening death.  "[A]ccording to experts in the field of pain control, almost all terminally ill patients can experience adequate relief with currently available treatments."[54]  More than 90% of people with cancer respond to simple analgesic (painkiller drugs) measures, and other effective treatments include additional pharmacologic interventions, psychotherapy, cognitive and behavioral strategies, as well as neurosurgical or anesthetic procedures.[55]  For anyone who is dying in discomfort, it is also legal in all U.S. states to receive palliative sedation, whereby the dying person is sedated so discomfort is relieved during the dying process.  Physician-assisted suicide is not necessary to address end-of-life concerns about pain.

68.    Publicly reported data about end-of-life concerns from over 4,000 people who died by physician-assisted suicide in Oregon and Washington show that people overwhelmingly request assisted suicide out of fear, anxiousness, and/or sadness about living as a disabled person without necessary supportive services

---

[54] Judith Ahronheim & Doron Weber, FINAL PASSAGES: POSITIVE CHOICES FOR THE DYING AND THEIR LOVED ONES 102 (Simon & Schuster 1992).

[55] Block & Billings, *supra* note 3, at 447.

and/or accommodations.[56]  For Oregonians who died from physician-assisted suicide, over 90% cited loss of autonomy and the loss of ability to engage in activities that make life enjoyable, and over 70% cited loss of dignity.  Just over a quarter of people cited pain or concerns about future pain.[57]  Washington's data show similar end-of-life concerns about losing autonomy (87%), losing ability to engage in activities that make life enjoyable (86%), and loss of dignity (71%) predominating.  Fewer than four in ten people cited concerns about actual or anticipated pain.[58]  These data confirm that most people who request physician-assisted suicide require are fearful of and require assistance in living with their terminal disability—that is, for help in dealing with the depression, anxiety, grief, dependence, lack of control, and fear about physical suffering that are attendant to living with a terminal disability, especially when there are inadequate care options.[59]

69.     One well-worn expression among many who contemplate the need for end-of-life care is:  "I don't want someone else wiping my ass."  But an even more common and pressing concern is whether a person with a terminal disability has reliable in-home care to assist with toileting in the first place, so that the person is not forced to choose between laying for hours in a soiled bed or risking a fall to get to the toilet.  The everyday tasks associated with living, like meal preparation, taking one's meds, going to the bathroom, and bathing necessarily depend on the assistance of others.  Fears about control, personal privacy, and insecurity are common among people who transition from full to partial independence.  But the

---

[56] Oregon and Washington's physician-assisted suicide laws require such reporting; California's EOLOA does not.

[57] Or. Health Auth., OREGON DEATH WITH DIGNITY ACT: 2021 DATA SUMMARY 13 (2022) ("Oregon 2021 Data Summary"), https://www.oregon.gov/oha/PH/PROVIDERPARTNERRESOURCES/EVALUATIONRESEARCH/DEATHWITHDIGNITYACT/Documents/year24.pdf.

[58] *Id*.

[59] Block & Billings, *supra* note 3.

uneasiness about *all* of the above reported end-of-life concerns are quite familiar to people with disabilities, who are better able to cope with and manage such concerns when provided access to adequate supportive services and accommodations, mental health care, and counseling—even as they approach the end of their lives.  When the physical and psychological needs underlying requests for physician-assisted suicide are addressed, the desire for death diminishes or goes away all together.[60]

## III.    EOLOA Targets People with Disabilities for Death and Stigmatization

### A.    The Individual Plaintiffs, Constituents of the Organizational Plaintiffs, and People With "Terminal Diseases" Are All People with Disabilities Who Are Entitled to Protection Under the ADA and the Rehab Act

70.    Plaintiffs Lonnie VanHook and Ingrid Tischer are people with disabilities.  Plaintiffs United Spinal and CALIF are organizations whose members and constituents include people with disabilities.  United Spinal, CALIF, NDY and IPR perform work on behalf of people with disabilities.

71.    All people in California who qualify for EOLOA by having a "terminal disease" have—by definition—conditions[61] that qualify as disabilities under the ADA and the Section 504.  Under EOLOA, "terminal disease"[62] means "an incurable and irreversible disease that has been medically confirmed and will, within

---

[60] Hendin, *supra* note 4.

[61] CDPH, CALIFORNIA END OF LIFE OPTION ACT 2021 DATA REPORT (2022) ("Cal. 2021 Data Report"), at 5-6, https://www.cdph.ca.gov/Programs/CHSI/CDPH%20Document%20Library/CDPH_End_of_Life%20_Option_Act_Report_2021_FINAL.pdf. (The major categories of underlying diseases associated with those who died pursuant to the Act in 2021 were documented as:  cancer (66.0 percent), neurological diseases (13.2 percent), cardiovascular diseases (8.4 percent), respiratory diseases (non-cancer; 6.6 percent), and other diseases (5.8 percent).  The "other diseases" were documented as: kidney disease (2.1 percent); endocrine, nutritional, and metabolic disease (1.4 percent); immune mediated disease (0.6 percent); cerebrovascular disease (0.4 percent); and other (1.2 percent).).

[62] Plaintiffs use "terminal disease" and "terminal illness" interchangeably throughout this Complaint.

reasonable medical judgment, result in death within six months."[63]  All "terminal

diseases" under EOLOA are also disabilities under the ADA and Section 504

because they are physical impairments that substantially limit major life activities

including operation of major bodily functions, including but not limited to, functions

of the immune system, normal cell growth, digestive, bowel, bladder, neurological,

brain, respiratory, circulatory, endocrine, and reproductive functions.[64]  These

conditions also substantially limit people in other major life activities including

caring for oneself, performing manual tasks, eating, sleeping, walking, and

breathing.[65]  EOLOA is thus available only to people with disabilities.

### B. Physician-Assisted Suicide Laws Are Grounded in a Sordid Legal Framework of Eugenic Discrimination Against People with Disabilities

72.    EOLOA is situated within this country's long history of using the

power of the State and its law-making powers to discriminate against people with

disabilities in the health care arena.  The late 19th and first part of the 20th Century

saw the rise of the eugenics movement in the United States, which argued that

reproduction by people with disabilities would ruin the species and advocated for

their sterilization.[66]  From 1909 through 1979, over 20,000 people were forcibly

sterilized under California's eugenics laws—the majority of whom were Black,

Indigenous, other people of color, and/or with disabilities—most of whom lived in

state-run hospitals, homes, and institutions.[67]  Even after California repealed its

---

[63] Cal. Health & Safety Code § 443.1(r).

[64] 42 U.S.C § 12102(2)(B).

[65] 42 U.S.C § 12102(A).

[66] *See* Robyn M. Powell & Michael Ashley Stein, *Persons with Disabilities and Their Sexual, Reproductive, and Parenting Rights: An International and Comparative Analysis*, 11 FRONT. L. CHINA 53, 60–68 (2016) (explaining the ways in which restrictions on sexual, reproductive, and parenting rights for people with disabilities have evolved over time and across jurisdictions).

[67] Derek Hawkins, *California Once Forcibly Sterilized People by the Thousands.*

compulsory sterilization laws in 1979, nearly 1,400 sterilizations were performed from 1997 to 2013 by State prison doctors.[68]

73.     The same rationale and arguments used to advocate for forced sterilization were deployed in support of this country's euthanasia movement, with highly influential leaders publicly endorsing schemes to euthanize "diseased," "deformed and deficient" "unproductive members" of society."[69]  For example, Stanford University's founding president, David Starr Jordan, wrote that "a race of men or a herd of cattle are governed by the same laws of selection.  Those who survive inherit the traits of their own actual ancestry.  If we sell or destroy the rough, lean or feeble calves, we shall have a herd descended from the best."[70]

74.     The earliest American proposals to legalize euthanasia did not succeed. In 1906, Ohio and Iowa lawmakers introduced legislation "based upon an individual rights platform permitting those suffering from a terminal illness or extreme pain to end life, provided that the decision was voluntary and competent."[71]  Other

_____

*Now the Victims May Get Reparations,* WASH. POST (Jul. 9, 2021, 6:24 PM), https://www.washingtonpost.com/nation/2021/07/09/california-once-forcibly-sterilized-people-by-thousands-now-victims-may-get-reparations/; *California Launches Program to Compensate Survivors of State-Sponsored Sterilization,* OFFICE OF GOVERNOR GAVIN NEWSOM (Dec. 31, 2021), https://www.gov.ca.gov/2021/12/31/california-launches-program-to-compensate-survivors-of-state-sponsored-sterilization/.

[68] Shilpa Jindia, *Belly of the Beast: California's Dark History of Forced Sterilizations,* GUARDIAN (Wash.) (Jun. 30, 2020, 6:00 AM), https://www.theguardian.com/us-news/2020/jun/30/california-prisons-forced-sterilizations-belly-beast.

[69] Neil M. Gorsuch, THE FUTURE OF ASSISTED SUICIDE AND EUTHANASIA 34-5 (Princeton U. Press 2006).

[70] Claire Wang, *Stanford's History With Eugenics*, THE STANFORD DAILY (Dec. 7, 2016, 2:52 PM), https://stanforddaily.com/2016/12/07/stanfords-history-with-eugenics/.

[71] Helen Y. Chang, *A Brief History of Anglo-Western Suicide: From Legal Wrong to Civil Right,* 46 S.U. L. REV. 150, 181-2 (2018), https://digitalcommons.law.ggu.edu/cgi/viewcontent.cgi?article=1854&context=pubs.

1   unsuccessful legislative attempts to legalize euthanasia took place throughout the

2   country, including in Nebraska and New York in the 1930s.[72]  In 1931, the Illinois

3   Homeopathic Medical Association argued in support of euthanasia for "imbeciles

4   and sufferers from incurable diseases."[73]

5   **C.     The ADA and Section 504 Prohibit Public Entities from Excluding
        Persons with Disabilities from Public Services**

6

7       75.     Responding to the long history of discrimination against people with

8   disabilities, Congress enacted Section 504 in 1974 and the ADA in 1990 to provide

9   "a clear and national mandate for the elimination of discrimination" based on

10  disability.  42 U.S.C. § 12101(b)(1).  The ADA prohibits public entities from

11  excluding persons with disabilities from the receipt of public services and benefits

12  from governmental agencies and medical providers (both public and private), and

13  requires that health care providers provide full and equal access to health care

14  services for people with disabilities.  *See* 42 U.S.C. §§ 12132 and 12182; 28 C.F.R.

15  §§ 35.130(b) and 36.202(b) and (c).

16      76.     Title II of the ADA represents Congress' attempt to apply this "clear

17  and comprehensive national mandate" to the "services, programs, or activities," 42

18  U.S.C. § 12132, of "any State or local government" and "any department,

19  agency, … or other instrumentality of a State."  Title II of the ADA applies "to

20  anything a public entity does [and] is not limited to 'Executive' agencies, but

21  includes activities of the legislative and judicial branches of State and local

22  governments.  All governmental activities of public entities are covered, even if they

23  are carried out by contractors."  28 C.F.R. App'x B to Part 35 at § 35.102.

24

25  [72] Derrick A. Carter, *Knight in the Duel with Death: Physician Assisted Suicide and
    the Medical Necessity Defense*, 41 Vill. L. Rev. 663, 680 (1996),
26  https://digitalcommons.law.villanova.edu/cgi/viewcontent.cgi?referer=&ttpsredir=1
    &article=2963&context=vlr.

27  [73] *Death for Insane and Incurable Urged by Illinois Homeopaths*, N.Y. Times,
28  May 9, 1931, at 4.

1   Section 504 applies to any program or activity that receives federal funds.  EOLOA

2   conflicts with and is preempted by federal disability law.

3         **D.    Medical Bias Against People with Disabilities Remains Pervasive**

4         77.    Contemporary studies show that, even after the passage of the

5   Section 504 and ADA, many American physicians continue to have negative

6   perceptions of people with disabilities, and that this bias affects all sorts of health

7   care decisions that lead to broad disparities in treatment and outcomes.  A 2021

8   Harvard Medical School survey of practicing physicians nationwide revealed that

9   82% reported that people with significant disability have a worse quality of life than

10  non-disabled people.[74]  This is in stark contrast to the views of people with

11  disabilities themselves; over half of whom rate their quality of life as good or

12  excellent.[75]  Only 41% of physicians surveyed in 2021 were very confident about

13  their ability to provide the same quality of care to people with disabilities, and

14  barely half of those surveyed strongly agreed that they welcomed people with

15  disability into their practices.[76]  Another study published in 2022 found that

16  "physicians' bias and general reluctance to care for people with disabilities play a

17  role in perpetuating the health care disparities they experience."[77]  People with

18  multiple disabilities face additional levels of bias from their providers.

19        78.    Medico-legal bias against people with disabilities became widely

20  visible in 2020, when the implementation of health care rationing systems in

21

22  _____

23  [74] *See* Lisa I. Iezzoni, et al., *Physicians' Perceptions of People With Disability and Their Health Care*, 40 HEALTH AFF. (Millwood) 297 (2021),
    https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8722582/pdf/nihms-1763873.pdf.

24  [75] *Id.*

25  [76] *Id.*

26  [77] Tara Lagu, Carol Haywood, Kimberly Reimold, Christene DeJong, Robin Walker
27  Sterling, & Lisa I. Iezzoni, *"I Am Not The Doctor For You": Physicians' Attitudes About Caring For People With Disabilities*, 41 HEALTH AFF. (Millwood) 1387,
28  1387 (2022),  https://www.healthaffairs.org/doi/epdf/10.1377/hlthaff.2022.00475.

response to the COVID-19 pandemic showed that doctors explicitly prioritized the lives of people without disabilities for access to ventilators and other critical care.[78]

79.     Plaintiff Ingrid Tischer experienced firsthand medical bias based on her disabilities and the related pressure to forgo life-sustaining medical care.  In January 2021, Ms. Tischer went to the emergency room, where she was admitted to the hospital for a six-day stay.  She was diagnosed with pneumonia, put on antibiotics, and placed on a breathing machine.  When she was offered a consultation with a psychiatrist, she accepted it and the consultation resulted in a diagnosis of depression and anxiety, and a treatment plan that included psychiatric medication, psychosocial therapy, and meeting with a social worker.  Her mental health status was documented.  Concerned about her rapid muscular deterioration, Ms. Tischer asked the neurologist about participating in an in-patient rehabilitation program, the neurologist responded that the facility would not take patients with progressive disabling conditions like hers because the admitting criteria required a likelihood that the patient would regain their original baseline.  When Ms. Tischer asked if this was not exclusionary of people like her, the neurologist replied it was not discriminatory, it was simply the program's admission policy.  She asked why the criteria would not simply be an ability to work toward the best health possible.  The neurologist gestured toward her body and responded that Ms. Tischer must have always known that death was just around the corner and "there's nothing we can really do about it."  Fortunately, Ms. Tischer proved the doctor wrong.  While she ultimately recovered, she takes medication for anxiety and fears that she will once again find herself in the care of a doctor who refuses supportive services and instead

---

[78] Liz Essley Whyte, *State Policies May Send People With Disabilities to the Back of the Line for Ventilators*, CTR. PUB. INTEGRITY (Apr. 13, 2020), https://publicintegrity.org/health/coronavirus-and-inequality/state-policies-may-send-people-with-disabilities-to-the-back-of-the-line-for-ventilators/; *see also HHS-OCR Complaints Re COVID-19 Medical Discrimination*, THE ARC (Mar. 23, 2020), https://thearc.org/resource/hhs-ocr-complaint-of-disability-rights-washington-self-advocates-in-leadership-the-arc-of-the-united-states-and-ivanova-smith/.

steers her towards physician-assisted suicide as the solution to her medical needs.

**E.    Medical Bias Against People with Disabilities Intersects with Pre-Existing Bias in the Medical Profession Based on Race and Class**

80.    Physicians' bias against people with disabilities has long intersected with medical bias based on race and ethnicity, and healthcare disparities by race/ethnicity remain widespread.[79]  It is well known that throughout U.S. history, Black Americans have been disproportionately subject to unethical medical experiments by government officials, including exposure to untested pharmaceuticals, forced anatomical investigations, and radiation of unsuspecting victims.[80]  Contemporary research shows that racist health care policies and practices continue to result in widespread disparities in access to care and health outcomes.  A March 15, 2023 study published by the Kaiser Family Foundation "found that Black, Hispanic, and [American Indian and Alaska Native] people fared worse than White people across the majority of examined measures of health and health care and social determinants of health."[81]

81.    Current medical studies also show that medical providers are less likely to discuss end-of-life treatment preferences with historically underrepresented

---

[79] NAT'L COUNCIL ON DISABILITY, THE DANGER OF ASSISTED SUICIDE LAWS: PART OF THE BIOETHICS AND DISABILITY SERIES (Oct. 9, 2019, Letter of Transmittal) ("NCD Report"), at 48, https://ncd.gov/sites/default/files/NCD_Assisted_Suicide_Report_508.pdf (citing Lydia S. Dugdale, Opinion Contributor, *Will Black Lives Still Matter to Death with Dignity Act?*, THE HILL (Jan. 23, 2017, 5:20 p.m.), https://thehill.com/blogs/pundits-blog/healthcare/315731-will-black-lives-matter-to-death-with-dignity-act ).

[80] *See generally* Harriet Washington, MEDICAL APARTHEID: THE DARK HISTORY OF MEDICAL EXPERIMENTATION ON BLACK AMERICANS FROM COLONIAL TIMES TO THE PRESENT (Doubleday 2006); Jean Heller, *Syphilis Victims in U.S. Study Went Untreated for 40 Years*, N.Y. TIMES, Jul. 26, 1972, at 1, 8, https://www.nytimes.com/1972/07/26/archives/syphilis-victims-in-us-study-went-untreated-for-40-years-syphilis.html.

[81] Latoya Hill, Nambi Ndugga, & Samantha Artiga, *Key Data on Health and Health Care by Race and Ethnicity*, KAISER FAMILY FOUNDATION, Mar. 15, 2023, https://www.kff.org/report-section/key-data-on-health-and-health-care-by-race-ethnicity-report/.

groups.[82]  Research has documented the "barriers to palliative/hospice care utilization" that Black, Asian, and Hispanic persons regularly experience as a result of racist medical policies and practices.[83]  A 2016 JAMA Internal Medicine study found that hospice patients were less likely to be visited by staff in their last two days of life if they were Black.[84]  California nursing facilities with higher numbers of Black and Latino residents have "had higher rates of death."[85]

82.    The intersection of medical bias against people of color with disabilities is seen in the death of Michael Hickson, a 46-year-old Black father who lived with a brain injury, quadriplegia, and cortical blindness.  After contracting COVID-19 in a nursing facility, he was transferred to a hospital for treatment.[86]  Mr. Hickson's hospital medical team precipitated his death by discontinuing medical treatment, hydration, and nutrition—over the objection of his wife.  The attending physician explained to his wife that the decision to end treatment was

---

[82] Donna P. Mayeda & Katherine T. Ward. Methods for Overcoming Barriers in Palliative Care for Ethnic/Racial Minorities: A Systematic Review. 17 PALLIATIVE AND SUPPORTIVE CARE 697 (2019), https://www.cambridge.org/core/journals/palliative-and-supportive-care/article/abs/methods-for-overcoming-barriers-in-palliative-care-for-ethnicracial-minorities-a-systematic-review/EF5A6154814F5472CE8A3F3DAFC4692F.

[83] Jyotsana Parajuli, Aluem Tark, Ying-Ling Jao, & Judith Hupcey, Barriers to Palliative and Hospice Care Utilization in Older Adults with Cancer: A Systematic Review, 11 J. GERIATRIC ONCOLOGY 8, 13 (2020), https://www.geriatriconcology.net/action/showPdf?pii=S1879-4068%2819%2930238-3.

[84] Joan M. Teno,, Mike Plotzke,, Thomas Christian, et al,, Examining Variation in Hospice Visits by Professional Staff in the Last 2 Days of Life. 176 JAMA INTERN. MED. 364 (2016), https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2488922.

[85] Letter from Members of Congress to Cal. Dep't Health Care Servs., Comment re: California's 2022 – 2026 Renewal of the Home & Community-Based Alternatives Waiver, https://barragan.house.gov/wp-content/uploads/2021/09/HCBA-Comments-Letter-Final-09-16-21.pdf.

[86] Bazelon Ctr. for Mental Health Law, EXAMINING HOW CRISIS STANDARDS OF CARE MAY LEAD TO INTERSECTIONAL MEDICAL DISCRIMINATION AGAINST COVID-19 PATIENTS 2 (2021), http://www.bazelon.org/wp-content/uploads/2021/02/FINAL-Intersectional-Guide-Crisis-Care-PDF.pdf.

based on the doctor's evaluation that Mr. Hickson did not "have much of" a quality of life due to his pre-existing paralysis and brain injury.[87]

83.     Plaintiff Lonnie VanHook, an African American male with multiple disabilities including quadriplegia, has experienced discrimination by several of his providers, who have opined that his quality of life is low and questioned whether he would be better off dead than alive.  People of color, especially those who are financially challenged, are more likely to be steered towards physician-assisted suicide by their providers, who may view their lives as less worthy of preservation due to the combined forces of racism and ableism.

**F.     EOLOA Advances the Idea that Disabled Lives Are Not Worth Living**

84.     Physician-assisted suicide laws are based on ableist stereotypes, implicit biases, and long-held fears about living with disability as well as the false idea that it is rational for disabled persons to want to end their own lives.  These misleading tropes are glorified in Hollywood movies like *Me Before You* and *Million Dollar Baby*, where the protagonist is portrayed heroically for choosing to be euthanized rather than live with their disability.

85.     In contrast to fictionalized stories, actual surveys about public support for physician-assisted suicide laws show that "support is weakest among groups who express concerns about being pressured to die (i.e., older adults, people with disabilities, people with less education, women, and racial and ethnic minorities)."[88] Every prominent national disability rights organization that has taken a position on assisted suicide has opposed it.  Additionally, the National Council on Disability

---

[87] Kim Roberts, *Austin Hospital Withheld Treatment from Disabled Man Who Contracted Coronavirus,* THE TEXAN (Jun. 29, 2020), https://thetexan.news/austin-hospital-withheld-treatment-from-disabled-man-who-contracted-coronavirus/.

[88] *Resolution on Assisted Dying,* AM. PSYCH. ASS'N (Aug. 2017), https://www.apa.org/about/policy/assisted-dying-resolution.

("NCD")—an independent, bi-partisan federal agency that makes recommendations to the President and Congress in order to enhance the quality of life for all Americans with disabilities and their families—"has long opposed assisted suicide laws."[89]  NCD's 2019 report "The Danger of Assisted Suicide Laws," concluded that assisted suicide laws "create a deadly mix that poses multifaceted risks and dangers to people with disabilities as well as people in other vulnerable constituencies."[90]  Over the strong opposition of those most likely to die under physician-assisted suicide laws, EOLOA sends the stigmatizing message that society should endorse and even elevate suicide when the person has a terminal disability.

86.    As discussed further in Sections V and VI, EOLOA unlawfully discriminates against and deprives people with terminal disabilities of protections afforded to other persons under California law, in violation of the ADA and Section 504.

## IV.   EOLOA Draws an Irrational Distinction Between People with Terminal Disabilities and Everyone Else, Including People with Other Disabilities and People without Disabilities

### A.   There Is No Rational Basis for the Act's "Terminally Disease" Classification

87.    The "author's statement" to EOLOA provides that "how each of us spends the end of our lives is a deeply personal decision.  That decision should remain with the individual, as a matter of personal freedom and liberty, without criminalizing those who help to honor our wishes and ease our suffering."[91]  None of these justifications for physician-assisted suicide are rationally related to a

---

[89] NCD Report, *supra* note 79 (Letter of Transmittal).

[90] *Id.* at 16.

[91] Sen. Rules Comm., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill 15 (2015-2016 2d Ex. Sess.), as amended Sept. 10, 2015, https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201520162AB15#.

governmental purpose, especially where the discriminatory distinction between who may and may not be assisted to die implicates the fundamental right to live.

88. To be sure, all Californians will die. EOLOA does not grant all Californians the freedom and liberty to die by physician-assisted suicide, and there is no rational relationship in the Act between autonomy and certain physical disabilities with unreliable prognoses. The only other justification proffered by the law's author is to ease suffering. But the fit between suffering and those with terminal disabilities is also attenuated and loose. Only a minority of people eligible to participate in EOLOA cite suffering from pain or even have a concern about it. Many non-terminal people suffer from pain but are ineligible for physician-assisted suicide under the Act. Likewise, many non-terminal people experience existential suffering from losing autonomy, feeling a loss of dignity, losing control of bodily functions, becoming a burden on caregivers, and/or the financial costs associated with continued living—but are nevertheless ineligible to participate in EOLOA.

89. The Act treats differently people with terminal disabilities as compared to everyone else that expresses a wish to die to their medical doctor (including people with psychiatric and other disabilities as well as people without disabilities). This distinction is arbitrary and irrational because all groups include people who want to, and do, take their own lives. The Act does not reasonably advance its claimed purposes of enabling autonomous choices in dying and relieving suffering.

90. Some people with terminal disabilities have impaired judgment and yet express a wish to die. Their status is incompatible with autonomy and personal decision-making. When people with terminal disabilities are provided lethal drugs, there is a potential for exposing individuals to life-threatening mistakes and abuses. EOLOA fails to contain safeguards sufficient to justify treating people with terminal disabilities differently than others. As discussed further below and in Sections V and VI, EOLOA violates the rights of people with terminal disabilities to equal protection under the law.

[4276502.1]                    42
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**B.    EOLOA's Definition of "Terminal Disease" Includes People with Terminal Disabilities Who Can Live for Years with Adequate Treatments and Supports**

91.    EOLOA also contains an overly-broad definition of "terminal disease" such that a person may be diagnosed with a terminal disease even if the person's disability can be adequately managed for years with appropriate care and/or supports.  In determining whether a person's condition meets the definition of "terminal disease," EOLOA has no requirement that the attending or consulting physician consider the effect of treatments, counseling, or other supports on survival rates.  People who would otherwise survive beyond six months if provided treatment or other supportive services are still eligible for physician-assisted suicide regardless of whether those treatments or supports are denied by their insurance company, refused, or otherwise not available.  The relevant inquiry under the Act is: should the disease take its course, *absent further treatment or supportive services*, is the person likely to die within six months?

92.    California doctors prescribe physician-assisted suicide drugs to patients who opt to forgo chemotherapy, even though *with* treatment they may live for years. Similarly, conditions that would not otherwise be considered "terminal" with treatment—such as spinal cord injuries, diabetes, complications from falls, hernias, and kidney disorders requiring dialysis—can and do qualify for assisted suicide. People with anorexia have already died by physician-assisted suicide in the United States.[92]  It is contrary to reasoned medical judgment and the standard of care in California to facilitate the suicide of a person who can live a normal life span with medical treatment and supports.

**C.    Terminal Prognoses Are Arbitrary, Uncertain, and Often Wrong**

93.    The six-month survival estimate embodied in EOLOA's definition of

---

[92] Jennifer L. Gaudiani, Alyssa Bogetz, & Joel Yager, *Terminal Anorexia Nervosa: Three Cases and Proposed Clinical Characteristics*.  10 J. EAT. DISORD. 23 (2022). https://jeatdisord.biomedcentral.com/articles/10.1186/s40337-022-00548-3.

"terminal disease" is not rationally related to the Act's stated purposes of reducing suffering.[93]  There is no connection between suffering and the six-month mark. Palliative care and pain control do not stop working six months before death.  In addition, people without a terminal disease also can suffer from pain.

94.     EOLOA's six-month criteria was selected for the sole reason that it mirrors the federal six-month standard for hospice care coverage under Medicare and Medi-Cal, which is purely a cost-reduction measure intended to cap the time a person can spend in hospice.  The six-month hospice criteria is inherently uncertain and subject to error.[94]  One study published in JAMA found that 75% of hospitalized persons with hospice-eligible prognoses survived longer than six months after hospital discharge.[95]  Californians regularly outlive six-month prognoses, and either have their hospice stays re-certified or leave to resume treatment.[96]  EOLOA contains no criteria, guidance, or assurances to make the six-month prognosis any more accurate than it is in the hospice context.  Because EOLOA is limited to physical disabilities that will result in death within six months, it makes an irrational distinction between physical disabilities that will most certainly cause death in any longer period, like eight months or a year.

95.     Physicians are not trained, equipped, or otherwise capable of predicting

---

[93] EOLOA's use of the term "suffering" is assumed to mean untreatable pain given that the Act does not require evaluation or treatment of a patient's psychological suffering.

[94] NCD Report, *supra* note 79, at 21-3 (citing Nina Shapiro, *Terminal Uncertainty*, SEATTLE WEEKLY, Jan. 14, 2009, reprinted at https://dredf.org/wp-content/uploads/2012/08/Terminal-Uncertainty.pdf).

[95] Ellen Fox et al., *Evaluation of Prognostic Criteria for Determining Hospice Eligibility in Patients With Advanced Lung, Heart, or Liver Disease*, 282 JAMA. 1638 (1999). https://jamanetwork.com/journals/jama/fullarticle/192058.

[96] Auditor of State of Cal., CALIFORNIA HOSPICE LICENSURE AND OVERSIGHT (2022) ("State Auditor Report 2022"), at 25 (finding 51% of hospice patients in Van Nuys receive a live discharge and 46% of patients in North Hollywood), https://www.auditor.ca.gov/pdfs/reports/2021-123.pdf.

with a high degree of reliability, that a particular person with a particular condition will certainly die within six months.  The overwhelming research and clinical information demonstrates that the timing of death is inherently unpredictable, that physicians are not particularly good prognosticators, and that any such prediction is deeply tainted by impermissible stereotypes, discriminatory biases, and structural racism.  A mistakenly grim prognosis may drive people to physician-assisted suicide when they could otherwise live long lives with (or without) treatment.  Spinal cord injury survivors are at times suicidal following their injury and qualify as "terminal" because their injury will often result in death without surgery and/or supportive services—but they can and do live long, happy lives.  Inaccurate end-of-life predictions are common.  For example:

      a.     In 2012, Stephanie Packer, a Californian mother of four, was diagnosed with scleroderma and pulmonary fibrosis.  She qualified for and had been enrolled in hospice a number of times.  Ms. Packer's insurance company told her it would not cover her chemotherapy but would cover lethal physician-assisted suicide drugs.  Ms. Packer refused physician-assisted suicide and became an advocate against such laws.[97]  On information and belief, she is still alive.

      b.     Laurie Hoirup, a California woman with a life-long disability of spinal muscular atrophy, "survived *by decades* several terminal prognoses given to her by physicians over the course of her life, including one that she would never reach adulthood ….  Ms. Hoirup finally died at the age of 60 from accidental causes."[98]

      c.     In 2000, Michael Freeland was living in Oregon and was diagnosed with lung cancer.  Mr. Freeland had a 43-year medical history of

---

[97] Adam Wesselinoff, *Go Away and Die: Message Received by Stephanie Packer* CATHOLIC WEEKLY (Nov. 18, 2021), https://www.catholicweekly.com.au/go-away-and-die-message-received-by-stephanie-packer/.

[98] *Id.* at 22 (emphasis added).

significant depression and suicide attempts when he requested physician-assisted suicide.  He was prescribed lethal drugs without any psychological evaluation. Ultimately, Mr. Freeland obtained supportive services through a non-profit organization that arranged for medication to treat his depression and physical pain. He subsequently reconciled with his estranged daughter and died of natural causes two years after his initial terminal prognosis.[99]

        d.     Plaintiff Ingrid Tischer and activist/author Alice Wong were both told as children that they would not live beyond 40 and 30 years of age, respectively.  They are both living well over a decade past their childhood prognoses.

## V. Defendants Deny People with Terminal Disabilities Equal Access to State-Based Programs and Services, in Violation of the ADA, Section 504, and Equal Protection Clause

### A. Defendant State Agencies and Officials Administer Suicide Prevention Programs and Services from Which They Exclude People Who Seek Physician-Assisted Suicide on the Basis of Their Terminal Disabilities

#### 1. California Operates Suicide Prevention Programs and Services

96.    Defendant MHSOAC developed California's Strategic Plan for Suicide Prevention 2020-2025 ("Strategic Plan"), which strives for the "elimination of suicide in California," and states that "[o]ne life lost to suicide is one too many."[100] Consistent with literature concerning suicidal thoughts among terminally ill individuals, the Strategic Plan recognizes that "crises involving suicidal behavior tend to be transient, and characterized by extreme ambivalence about the wish to die

---

[99] NCD Report, *supra* note 79, at 23-24; *see also* Wesley J. Smith, Charlotte Lozier Inst., ASSISTED SUICIDE IS NOT COMPASSION, at 11 (Apr. 2015), https://lozierinstitute.org/wp-content/uploads/2015/04/American-Reports-Series-Assisted-Suicide-Is-Not-Compassion-WSmith-April-20151.pdf.

[100] California's Strategic Plan, *supra* note 17, at 13.

or stay alive."[101]  The Strategic Plan advises that "suicide risk factors" include "[u]nmet acute or persistent physical health and behavioral health needs, including chronic pain [and] disability," as well as "mood disorders, such as depression; medical illness; and access to the methods to attempt suicide."[102]  These risk factors are common among people who qualify for EOLOA.

97.    California recognizes that "access to effective medical and mental health care" reduces the risk for suicide.[103]  California's Strategic Plan calls for practices and services such as:  (1) lethal means restriction, (2) depression screening and treatment, (3) collaborative interventions with older adults experiencing depression, (4) provider education on risk and protective factors, and (5) expansion of data collection and recording.[104]

98.    Defendant CDPH receives federal funds to administer suicide prevention initiatives in California.[105]  Defendant CDHCS is responsible for providing suicide prevention services, including by providing resources to counties for suicide prevention trainings and programs as well as by connecting individuals in crisis to immediate assistance.[106]  CDPH's Office of Suicide Prevention supports and facilitates suicide prevention activities throughout California, including services targeted to older adults dealing with suicidal ideation and depression.[107]

---

[101] *Id.* at 48.

[102] *Id.* at 9, 58.

[103] *Id.* at 9.

[104] *Id.*

[105] *See, e.g., Comprehensive Suicide Prevention,* Funded Programs, CDC, https://www.cdc.gov/suicide/programs/csp/index.html (Jan. 4, 2023).

[106] *See, e.g.,* CDHCS, *Suicide Prevention* (2020), https://www.dhcs.ca.gov/Documents/CSD_YV/Youth%20Services%20Section%20Suicide%20Prevention/DHCS-Suicide-Prevention-Fact-Sheet.pdf.

[107] *Comprehensive Suicide Prevention (CSP) Program,* Injury and Violence Prevention (IVP) Branch, CDPH,

99.    California law mandates that people who are an imminent danger to themselves are connected to mental health services.  Under Welfare & Institutions Code section 5150, law enforcement officers and mental health professionals can place a suicidal person on an emergency 72-hour hold if, due to a mental illness, the person is determined to pose a danger to themself.[108]  During this 72-hour period, the person may be taken into custody "for assessment, evaluation, and crisis intervention, or placement for evaluation and treatment" in a hospital or other health care facility.[109]  If mental health professionals determine that the person needs additional treatment because the individual is unwilling or unable to accept voluntary treatment, the hold may be extended for up to 14 days.[110]

100.   All of the above are programs, services, and/or activities subject to the ADA and Section 504.

### 2.    EOLOA Denies People with Terminal Disabilities the Equal Benefit of Suicide Prevention Programs and Services

101.   When a person in California who does not have terminal disabilities expresses suicidal intentions to a physician, the standard of care requires the above suicide prevention programs, services, and/or activities to be made available to the person.  If that person does not pursue those resources and maintains an interest in

---

https://www.cdph.ca.gov/Programs/CCDPHP/DCDIC/SACB/Pages/Comprehensive-Suicide-Prevention-(CSP).aspx (Aug. 9, 2022); Deborah M. Stone, et al., Nat'l Ctr. Injury Prev. Control, CDC. PREVENTING SUICIDE: A TECHNICAL PACKAGE OF POLICIES, PROGRAMS, AND PRACTICES (2017), https://stacks.cdc.gov/view/cdc/44275; CDPH, *Older Adult Suicide in California in 2019* (2022), https://www.cdph.ca.gov/Programs/CCDPHP/DCDIC/SACB/CDPH%20Document%20Library/Suicide%20Prevention%20Program/OlderAdultSuicideCADataBrief_2019.pdf.

[108] 5150 holds are not voluntary, comprehensive, community-based, recovery-oriented, and culturally and linguistically competent mental health treatment and services which have a track record of helping people overcome suicidal behaviors.

[109] Cal. Welf. & Inst. Code § 5150(a).

[110] Cal. Welf. & Inst. Code § 5250.

suicide, the person is neither offered assistance to complete the act nor left to their own devices. Instead, an entire system of prevention measures is deployed around the person including, if necessary, emergency behavioral health services and/or inpatient programs.

102. Defendant State agencies and officials are aware of the heightened risk factors associated when a person has a terminal disability and requests physician-assisted suicide—including that the person likely has depression that impairs the person's ability to make informed decisions—yet fail to ensure that the suicide prevention programs that they develop and administer are equally available to those individuals. Under EOLOA, Defendants permit the withholding of suicide prevention services and interventions when the person has a terminal disability. MHSOAC explicitly carves out physician-assisted suicide from the protection of its suicide prevention services. In a 2019 letter to the President of the United States, the National Council on Disability described this situation as "a double standard in suicide prevention efforts" given that people with terminal disabilities "are not referred for mental health treatment when seeking assisted suicide, while people without disabilities receive such referrals."[111]

103. By relegating people with terminal disabilities to a less effective, unequal, and separate program for people expressing suicidal ideation, EOLOA: (1) "den[ies] qualified individuals with disabilities the opportunity to participate in or benefit from" behavioral health programs, including suicide prevention, hospitalization, and medication services, in violation of 28 CFR 35.130(b)(1)(i); (2) afford[s] qualified individuals with disabilities an opportunity "that is not equal to that afforded others" or that is not as "effective in affording equal opportunity to … gain the same benefit … as that provided to others," in violation of 25 CFR 35.130(b)(1)(ii)-(iii); and (3) provide[s] "different or separate aids, benefits, or

---

[111] NCD Report, *supra* note 79.

services" to people with disabilities in a manner that does not "provide qualified individuals with disability with aids, benefits, or services that are as effective as those provided to others" in violation of 28 CFR 35.130 (b)(1)(iv).

### B. The Medical Board of California and its President Deny People With Terminal Disabilities the Medical Licensing and Regulatory Protections Available to Everyone Else in California

104.   The U.S. Supreme Court recognizes that the State "has an interest in protecting the integrity and ethics of the medical profession."[112]  Defendant MBC and MBC President Lawson protect health care consumers through the proper licensing and regulation of physicians and certain allied health care professionals through the vigorous, objective enforcement of the Medical Practice Act, as well as by ensuring quality medical care through licensing and regulatory functions.  By law, the "highest priority" of the MBC in its regulatory and disciplinary functions is the "[p]rotection of the public."  Cal. Bus. & Prof. Code § 2001.1.  EOLOA, however, eliminates MBC's patient protections for people with terminal disabilities.

105.   The MBC is charged with enforcing the disciplinary and criminal provisions of the Medical Practice Act.  *See* Cal. Bus. & Prof. Code § 2004.  Where the MBC finds evidence of a violation of the Medical Practice Act warranting disciplinary action, the MBC forwards the case to Defendant Bonta's Office for proceedings.  A physician who is found guilty may face an array of consequences, including revocation of the physician's license by order of the MBC, temporary suspension of the physician's right to practice or placement on probation, a public reprimand, or any other action that the MBC or the hearing judge deems proper. Cal. Bus. & Prof. Code § 2227.

---

[112] *Glucksberg*, 521 U.S. at 731 (citing American Medical Association, Code of Ethics § 2.211 (1994) ("[p]hysician-assisted suicide is fundamentally incompatible with the physician's role as healer."); *see also* Council on Ethical and Judicial Affairs, *Decisions Near the End of Life*, 267 JAMA 2229, 2233 (1992) ("[T]he societal risks of involving physicians in medical interventions to cause patients' deaths is too great").

106.   The MBC is required to "take action against any licensee who is charged with unprofessional conduct." Cal. Bus. & Prof. Code § 2234.  This includes repeated acts of clearly excessive prescribing as well as prescribing or dispensing dangerous drugs without a medical indication. *Id.* §§ 2242, 725(a). Pursuant to these provisions, the MBC has historically disciplined doctors for prescribing excessive medications to patients at risk of suicide.  Certain acts, including excessive prescribing of dangerous drugs, can also be the basis for criminal liability. *Id.* § 725(b).  The MBC normally revokes the medical license of any physician who intentionally kills a patient, including where the physician prescribes drugs for the purpose of ending the patient's life.

107.   Under EOLOA, Plaintiffs and other individuals with terminal disabilities are denied the equal benefit of MBC's protections.  The Act prohibits the MBC from imposing any discipline on doctors who prescribe lethal drugs under EOLOA, even though the doctor knows that the patient is suicidal. *See* Cal. Health & Safety Code § 443.14(c).  Instead, EOLOA requires doctors to adhere to the standard of care only in "[m]aking an initial determination … that an individual has a terminal disease and informing him or her of the medical prognosis." *Id.* § 443.16(a)(1).  Once the person is identified as having a terminal disability, the disciplinary safeguards provided by the Medical Practice Act are eliminated.  After that point, doctors who follow EOLOA's minimal procedural requirements have total immunity from discipline. *Id.* § 443.14(c).

108.   Plaintiffs are informed and believe and on that basis allege that the MBC has not undertaken any investigations of complaints or conducted any disciplinary proceedings against a healthcare professional in California based on their prescribing of lethal medications pursuant to EOLOA.  On January 13, 2023, the MBC stated that it was in possession of no documents relating to any disciplinary proceedings regarding a healthcare professional's participation in activities under EOLOA.

109.   Additionally, people can normally contact the MBC to learn whether a doctor has been subject to charges or has had administrative-related action taken against them.  But this public benefit is not available to people looking for investigations and complaints regarding EOLOA.  The MBC will not provide such information.

### C.   Defendant Law Enforcement Agencies and Officers Deny People with Terminal Disabilities the Protection of California's Criminal Laws as Well as Civil Protections for the Elderly and Vulnerable

#### 1.   Criminal Laws Relating to Assisting Suicide Are Meant to Protect People

110.   Once illegal, suicide is now legal in all states.  The decriminalization of suicide occurred throughout the U.S. as society recognized the link between suicide and mental illness.[113]  Decriminalization of suicide reduces social stigma, helps remove barriers to obtaining adequate mental health care, increases access to emergency medical services, fosters suicide prevention activities, improves the well-being of people vulnerable to suicidal behaviors, and contributes to more accurate monitoring of suicidal behaviors.[114]

111.   Whereas taking one's own life was decriminalized to prevent suicide, the act of assisting suicide *is* criminalized in most states for the very same purpose of protecting those susceptible to suicide from completing the act.  Throughout the history of this nation, "we have directed the force of the criminal law against aiding or assisting suicide."[115]

---

[113] Yale Kamisar, *Are Laws against Assisted Suicide Unconstitutional?* 23 HASTINGS CTR. REP, 32, 32 (1993); Marzen, et al., *supra* note 38, at 99.

[114] Int'l Ass'n for Suicide Prevention (IASP), THE DECRIMINALISATION OF ATTEMPTED SUICIDE: POLICY POSITION STATEMENT (2020), https://www.iasp.info/wp-content/uploads/IASP-Decriminalisation-Policy-Position-Statement-GA.pdf.

[115] Kamisar, *supra* note 113, at 33; *see also Glucksberg*, 521 U.S. at 715 ("By the time the Fourteenth Amendment was ratified, it was a crime in most States to assist a suicide").

112.   Consent is no defense where the decedent may have requested the perpetrator's assistance.[116]   Commentary to the Model Penal Code explains that the interests in preserving life "that are represented by the criminal homicide laws are threatened by one who expresses a willingness to participate in taking the life of another, even though the act may be accomplished with the consent, or at the request, of the suicide victim."[117]   And until the passage of recent state laws permitting physician-assisted suicide, no law in this country pertaining to assisted suicide took into account the physical health of the decedent.[118]   Even after the enactment of state-based physician-assisted suicide statutes, the federal Assisted Suicide Funding Restriction Act prohibits the use of federal funds to pay, directly or indirectly, for "any health care item or service furnished for the purpose of causing, or for the purpose of assisting in causing, the death of any individual, such as by assisted suicide, euthanasia, or mercy killing."[119]

### 2.   EOLOA Denies the Protection of Criminal Laws From People with Terminal Disabilities

113.   Defendants Governor Newsom, Attorney General Bonta, the DA's Office, and DA Gascón are all responsible to ensure fair and equal enforcement of the law.   They fail to discharge this responsibility and deny this public benefit to individuals with terminal disabilities when they permit physicians to assist in suicides of people with impaired judgment without legal consequence.   EOLOA "utilize[s] criteria [and] methods of administration" in criminal law enforcement that

---

[116] Marzen, et al., *supra* note 38, at 78.

[117] *Glucksberg,* 521 U.S. at 716 (citing Model Penal Code § 210.5, Comment 5, p. 100 (Official Draft and Revised Comments 1980)).

[118] *Glucksberg*, 521 U.S. at 714-15; *see also, e.g.*, *People v. Roberts*, 178 N.W. 690, 692 (Mich. 1920) (holding that providing means of suicide to one's terminally ill wife is murder at common law).

[119] 42 U.S.C. § 14402(a)(1)-(3).

discriminate against individuals with disabilities and "defeat" "accomplishment of the objectives of" the criminal legal system with respect to such individuals.  28 C.F.R. § 35.130(b)(3)(i), (ii).  Law enforcement falls within the ambit of the ADA. *See* 28 C.F.R. § 42.540(j) ("benefit" includes "provision of services, financial aid, or disposition (i.e., handling, decision, sentencing, confinement, or other prescription of conduct)").

114.   Providing lethal drugs to a person with a life-threatening disease *was* a criminal offense for all California victims immediately prior to the enactment of EOLOA.  In 2015, after EOLOA was signed into law but before the law became effective, the California Court of Appeal held that "prescribing a lethal dose of drugs to a terminally ill patient with the knowledge the patient may use it to end [their] life goes beyond the mere giving of advice and encouragement and falls under the category of direct aiding and abetting." *Donorovich-Odonnell v. Harris*, 241 Cal. App. 4th 1118, 1129 (2015).

115.   EOLOA changed the law on June 9, 2016, adding subsection (b) to Penal Code Section 401, which now provides that "[a] person whose actions are compliant with the provisions of the End of Life Option Act [ ] shall not be prosecuted under this section."  Under the Act, "a health care provider or a health care entity shall not be subject" to any criminal sanction, penalty, other liability for participating in EOLOA.  Thus, Californian law still protects most people from doctors willing to prescribe lethal drugs—but not people with terminal disabilities.

116.   California criminal law contains many protections for older people, dependent adults, and persons with disabilities, stating that these individuals "deserve a special consideration and protection." Cal. Pen. Code § 368(a).  It is a crime, for example, to willfully cause or permit such individuals to suffer unjustifiable physical pain or mental suffering, or to be placed in a situation where their health is in danger. *Id*. § 368(b).  California's Elder Abuse and Dependent Adult Civil Protection Act ("The Elder Abuse Act"), Welf. & Inst. Code §§ 15600

*et seq*., makes it unlawful for caregivers to fail to report known or suspected incidents of abuse of older or dependent adults. But these laws, like the criminal law against aiding and abetting suicide, are not enforced by the law enforcement Defendants against doctors who prescribe physician-assisted suicide to people with terminal disabilities —even if their doctor prescribes drugs that result in a distressing or botched suicide attempt, or are ultimately administered by another person. EOLOA's broad exemption from criminal liability extends to all criminal laws so long as the physician complies with the Act's limited requirements.

117. Defendant Bonta's Office has an Elder Abuse Division that includes a Criminal Law Unit that investigates and prosecutes crimes against elders and dependent adults committed by employees in care facilities, including physical abuse and homicide. Defendant Bonta's Office also has a Facilities Enforcement Team that investigates and prosecutes owners and operators of nursing homes, hospitals, and residential care facilities for the elderly, for policies and/or practices that lead to poor quality of care. Upon information and belief, however, Defendant Bonta has not investigated or prosecuted anyone in connection with a death by lethal drugs made available pursuant to EOLOA, nor has his Office even considered bringing criminal charges for a death pursuant to EOLOA.

118. Defendants DA's Office and DA Gascón have a specialized division focused on elder abuse, which handles cases of physical abuse, emotional abuse, physical neglect, and financial abuse of victims 65 years and older. Upon information and belief, however, Defendants DA's Office and DA Gascón have not investigated or prosecuted anyone in connection with a death by lethal drugs made available pursuant to EOLOA, nor have they even considered bringing criminal charges against an individual in this context.

119. EOLOA shields assisted suicide even from investigation as to its possible misuse. By statute, information collected pursuant to the Act "shall not be disclosed, discoverable, or compelled to be produced in any civil, criminal,

administrative, or other proceeding."[120]  This provision effectively handcuffs law enforcement agencies, making it impossible to investigate and prosecute violations of the Act.  In this lax context, without any systematic investigation of accident or abuse, or even a way to report it, the examples of abuse that have come to light are likely only the tip of the iceberg.  On information and belief, the law enforcement Defendants have neither investigated nor prosecuted any medical professional for assisting a suicide pursuant to EOLOA.

### D.  EOLOA Denies People with Terminal Disabilities the Equal Benefit of Civil Laws Protecting Older People, People with Disabilities, and Suicidal People

120.  Physicians in California have a duty to provide health care that falls within what is known as the "standard of care."  California's civil jury instructions define the standard of care as the "level of skill, knowledge and care in diagnosis and treatment that other reasonably careful [physicians] would use in the same or similar circumstances."[121]  California's interests in protecting suicidal people is also reflected in part in its laws imposing duties of care on doctors who treat suicidal patients.  As explained in *Vistica v. Presbyterian Hospital and Medical Center*, 67 Cal. 2d 465 (1967) and *Meier v. Ross General Hospital*, 69 Cal. 2d 420 (1968), doctors who do not take reasonable precautions to prevent a patient's death by suicide may be civilly liable in an action for negligence or wrongful death.  *Meier* and *Vistica* both involved hospitalized patients; courts have since extended this duty to physician-patient relationships in outpatient settings as well.  *See, e.g.*, *Klein v. BIA Hotel Corp.*, 41 Cal. App. 4th 1133 (1996).  But under EOLOA, it is impossible to bring a successful negligence or wrongful death claim against a physician who failed to "provide appropriate treatment for potentially suicidal patients" where that

---

[120] Cal. Health & Safety Code § 443.19(a).

[121] Judicial Council of California Civil Jury Instructions (2022) No. 501, Standard of Care for Health Care Professionals, https://www.justia.com/trials-litigation/docs/caci/500/501/.

1   physician complied with EOLOA's minimal requirements.

2       121.   The Elder Abuse Act also permits private civil enforcement of laws that

3   protect against abuse and neglect of older or dependent adults.  EOLOA denies these

4   protections to patients solely on account of their terminal disability.[122]

5   **VI.   EOLOA Unlawfully Steers People with Terminal Disabilities Toward Suicide**

6

7       122.   In fair housing law, steering occurs where "real estate brokers and

8   agents preserve and encourage patterns of racial segregation in available housing by

9   steering members of racial and ethnic groups to buildings occupied primarily by

10  members of such racial and ethnic groups and away from buildings and

11  neighborhoods inhabited primarily by members of other races or groups." *Havens*

12  *Realty Corp. v. Coleman*, 455 U.S. 363, 366, n.1 (1982).  In a similar manner,

13  EOLOA unlawfully and irrationally discriminates by steering people with terminal

14  disabilities towards physician-assisted suicide and all others towards life-preserving

15  suicide treatment services.  This sorting of people by perceived physical health is

16  especially harmful because people with terminal disabilities are, at baseline,

17  substantially more likely to be suicidal than all other people.[123]

18      123.   Steering has the further effect of subjecting people with terminal

19  disabilities to coercion and undue influence—depriving individuals of a truly

20  voluntary and informed waiver of their right to live.  Likely under the influence of

21  depression and decreased decision-making capacity, a person evaluating physician-

22  assisted suicide may be highly influenced by others' opinions about whether they

23  should go forward with the act.  Insurers, hospitals, nursing homes, physicians, and

24  even family members all have their own perspectives and unique incentives that

25  inevitably help shape the person's ultimate decision.  People with terminal

26

27  [122] *See* Cal. Health & Safety Code § 443.14(d)(2).

28  [123] Wilson, et al., *supra* note 32.

[4276502.1]

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

disabilities are particularly susceptible to undue influence from these stakeholders, who may directly or indirectly pressure them to obtain physician-assisted suicide for the stakeholder's own convenience, financial gain, or other interest at odds with keeping the person alive.  In their administration and enforcement of EOLOA, Defendants subject only people with terminal illnesses to these coercive situations.

124.   In fair housing law, all steering is unlawful—even when it is well-intentioned.  The real estate agent who sincerely attempts to create a hospitable community by directing a non-English speaking family to an apartment building where they can communicate with neighbors in their native language is just as guilty of steering as the agent who invidiously segregates all prospective renters into different buildings in an effort to preserve racial purity.  Since EOLOA was enacted, the floodgates have opened for myriad influences to tip the balance in favor of using physician-assisted suicide.  Crucially, only people with terminal disabilities are subject to having their choice about suicide influenced—and even implemented—with the help of others.  The mere presence of the option invites steering.

A.     **Defendants' Failure to Provide Supportive Services Steers People with Terminal Disabilities Towards Physician-Assisted Suicide**

125.   Most people in the elder community will experience a chronic disability or disease at the end of their lives and require extra care to safely remain in their home.  But if that care is not made available and an individual's only alternatives to physician-assisted suicide are waiting for a nursing home placement, burned-out or unavailable family care, or suffering in isolation, assisted suicide can become a preferable option.  That is what happened when Plaintiffs Ms. Tischer and Mr. VanHook experienced medical crises, believing that physician-assisted suicide may be the most desirable and only alternative to living without adequate medical care and dignity.

126.   EOLOA presents a false choice between obtaining end-of-life care or assisted suicide.  The Act purports to make physician-assisted suicide "one more

1  option" for end-of-life care.  Expanding care options should decrease suicidality, not

2  elevate it.[124]  But the system is rigged to make physician-assisted suicide the *only*

3  viable option.  Assisted suicide is fully covered by Medi-Cal for California's

4  majority non-White participants who live near or below the federal poverty

5  threshold.  Yet life-sustaining treatment, long-term supportive services, in-home

6  nursing services, palliative care, and hospice may be unavailable (or denied) due to

7  a variety of reasons—including Defendants' system of setting health care priorities.

8  The Act does nothing to require that sufficient long-term care actually be available

9  to the person, and exhausted or knowingly rejected, so that they can make an

10  informed choice between assisted suicide and continuing to live with some

11  semblance of independence.  Physician-assisted suicide reduces pressure on

12  Defendant State agencies and actors to supply support services that enable people

13  with terminal disabilities to make a *meaningful* choice between options that actually

14  exist.  True autonomy presupposes having access to real options and being

15  empowered to choose from among them.

16     127.   Recent studies by the California Health Care Foundation have found

17  significant shortfalls and wide regional discrepancies in the availability of palliative

18  care in the State.  Indeed, the studies show that many counties in California have *no*

19  community-palliative care options, and those that do have far too little to meet the

20  need.[125]

21     128.   Widespread safety problems and deficiencies in care among California

22  hospices suggest that people with terminal disabilities in hospice are likely not

23  
_____

24  [124] *See* Xin Hu, et al., *Suicide Risk Among Individuals Diagnosed With Cancer in the US, 2000-2016.* 6 JAMA NETW OPEN e2251863 (2023),

25  https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2800688#:~:text=Findings%20In%20this%20population%2Dbased,contributing%20to%20the%20elevat

26  ed%20risk (finding that Medicare expansion was associated with decreased suicide rates among individuals diagnosed with cancer).

27  [125] Cal. Health Care Found., *Palliative Care in California: Narrowing the Gap* 2

28  tbl.1 (2018), https://www.chcf.org/wp-content/uploads/2018/05/NarrowingGap.pdf.

1   receiving adequate care, which could be a contributing factor to their decision to

2   seek physician-assisted suicide.[126]   A December 2020 Los Angeles Times

3   investigation found massive neglect and under-enforcement of safety requirements

4   in California hospice care, including mismanaged medications, neglected wounds,

5   and missed appointments.[127]   Documenting the explosive growth of for-profit

6   hospice agencies in Los Angeles County fueled by fraudulent providers, the State

7   Auditor issued a March 2022 report finding "the State's weak controls have created

8   the opportunity for large-scale fraud and abuse."[128]   The State Auditor singled out

9   Defendant CDPH for its "inadequate performance" and noted that it did "not

10   adequately safeguard patient care or prevent fraud."[129]   A recent JAMA Internal

11   Medicine study of more than 600,000 patients found that over 12% received no

12   visits from hospice staff in the last two days of life.[130]

13   129.   The availability of in-home care services for people with terminal

14   disabilities is woefully inadequate in California, and steers people towards

15   physician-assisted suicide.   Medi-Cal's In-Home Supportive Services ("IHSS")

16   program is meant to serve aged and/or disabled Californians at risk of nursing home

17   placement.   In 2021, the State Auditor issued a report concluding that the IHSS

18   program "is not providing needed services to all Californians approved for the

19

20

---

21   [126] *See* U.S. Dep't Health Hum. Servs., OIG, HOSPICE DEFICIENCIES POSE RISKS TO
22   MEDICARE BENEFICIARIES 32 (2019), https://oig.hhs.gov/oei/reports/oei-02-17-00020.pdf?utm_source=summary-page&utm_medium=web&utm_campaign=OEI-02-17-00020-PDF.

23   [127] Kim Christensen & Ben Poston, *Dying Californians Suffer Harm and Neglect*
24   *From an Industry Meant to Comfort Them*, L.A. TIMES (Dec. 9, 2020),
25   https://www.latimes.com/california/story/2020-12-09/california-hospice-under-fire-mistreatment-patients.

26   [128] State Auditor Report 2022, supra note 96, at iii.

27   [129] *Id.*

28   [130] Teno, et al. *supra* note 84.

program, is unprepared for future challenges, and offers low pay to caregivers."[131] Among other things, the State Auditor found that each month more than 40,000 IHSS recipients do not receive the services for which they qualify, and that over a five-year period between 2015 and 2019, there were "more than 130 million hours of services IHSS recipients needed but did not receive."[132]  Plaintiff Mr. VanHook relies on in-home supportive services in order to live and although he is approved for virtually 24/7 care he is unable to find, train, and retain sufficient help because the IHSS wage rate is too low to attract suitable caregivers, leaving him without adequate care.

130.   Defendant CDHCS fails to provide sufficient supportive services to allow people to avoid physician-assisted suicide.  CDHCS administers the State's Home and Community-Based Alternatives ("HCBA") waiver, which allows some Medi-Cal beneficiaries with high-level care needs to obtain in-home personal care services ("PCS") that includes nursing care.  These types of PCS are useful in addressing the concerns that drive people to physician-assisted suicide, but CDHCS enforces harsh rationing on HCBA in-home care, with long approval times, waitlists, and a track record of serving only a tiny fraction of the need.[133]

131.   Medi-Cal also covers some assisted living and memory care centers, but that placement program is plagued with long waitlists which can stretch two or three years.[134]  Many older people are forced to spend down their savings to become

---

[131] Auditor of State of Cal. IN-HOME SUPPORTIVE SERVICES PROGRAM (2021) ("State Auditor Report 2021"), https://www.auditor.ca.gov/pdfs/reports/2020-109.pdf.

[132] *Id.* at 1.

[133] CDHCS, *Home and Community-Based Alternatives Waiver Monthly Dashboard: October 2022,* https://www.dhcs.ca.gov/services/ltc/Documents/2022-1131-HCBA-Web-Totals-Oct2022.pdf; CDHCS, MEDI-CAL MONTHLY ELIGIBLE FAST FACTS, AUGUST 2022 (Nov. 2022), https://www.dhcs.ca.gov/dataandstats/statistics/Documents/FastFacts-August2022.pdf.

[134] *See* Ana B. Ibarra, *'Operating Under Water': Families Trying to Place Loved*

1 eligible for assisted living care.  Nursing facilities are often considered a placement

2 of last resort, made out of desperation, as older people are often terrified of being

3 placed in facilities where "abuse of older residents by other residents in long-term

4 care facilities is now recognized as a problem that is more common than physical

5 abuse by staff."[135]

6      132.   EOLOA's stated purpose includes aspirational language about

7 autonomy and freedom:  "In the end, how each of us spends the end of our lives is a

8 deeply personal decision.  That decision should remain with the individual, as a

9 matter of personal freedom and liberty."[136]  Despite such lofty ideals, EOLOA

10 extends this "freedom" only to the decision to die by physician-assisted suicide.

11 Defendants fail to ensure availability of *any* of the "feasible alternatives" the

12 attending physician is supposed to review with the patient.  Under the Act, there is

13 no freedom to continue living in one's own home with adequate supportive services,

14 and no requirement that such services be exhausted or knowingly rejected, as a less

15 restrictive alternative to death.  Without access to adequate pain control or hospice

16 care, the liberty to choose how to spend one's final days are illusory.  A public

17 health system which fails to adequately care for the living should not be empowered

18 with the license to kill.

19     **B.**    **Insurance Providers Steer People with Terminal Disabilities**
             **Towards Physician-Assisted Suicide**

20

21      133.   EOLOA purports to prohibit insurance steering by barring

22

23 ───────────────

24 *Ones in Medi-Cal Assisted Living Program Wait Years*, CALMATTERS (Sept. 7, 2022), https://calmatters.org/health/2022/09/medi-cal-assisted-living/.

25 [135] Mark S. Lachs & Karl A. Pillemer, *Elder Abuse*, 373 N, ENG. J. MED. 1947 (2015), https://www.nejm.org/doi/full/10.1056/NEJMra1404688.

26

27 [136] Sen. Rules Comm., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill 15 (2015-2016 2d Ex. Sess.,) as amended Sept. 10, 2015, https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201520162

28 AB15#.

simultaneous written communication of treatment denials and physician-assisted suicide coverage.[137]  This bar is easily evaded.  For example, California resident Stephanie Packer, "a mother of four and a cancer patient, was denied her previously approved chemotherapy treatment, but offered low-cost suicide pills by her insurer by phone instead."[138]  Similarly, Dr. Brian Callister attempted to transfer his patient, a California resident, to a California provider for a procedure not available at the hospital he worked at across the border in Nevada.  Although he had not requested assisted suicide and the patient was not terminal if provided treatment, the California insurer advised that they would not cover the transfer or treatment but would cover assisted suicide.[139]  Even if there was perfect compliance with EOLOA's prohibition on such communications, the Act does nothing to ensure that insurers do not deny or delay approval of life saving medications while at the same time covering the costs of physician-assisted suicide.  Direct coercion is not necessary where "patients are denied necessary life-sustaining health care treatment, or even if the treatment they need is delayed[;] many will, in effect, be steered toward assisted suicide."[140]

134.   Defendant CDHCS administers Medi-Cal, the State's Medicaid program that serves low-income individuals, including families, seniors, and persons with disabilities.  Medi-Cal serves approximately one-third of California's

---

[137] Cal. Health & Safety Code § 443.13(c) (the statute permits two separate letters, sent separately).

[138] NCD Report, *supra* note 79, at 21.

[139] *Id.* (citing PRAF, *Physician Assisted Suicide—The Real Effects* (May 31, 2017), https://www.youtube.com/watch?v=CWrpr_5e4RY [video about Dr. Brian Callister's patients]); *see also Fatally Flawed Experiments: California,* AUSTL. CARE ALLIANCE, https://www.australiancarealliance.org.au/california (last visited Mar. 23, 2023).

[140] DREDF, *Why Assisted Suicide Must Not Be Legalized*, section I(C)(1), https://dredf.org/public-policy/assisted-suicide/why-assisted-suicide-must-not-be-legalized/#marker13 (last visited Mar. 23, 2023).

population, and over half of people on Medi-Cal whose race/ethnicity is known are Hispanic.[141]  Medi-Cal's EOLOA policy and billing information indicates that Medi-Cal covers physician-assisted suicide for all qualifying patients, but "routine office visits involving general discussions between a recipient and their physician … regarding available medical options for addressing the terminal illness (for example, hospice, palliative care or aid-in-dying services) are not a covered end of life service."[142]  California is incentivized to save millions of dollars by providing its eligible low-income and majority-minority population with physician-assisted suicide instead of health care services and supports.

### C.   Medical Care Providers Steer People with Terminal Disabilities Towards Physician-Assisted Suicide

135.   Having one's own doctor encourage or even agree with the choice to use physician-assisted suicide is a powerful factor in support of that decision.[143] Research has shown that doctors' own discomfort with people with terminal disabilities can influence the person's request to hasten death.[144]  Some physicians have a "tendency to assume that the depressive illness of an older patient is less likely to respond to treatment, that pain control is a less important issue for older patients, [and] that an older patient's suicidal wishes are more likely to be inherently 'rational' than those of a younger patient."[145]

136.   Doctors' value judgments about their patient's quality of life also lead

---

[141] CDHCS, MEDI-CAL MONTHLY ELIGIBLE FAST FACTS, SEPTEMBER 2022 10 (Dec. 2022), https://www.dhcs.ca.gov/dataandstats/statistics/Documents/FastFacts-September2022.pdf.

[142] CDHCS, *End of Life Option Act Services,* at 2 (updated Aug. 2020), https://files.medi-cal.ca.gov/pubsdoco/Publications/masters-MTP/Part2/eloa.pdf.

[143] *See, e.g.,* Steven H. Miles, *Physicians and Their Patients' Suicides.* 271 JAMA 1786 (1994).

[144] Maytal & Stern, *supra* note 47, at 302.

[145] Clark, *supra* note 41.

to recommendations of physician-assisted suicide as a way to address perceived low-quality of life.  For example, the wife of one seriously ill person in Oregon overheard her husband's doctor giving a "sales pitch" for assisted suicide including saying "[t]hink of what it will spare your wife, we need to think of her."[146]  Another oncologist admitted to prescribing lethal drugs to a person who explained that he sought physician-assisted suicide because "I don't have any friends. I don't have any real quality of life—not because I'm ill, but for social-economic reasons."  The doctor rationalized that the person's self-determination outweighed the doctor's impulse for medical intervention:  "I don't really feel it's my job to judge the quality of their reason," he explained.[147]  Some physicians possess a "false empathy" towards their patients, believing that a person with a terminal disability is better off dead than alive without inquiring into the quality of life available with adequate supportive services or even the barriers to accessing supportive services.  Moreover, physicians often receive little training in quality-of-life interventions that can make continued life more desirable.[148]

137.   A study from Georgetown University's Center for Clinical Bioethics found a strong link between cost-cutting pressure on physicians and their willing-ness to prescribe lethal drugs to patients.[149]  For hospitals, it is much less expensive to assist a person's suicide than it is to provide for care.  Last year, in a secret recording obtained by the Associated Press, the director of ethics at a Canadian hospital was heard telling a person with a degenerative brain disorder that it was

---

[146] DREDF, *supra* note 140.

[147] Anita Hannig, *Author[iz]ing Death: Medical Aid-in-Dying and the Morality of Suicide*, 34 J. CULTURAL ANTHROPOLOGY 53, 69 (2019).

[148] NCD Report, *supra* note 79, at 30.

[149] DREDF, *supra* note 140 (citing Daniel P. Sulmasy, Benjamin P. Linas, Karen F. Gold, & Kevin A. Schulman *Physician Resource Use and Willingness to Participate in Assisted Suicide*, 158 ARCH. INTERN. MED. 974, 978 (1998).)

costing "north of $1,500 a day" for the person to remain in the hospital.  When the person replied that he felt like he was being coerced and asked about the plan for his long-term care, the hospital director replied that "[m]y piece of this was to talk to you, to see if you had an interest in assisted dying"—even though the person never brought the issue up himself.[150]

138.   By allowing physicians with moral, religious, or ethical objections to opt out of EOLOA participation, the Act makes a bad situation even worse—the only physicians available to speak to about obtaining a physician-assisted suicide prescription are those who agree that it is appropriate to provide people with terminal disabilities with the lethal means to commit suicide.  Plaintiffs are informed and believe, and on that basis allege, that people with illnesses or conditions perceived as terminal are rarely, if ever, denied access to a lethal prescription.  The Act permits doctor shopping, such that if one physician finds the person ineligible, the person can contact additional physicians until they get approval for physician-assisted suicide.

### D.   Family and Caregiver Pressures Steer People with Terminal Disabilities Towards Physician-Assisted Suicide

139.   People who die by physician-assisted suicide often cite the burden on family caregivers as a contributing factor.  Family members and other caregivers involved in decisions about physician-assisted suicide have tremendous influence and can distort patient choice, based in part on their own anxiety, depression, and burnout from caring for a person with a terminal disability.  Family members who find it difficult to accept functional impairments in a loved one and/or are motivated by a desire to end perceived or actual suffering may—intentionally or unintention-

---

[150] Maria Cheng, *'Disturbing': Experts Troubled by Canada's Euthanasia Laws*, AP (Aug. 11, 2022), https://apnews.com/article/covid-science-health-toronto-7c631558a457188d2bd2b5cfd360a867.

1    ally—convey the idea that the person would be "better off dead." [151]

2          140.   Some people who die by physician-assisted suicide identify the "finan-

3    cial implications of treatment" as a reason for requesting lethal drugs.[152]  The high

4    cost of continuing medical care for people with cancer and other terminal conditions

5    can drain a family's savings, even with insurance.[153]  In contrast, physician-assisted

6    suicide is fully covered under Medi-Cal.  People with terminal disabilities may

7    experience overt pressure from family members concerned about mounting bills as

8    well as their own internalized guilt that they will be incapable of leaving sufficient

9    money or property to their next of kin—or worse, saddling them with unpaid

10   healthcare costs.[154]

11   **VII.   EOLOA Unconstitutionally Deprives People with Terminal Disabilities of
         Due Process Protections**

12

13          141.   EOLOA lacks sufficient safeguards and unconstitutionally deprives

14   people with terminal disabilities of protections for their right to live.  The Act fails

15   to ensure adequate due process for people who waive this constitutional right and

16   that they are free from undue influence and coercion—including the types identified

17   in the preceding Section.  EOLOA fails to require the consideration, exhaustion,

18   and/or knowing rejection of less restrictive, alternatives to physician-assisted

19   suicide.  The Act affirmatively places people with terminally disabilities in danger

20   by acting with deliberate indifference to the known, obvious, and foreseeable

21

22   _____

[151] NCD Report, *supra* note 79, at 28-9 (citing Gill, *supra* note 88).

23

[152] *See, e.g.*, Oregon 2021 Data Summary, *supra* note 57.

24

[153] John G. Cagle et al., *Financial Burden Among US Households Affected by
25   Cancer at the End of Life*, 25 PSYCHOONCOLOGY 919 (2016),
     https://onlinelibrary.wiley.com/doi/abs/10.1002/pon.3933.

26

[154] Ezekiel J. Emanuel et al., *Understanding Economic and Other Burdens of
27   Terminal Illness: The Experience of Patients and Their Caregivers*, 21 ANNALS
     INTERN. MED. 451, (2000), https://www.acpjournals.org/doi/10.7326/0003-4819-
28   132-6-200003210-00005.

dangers of making physician-assisted suicide available to those with the highest risk factors for suicide.  Through their acts and omissions, Defendants fail to ensure that people who die by physician-assisted suicide are provided their constitutional due process rights and had a *real* end-of-life option.

142.   EOLOA's authors attempted to downplay concerns about systemic abuse and other due process violations by including a statement that "[t]his bill includes strong provisions to safeguard patients from coercion" and that "[t]here is substantial evidence from [the five states that had already legalized physician-assisted suicide] that prove this law can be used safely and effectively."[155]  Prominent national medical professional organizations disagree.  The American Medical Association's Code of Ethics observes that "permitting physicians to engage in assisted suicide would ultimately cause more harm than good."[156]  The American College of Physicians, the American Medical Directors Association, and the National Hospice and Palliative Care Organization all oppose physician-assisted suicide.[157]  EOLOA's safeguards are illusory, frequently disregarded, and/or circumvented in ways that harm people with terminal disabilities.[158]

### A.   EOLOA's Vague Definition of "Terminal Disease" Fails to Ensure an Adequate Process to Determine Physician-Assisted Suicide Eligibility

143.   As explained in Section IV.B, the statutory definition of "terminal

---

[155] *Id.*

[156] AMA CODE MED. ETHICS, Opinion 5.7, *Physician-Assisted Suicide,* https://code-medical-ethics.ama-assn.org/ethics-opinions/physician-assisted-suicide; *see also* AMA CODE MED. ETHICS, Opinion 5.8, opposing euthanasia.

[157] *See* Lois Snyder Sulmasy & Paul S. Mueller, *Ethics and the Legalization of Physician-Assisted Suicide: An American College of Physicians Position Paper*, 167 ANNALS INTERN. MED. 576 (2017), https://www.acpjournals.org/doi/full/10.7326/M17-0938; *Position Statement on Care at the End of* Life, AMDA - SOCIETY FOR POST-ACUTE AND LONG-TERM CARE MEDICINE (Mar. 1, 1997), https://paltc.org/amda-white-papers-and-resolution-position-statements/position-statement-care-end-life.

[158] *See generally*, NCD Report, *supra* note 79, at 20-34.

disease" is overbroad and encompasses the class of persons who have medical conditions that would result in death within six months *without* medical care but who can live for more than six months *with* medical care.  By leaving this key term vague and unclear, EOLOA fails to define the class of persons eligible for physician-assisted suicide with precision, and fails to provide adequate guidance to the State's physicians as to how to determine whether a patient's condition meets the principle eligibility criteria.  UCSF Medical Center, for example, does not even include the term "terminal" or "terminal disease" in its guidance as to who is eligible for physician-assisted suicide, and instead advises that people qualify if they "[h]ave a diagnosis of a serious, life-limiting illness with a prognosis of six months or less (as estimated by two doctors)."[159]  The category of people with "terminal disease" is inherently unstable.

144.   As explained in Section IV.C, physicians are notoriously poor prognosticators regarding the timing of their patients' deaths.  By failing to rely on any criteria or methodology to determine length of remaining life with any level of precision, and by failing to provide any guidance to the State's physicians as to how to determine whether a particular person's condition will or will not "result in death within six months" (with or without medical care), EOLOA sweeps in untold numbers of individuals whose conditions will (and do) not result in death within six months.

145.   The lack of clarity surrounding the process for determining who is eligible for State-sanctioned assisted suicide places individuals' lives at the unaccountable discretion and potential biases of individual doctors, and deprives those at risk of obtaining physician-assisted suicide prescriptions without decision-making capacity or voluntariness the due process required by the U.S. Constitution.

---

[159] *FAQs: End of Life Option Act at UCSF*, Patient Education, UCSF HEALTH, https://www.ucsfhealth.org/education/faq-end-of-life-option-act-at-ucsf (last visited April 6, 2023).

### B.  No Meaningful Mental Health Assessment or Treatment Is Required Under the Act

146.   People who seek physician-assisted suicide have the highest risk factors for suicide (old age, illness, disability), along with extraordinarily high levels of depression and accompanied impaired decision making capacity.  EOLOA's lack of safeguards with respect to this population deprives people of life without due process of law.

147.   Depression plays an enormous role in California's physician-assisted suicide deaths.  Data from medical studies about the desire for death among terminally ill people show "a strong correlative relationship between the clinical manifestations of major depressive disorder and patients with life-threatening illness expressing a desire for a hastened death."[160]  "Eighty per cent of patients with cancer who complete suicide have a mood disorder, and, in primary care populations, treatment of depression reduces suicidal ideation."[161]  EOLOA neither offers nor ensures provision of treatment for depression.  The co-director of Harvard Medical School's Center for Palliative Care, after studying physician-assisted suicide practices, has written that all people who request hastened death should be assessed by a psychiatrist for treatable depression.[162]  Most people diagnosed as terminal who express a desire to die are indirectly asking for help in dealing with the depression and accompanying concerns common to all people nearing the end of

---

[160] Maytal & Stern, *supra* note 47, at 301; *see also* Linda Ganzini, Elizabeth R. Goy, & Steven K. Dobscha, *Prevalence of Depression and Anxiety in Patients Requesting Physicians' Aid in Dying: Cross Sectional Survey* 337 BMJ 973 (2008), https://www.bmj.com/content/bmj/337/bmj.a1682.full.pdf ("For people at the end of life, depression, hopelessness, and psychosocial distress are among the strongest correlates of desire for hastened death.").

[161] Ganzini et al., *supra* note 160 at 973.

[162] Block & Billings, *supra* note 3, at 448; *see also* Wilson, et al., *supra* note 32, at 173 ("the expression of a desire for death by a terminally ill patient should raise a suspicion about mental health problems").

1    life.[163]  When these needs are addressed "the desire for death diminishes."[164]

2        148.   Reduced decision-making capacity also plays an enormous role in

3    deaths pursuant to EOLOA.  While the Act contains a requirement that the attending

4    physician determine that the person has the "capacity to make medical decisions,"[165]

5    "[m]any physicians receive no formal training in capacity assessment and may hold

6    erroneous beliefs about decisional capacity."[166]  A study published in the American

7    Journal of Geriatric Psychiatry in 2018 "revealed high rates of decisional impair-

8    ment in terminally ill participants," and found that although "[m]ost terminally ill

9    participants were able to express a treatment choice (85.7%)," "impairment was

10   common on the Understanding (44.2%), Appreciation (49.0%) and Reasoning

11   (85.4%) subscales."[167]

12       149.   Defendant State agencies and officials fail to ensure that the standard of

13   care—including a mental health evaluation—is implemented for people who seek

14   physician-assisted suicide from their doctors.  Psychiatrists and psychologists are

15   *almost never* involved in decisions surrounding physician-assisted suicide.  Instead,

16   the attending physician is required to refer the patient to a mental health specialist

17   assessment only "if there are indications of a mental disorder"[168]—but the Act does

18

19

---

20   [163] Block & Billings, *supra* note 3.

21   [164] Hendin, *supra* note 4, at 46.

22   [165] Defined as "the ability to understand the nature and consequences of a health
23   care decision, the ability to understand its significant benefits, risks, and
     alternatives, and the ability to make and communicate an informed decision to
     health care providers." Cal. Health & Safety Code § 443.1(e).

24   [166] Elissa Kolva, Ph.D., Barry Rosenfeld, Ph.D., & Rebecca Saracino, Ph.D.,
25   *Assessing the decision making capacity of terminally ill patients with cancer* 26 Am
     J Geriatr Psychiatry 5, 523-531, (2018)
26   https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6345171/.

27   [167] *Id.*

28   [168] Cal. Health & Safety Code § 443.5(a)(1)(A)(ii).

not define what constitutes a mental disorder, nor require training in detection.[169] Significantly, EOLOA assumes that a request for physician-assisted suicide is *not* an indication of a mental disorder, when other California laws make precisely the opposite assumption for virtually everyone else, and those laws require interventions up to and including involuntary hospitalization to test the assumption and diagnose the condition.  Plaintiffs are informed and believe, and on that basis allege, that few, if any, people who are provided physician-assisted suicide under California's EOLOA are referred for psychological assessments before receiving lethal prescriptions.  Oregon and Washington's data show that over 95% of people who qualify for and seek physician-assisted suicide are *not* referred to psychological assessments but instead prescribed lethal drugs—California collects but does not publish this information.

150.   Even when a person *is* referred to a mental health assessment under EOLOA, the provider's inquiry is limited to "determining that the individual has the capacity to make medical decisions and is not suffering from impaired judgment due to a mental disorder."[170]  In a study of Oregon's physician-assisted suicide law, more than half of psychiatrists surveyed reported that they were "not at all confident that they could, in the context of a single consultation, determine if a mental disorder or depression impaired the judgment of a person requesting assisted suicide."[171]

151.   EOLOA's procedures are insufficient for differentiating between people who have adequate decision-making capacity and those who do not.

---

[169] *See* Clark, *supra* note 41, at 150 (noting that primary care physicians "are clearly ill-equipped to assess the presence and effect of depressive illness in older patients").

[170] Cal. Health & Safety Code § 443.1(l).

[171] Linda Ganzini, et al., *Evaluation of Competence to Consent to Assisted Suicide: Views of Forensic Psychiatrists*, 157 AM. J. PSYCH. 595, 595 (2000), https://ajp.psychiatryonline.org/doi/epdf/10.1176/appi.ajp.157.4.595.

C.    **EOLOA Fails to Include Any Safeguards To Ensure that People Are Not Judgment-Impaired or Unduly Influenced at the Time of Death**

152.   Once a prescription for physician-assisted suicide drugs is provided to the patient, there are no requirements whatsoever in EOLOA to ensure that the necessary predicates for the physician prescribing the lethal medication remain true at a later time when the person may actually decide to ingest the medication:  is the person under duress, capable of making medical decisions, suffering from a mental disorder that impairs judgment, still deemed to have a "terminal disease," and capable of understanding feasible alternatives?  Importantly, the time that the person ingests the lethal drugs may be days, weeks, months, or even years after the request for physician-assisted suicide was approved.

153.   There are no witness requirements at time of ingestion, no requirement that the attending physician be present or informed of the person's death, and no obligation to inform authorities of the true manner or cause of death—despite California law requiring the coroner to inquire into and determine the "circumstances, manner, and cause of all … known or suspected … suicide[s]."[172] There are no requirements that the drugs be used within days, weeks, months, or years, and neither EOLOA nor Defendants do anything to ensure that the drugs are safely stored prior to consumption or properly disposed of should the person not take the medication.  This places the requestor and other people in the home— including children—at risk of suicide, misuse, or accidental ingestion of the drugs.

154.   The Act does not require any evidence that the person ingested the lethal drugs themselves, that is whether the person self-administered the lethal drugs as required by the Act or whether anyone else (family member, nurse, physician, or

---

[172] Cal. Gov't Code § 27491.  In fact, EOLOA requires that coroners misrepresent the cause of death and omit suicide.  Cal. Health & Safety Code § 443.18 ("Actions taken in accordance with this part shall not, for any purposes, constitute suicide, homicide, or elder abuse under the law").

friend) administered the medication or physically assisted the person.  Anything other than self-administration is a violation of the Act, but Defendants do nothing to determine whether this critical line between suicide and active euthanasia is ever crossed and in implementing and enforcing EOLOA, Defendants make clear that they do not care or want to know.

**D.**    **EOLOA Fails to Provide Viable Alternatives to Suicide, Fails to Require Consideration or Exhaustion of Less Restrictive Alternatives to Suicide, and Lacks Independent Oversight**

155.    EOLOA requires the attending physician to inform the patient of the "feasible alternatives or additional treatment opportunities, including, but not limited to, comfort care, hospice care, palliative care, and pain control" in order to ensure that the patient makes an "informed decision."[173]  But the Act includes no requirements or guidance regarding how in-depth or comprehensive this discussion must be, and Defendants fail to provide any.  Upon information and belief, alternatives to assisted suicide are routinely under-emphasized or not discussed in any meaningful way.  And as discussed in Section VI.A, EOLOA fails to ensure that any of these alternatives are actually available.  Defendants are aware that in many instances meaningful alternatives are unavailable to the person seeking physician-assisted suicide—rendering the advisement requirement deficient and/or useless.

156.    EOLOA fails to require that people meaningfully consider, exhaust, and/or knowingly reject less restrictive, truly viable alternatives to assisted suicide, including suicide prevention services, palliative and/or hospice care, medical and nursing support services, and other personal support services that are ostensibly included among the "feasible alternatives" that California providers are supposed to discuss with persons who seek physician-assisted suicide.  The Act fails to require the provision or exhaustion of the State's suicide prevention program, which is expressly designed to address the underlying concerns that drive people to suicidal

---

[173] Section 443.5(a)(2)(E).

thoughts and deter people from taking unnecessary, uninformed, untreated, or otherwise preventable suicidal actions.  By providing lethal medication to individuals Defendants know to be at high risk for suicide, the State has an obligation to ensure that the person has exhausted or knowingly rejected less restrictive alternatives than death.

157.   By endorsing physician-assisted suicide, the State also has an obligation to ensure proper oversight and accountability by appropriately trained professionals (including training in recognizing depression and decision-making impairments).  Yet EOLOA lacks any independent oversight for the decision to grant a physician-assisted suicide request (i.e., review by a probate court, as with civil commitments).  None of the Defendants provide adequate oversight of the process, and the Act itself specifically precludes their participation in ensuring the practice is truly free of bias, coercion, and malfeasance.

### E.   Prescribing Physicians Often Lack a Patient-Provider Relationship with the People for Whom They Prescribe Lethal Drugs

158.   EOLOA contains no safeguards to ensure that the physician who prescribes lethal drugs have any preexisting relationship with the patient or knowledge of their illness and treatment history.  There is no requirement for the attending physician to request the patient's medical records before assisting their suicide.  The attending and consulting physicians need not even ever see the suicidal patient in person, as the Act allows doctors to meet, evaluate, and prescribe lethal drugs to patients over the phone.[174]  People who qualify can obtain lethal drugs from a doctor the patient has "known" for only two days.

159.   EOLOA operates on the fiction that on the basis of a two-day telephonic relationship, a prescribing doctor can:  (1) make the terminal prognosis,

---

[174] *See, e.g., FAQs: End of Life Option Act at UCSF*, Patient Education, UCSF HEALTH, https://www.ucsfhealth.org/education/faq-end-of-life-option-act-at-ucsf (noting the availability of telehealth "visits").

(2) ensure the patient is not acting under impaired judgment or duress, (3) decide whether to refer the patient for a mental health assessment, and (4) counsel the patient on their options and alternatives.  The two-day doctor-patient relationship facilitates doctor-shopping, by which the patient seeks out a second physician, and in some cases, a third and a fourth "opinion," until one of them eventually agrees to write the prescription.  California makes no effort to track or restrict this practice, allowing easy evasion of the "safeguards" against duress, neglect, and abuse.  In contrast, California and federal law track all sorts of efforts by individuals to obtain other types of drugs.  For example, just to obtain pseudoephedrine, an over-the-counter cold medicine, an individual must present to drug-store cashiers a government–issued identification and sign a logbook, usually electronic, which can be accessible by law enforcement at any time.

**F.    Physician-Assisted Suicide Drug Cocktails Are Unregulated Under EOLOA, and Place People at Risk of Distressing Deaths**

160.    EOLOA provides no guidance as to what drugs should be prescribed for physician-assisted suicide, yet it promotes the idea of "a peaceful death."[175] Such statements further the public misconception that lethal drugs provide an easy transition from life to death.  The evidence, however, demonstrates that such drugs as administered under EOLOA can cause agonizing and painful deaths.[176]

161.    As drug companies have reduced supply and increased costs of the first-generation of physician-assisted suicide drugs (which are also used in death penalty executions), advocates have sought other, cheaper drugs, including new, and often untested, combinations.  Diazepam, a benzodiazepine, has now supplanted

---

[175] Senate Floor Analyses, *supra* note 91.

[176] Ana Worthington, Ilora Finlay, & Claud Regnard. *Efficacy and Safety of Drugs Used for 'Assisted Dying'*, 142 BRIT. MED. BULL. 15 (2022), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9270985/pdf/ldac009.pdf; Sean Riley, *Navigating the New Era of Assisted Suicide and Execution Drugs*, 4 J. LAW BIOSCIENCES 424 (2017), https://academic.oup.com/jlb/article/4/2/424/4265564.

1  barbiturates as the primary drug in effectuating physician-assisted suicide deaths in

2  states that permit the use of DDMA (diazepam, digoxin, morphine sulfate and

3  amitriptyline) and DDMP (diazepam, digoxin, morphine sulfate and propranolol).[177]

4  DDMA and DDMP are now responsible for over 99% of physician-assisted suicide

5  deaths in Oregon, where annual complication rates have reached 14.8% and people

6  are reported to have experienced difficulty ingesting, drug regurgitation, seizures,

7  and have even regained consciousness after ingesting the drug cocktails.[178]

8      162.   DDMP, the predominant drug used to end life in California physician-

9  assisted suicide deaths, was the cause of one distressing assisted suicide in which the

10  person was observed coughing, choking, and vomiting, and took over four hours to

11  die.[179]  The amount of time between drug ingestion and death varies dramatically.

12  Twenty years of data from Oregon show that the time from ingestion to death has

13  ranged up to 104 hours.[180]  The median time between ingestion and death has

14  doubled since the introduction of the experimental drug cocktails DDMA and

15  DDMP.[181]  Unlike Oregon, California does not require physicians to keep records of

16  the amount of time between ingestion and death.

17      **G.   What Safeguards Exist Are Being Methodically Stripped From
         EOLOA and Safeguards In Place Now May Not Be Present For
18       Long**

19      163.   EOLOA lacks safeguards to protect people from dying by suicide

20  impulsively.  Risk for depression and suicidality is often present immediately after a

21  traumatic injury or grave diagnosis, including a spinal injury.  A 2023 study of over

22

23  _____

   [177] Worthington, et al., *supra* note 176, at 17-18.

24  [178] *Id.* at 18.

25  [179] Kevin Simpson, *Voting for Aid in Dying Was Easy, But One Couple Found
   Themselves Struggling Toward a Graceful Death*, DENVER POST (Dec. 14, 2017,
26  2:08 PM), https://www.denverpost.com/2017/12/14/colorado-aid-in-dying-law/.

27  [180] Oregon 2021 Data Summary, *supra* note 57, at 17.

28  [181] *Id.*

16 million people with cancer in the U.S. found that the "highest suicide risk occurred in the first 6 months after diagnosis, during which individuals diagnosed with cancer bore more than 7 times the suicide risk of the general population."[182]

164.   In 2021, Defendant Governor Newsom signed into law a bill amending EOLOA by shortening the waiting period from fifteen days to only 48 hours.[183]  The likelihood that depression or another disorder that impairs judgment will resolve itself within two days is unlikely.  Californians can now make an oral request to the attending physician; have their diagnosis, prognosis, and capacity confirmed by a second consulting doctor (who does not have to meet with the patient in person); and 48 hours after the first request, ingest lethal drugs prescribed by the attending physician.  The mandatory waiting period for purchasing a gun in California is ten days—a far longer period to let impulses simmer down.

165.   California amendments to EOLOA also eliminated the requirement that the person make a final attestation affirming their choice before self-administering the lethal drugs.  The minimal safeguards which were used to allay the fears of legislators and the public about the safety of physician-assisted suicide are being eliminated to ensure that people with terminal disabilities are promptly provided the means to die rather than the standard of care for suicide prevention when they express a desire to kill themselves.  EOLOA's provisions are discriminatory, unconstitutional, and fail to protect Californians.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**(Americans with Disabilities Act, 42 U.S.C. §§  12132, 12203)**
**(Against All Defendants)**

166.   Plaintiffs reallege and hereby incorporate by reference the allegations

---

[182] Xin Hu, et al., *supra* note 124, at 9.

[183] Cal. Health & Safety Code § 443.3(a) (effective June 9, 2016, Amended by Stats. 2021, Ch. 542, Sec. 2. (SB 380) Effective January 1, 2022.)

1   contained in the preceding paragraphs of this Complaint.

2       167.   Title II of the ADA provides that "no qualified individual with a

3   disability shall, by reason of such disability, be excluded from participation in or be

4   denied the benefits of services, programs, or activities of a public entity, or be

5   subjected to discrimination." 42 U.S.C. § 12132.  A "public entity" includes State

6   and local governments, their agencies, and their instrumentalities.  42 U.S.C.

7   § 12131(1).  Defendants qualify as public entities and/or officers of public entities

8   within the meaning of 42 U.S.C. § 12131 and 28 C.F.R. § 35.104.

9       168.   The ADA defines "a qualified individual with a disability" as a person

10   who has a "physical or mental impairment that substantially limits one or more

11   major life activities," including, but not limited to, "caring for oneself, performing

12   manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending,

13   speaking, breathing, learning, reading, concentrating, thinking, communicating, and

14   working." 42 U.S.C. § 12102(1)(A), (2)(A).  The ADA Amendments Act of 2008

15   expanded the definition of "major life activities" to also include:  "the operation of a

16   major bodily function, including but not limited to, functions of the immune system,

17   normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory,

18   circulatory, endocrine, and reproductive functions." 28 C.F.R. § 35.108(c)(ii).  "The

19   definition of 'disability' shall be construed broadly in favor of expansive coverage,

20   to the maximum extent permitted by the terms of the ADA." 28 C.F.R.

21   § 35.108(a)(2)(i).

22       169.   Plaintiffs' constituents and/or members include, and Plaintiffs are,

23   qualified individuals with disabilities as defined in the ADA and ADA Amendments

24   Act of 2008.

25       170.   Defendants the State of California and Governor Newsom are

26   responsible for enacting, executing, and overseeing the enforcement and

27   implementation of the laws of the State, including EOLOA, and in so doing, violate

28   the ADA and its implementing regulations by:  (1) denying people with terminal

disabilities the opportunity to benefit from the State's laws and public services;

(2) providing an opportunity to people with terminal disabilities to benefit from State's laws and public services that is not equal to that afforded to others;

(3) providing the benefit of the State's laws and public services to people with terminal disabilities that is not as effective in affording equal opportunity to obtain the same result or benefit as that provided to other people; (4) unnecessarily providing a different or separate benefit of the State's laws and public services to individuals with terminal disabilities; (5) limiting people with terminal disabilities in the enjoyment of rights, privileges, advantage, or opportunities enjoyed by others; and (6) using criteria or methods of administration that have the effect of discriminating against people with terminal disabilities and substantially impairing accomplishment of the objectives of these public entities with respect to individuals with terminal disabilities.  *See* 28 CFR §§ 35.130(b)(1)(i)-(iv), (1)(vii), (3)(i), (3)(ii).

171.   Defendants MBC, Lawson, Attorney General Bonta, the DA's Office, and District Attorney Gascón are responsible for enforcing the laws of the State, including criminal laws and certain civil laws protecting older people and those with disabilities, and suicidal people, but fail to discharge their duties to enforce these laws pursuant to EOLOA.  In so doing, Defendants MBC, Lawson, Attorney General Bonta, the DA's Office, and District Attorney Gascón violate the ADA and its implementing regulations by:  (1) denying people with terminal disabilities the opportunity to benefit from enforcement of criminal and certain civil laws;

(2) providing an opportunity to people with terminal disabilities to benefit from enforcement of criminal and certain civil laws that is not equal to that afforded to others; (3) providing a benefit of enforcement of criminal and certain civil laws to people with terminal disabilities that is not as effective in affording equal opportunity to obtain the same result or benefit as that provided to others;

(4) unnecessarily providing a different or separate benefit of enforcement of criminal and certain civil laws to individuals with terminal disabilities; (5) limiting

people with terminal disabilities in the enjoyment of rights, privileges, advantage, or opportunities enjoyed by others, including the benefit of enforcement of criminal and certain civil laws; and (6) using criteria or methods of administration that have the effect of discriminating against people with terminal disabilities and substantially impairing accomplishment of the objectives of these public entities with respect to individuals with terminal disabilities.  *See* 28 CFR §§ 35.130(b)(1)(i)-(iv), (1)(vii), (3)(i), (3)(ii).

172.   Defendants CDPH, CDHCS, MHSOAC, Aragón, Baass, and Madrigal-Weiss are responsible for implementing and administering suicide prevention programs and EOLOA.  In so doing, they violate the ADA and its implementing regulations by:  (1) denying people with terminal disabilities the opportunity to participate in or benefit from public and behavioral health services; (2) providing an opportunity to people with terminal disabilities to participate in or benefit from public and behavioral health services that is not equal to that afforded to others; (3) providing public and behavioral health services to people with terminal disabilities that are not as effective in affording equal opportunity to obtain the same result or benefit as that provided to others; (4) unnecessarily providing different or separate public and behavioral health services to individuals with terminal disabilities; (5) limiting people with terminal disabilities in the enjoyment of rights, privileges, advantage, or opportunities enjoyed by others, including the benefits of public and behavioral health services; and (6) using criteria or methods of administration that have the effect of discriminating against people with terminal disabilities and substantially impairing accomplishment of the objectives of these public entities with respect to individuals with terminal disabilities.  *See* 28 CFR §§ 35.130(b)(1)(i)-(iv), (1)(vii), (3)(i), (3)(ii).

173.   The ADA aims "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).  Title II of the ADA represents Congress' attempt to apply

1   this "clear and comprehensive national mandate" to the "services, programs, or

2   activities," 42 U.S.C. § 12132, of "'any State or local government' and 'any

3   department, agency, … or other instrumentality of a State,'" *United States v.*

4   *Georgia*, 546 U.S. 151, 154 (omission in original) (quoting 42 U.S.C. § 12131(1)).

5   Congress also included in Title II a provision expressly abrogating the sovereign

6   immunity of the states.  *See* 42 U.S.C. § 12202.  "In the ADA, Congress provided

7   [a] broad mandate" to "effectuate its sweeping purpose [to] … forbid[]

8   discrimination against disabled individuals in major areas of public life,

9   [including] … public services …."  *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675.

10       174.   EOLOA is preempted because it conflicts with federal anti-

11   discrimination law, and supplants it with a State policy permitting physician-assisted

12   suicide, in violation of the ADA.  *See, e.g.*, *Bay Area Addiction Rsch. & Treatment,*

13   *Inc. v. City of Antioch*, 179 F.3d 725 (9th Cir. 1999); *Dare v. California*, 191 F.3d

14   1167 (9th Cir. 1999).

15       175.   Plaintiffs have no adequate remedy at law, and unless the relief herein

16   is granted, Plaintiffs and their members will suffer irreparable harm in that they will

17   continue to be discriminated against and denied equal access to the program or

18   activity operated and overseen by Defendants.  Consequently, Plaintiffs are entitled

19   to injunctive relief and attorneys' fees pursuant to 42 U.S.C. §§ 12101 and 12205.

**SECOND CLAIM FOR RELIEF**
**(Rehabilitation Act, 29 U.S.C. § 794)**
**(Against All Defendants)**

22       176.   Plaintiffs reallege and hereby incorporate by reference the allegations

23   contained in the preceding paragraphs of this Complaint.

24       177.   Section 504 of the Rehabilitation Act ("Section 504") provides that "no

25   otherwise qualified individual with a disability in the United States … shall, solely

26   by reason of his or her disability, be excluded from the participation in, be denied

27   the benefits of, or be subjected to discrimination under any program or activity

28   receiving federal financial assistance."  29 U.S.C. § 794(a).  Section 504 is

interpreted similarly to the ADA, *see Vinson v. Thomas*, 288 F.3d 1145, 1152 n. 7 (9th Cir. 2002), and applies to any entity that receives federal funds.

178.   At all times relevant to this action, Defendants are and have been recipients of federal financial assistance within the meaning of the Rehabilitation Act.

179.   An "individual with a disability" is defined under the statute, in pertinent part, as "an individual who has a physical or mental impairment that substantially limits one or more major life activities of such individual." 29 U.S.C. § 705(20)(B) (referencing 42 U.S.C. § 12102).  "Qualified" means, with respect to services, a person who meets the essential eligibility requirements for the receipt of such services.  28 C.F.R. § 41.32.  Plaintiffs' members include, and Plaintiffs are, qualified individuals with disabilities as they have disabilities that substantially limit one or more major life activities and meet the essential eligibility requirements of the Act.

180.   Plaintiffs' constituents and/or members include, and Plaintiffs are, qualified individuals with disabilities as defined in Section 504, which tracks the definition in the ADA.

181.   The United States DOJ is charged under Executive Order 12250 with coordinating the implementation of Section 504.  28 C.F.R. § 41.1.  Pursuant to this mandate, the DOJ has issued regulations defining the forms of discrimination prohibited by Section 504 which require:

a.      In providing any aid, benefit, or service, a recipient of federal financial assistance "may not … [d]eny a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit or service," "[a]fford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," "[p]rovide a qualified handicapped person with an aid, benefit, or service that is not as effective in affording equal opportunity … as that provided to others," "[o]therwise limit a

qualified handicapped person in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others," or "provide different or separate aids, benefits, or services to individuals with disabilities or to any class of individuals with disabilities than is provided to others unless such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others."  45 C.F.R. § 84.4(b)(i)(iv), (vii).

182.    Defendants the State of California and Governor Newsom are responsible for enacting, executing, and overseeing the enforcement and implementation of the laws of the State, including EOLOA, and in so doing, violate Section 504 by:  (1) denying people with terminal disabilities the opportunity to benefit from the State's laws and public services; (2) providing an opportunity to people with terminal disabilities to benefit from State's laws and public services that is not equal to that afforded to others; (3) providing the benefit of the State's laws and public services to people with terminal disabilities that is not as effective in affording equal opportunity to obtain the same result or benefit as that provided to other people; (4) unnecessarily providing a different or separate benefit of the State's laws and public services to individuals with terminal disabilities; (5) limiting people with terminal disabilities in the enjoyment of rights, privileges, advantage, or opportunities enjoyed by others; and (6) using criteria or methods of administration that have the effect of discriminating against people with terminal disabilities and substantially impairing accomplishment of the objectives of these public entities with respect to individuals with terminal disabilities.  *See* 45 C.F.R. § 84.4(b)(1)(i)-(iv), (b)(1)(vii), (b)(4).

183.    Defendants MBC, Lawson, Attorney General Bonta, the DA's Office, and District Attorney Gascón are responsible for enforcing the laws of the State, including criminal laws and certain civil laws protecting older people and those with disabilities, and suicidal people, but fail to discharge their duties to enforce these laws pursuant to EOLOA.  In so doing, they violate Section 504 by:  (1) denying

people with terminal disabilities the opportunity to benefit from enforcement of criminal and certain civil laws; (2) providing an opportunity to people with terminal disabilities to benefit from enforcement of criminal and certain civil laws that is not equal to that afforded to others; (3) providing a benefit of enforcement of criminal and certain civil laws to people with terminal disabilities that is not as effective in affording equal opportunity to obtain the same result or benefit as that provided to others; (4) unnecessarily providing a different or separate benefit of enforcement of criminal and certain civil laws to individuals with terminal disabilities; (5) limiting people with terminal disabilities in the enjoyment of rights, privileges, advantage, or opportunities enjoyed by others, including the benefit of enforcement of criminal and certain civil laws; and (6) using criteria or methods of administration that have the effect of discriminating against people with terminal disabilities and substantially impairing accomplishment of the objectives of these public entities with respect to individuals with terminal disabilities. *See* 45 C.F.R. § 84.4(b)(1)(i)-(iv), (b)(1)(vii), (b)(4).

184.   Defendants CDPH, CDHCS, MHSOAC, Aragón, Baass, and Madrigal-Weiss are responsible for implementing and administering suicide prevention programs and EOLOA.  In so doing, they violate Section 504 by:  (1) denying people with terminal disabilities the opportunity to participate in or benefit from public and behavioral health services; (2) providing an opportunity to people with terminal disabilities to participate in or benefit from public and behavioral health services that is not equal to that afforded to others; (3) providing public and behavioral health services to people with terminal disabilities that are not as effective in affording equal opportunity to obtain the same result or benefit as that provided to others; (4) unnecessarily providing different or separate public and behavioral health services to individuals with terminal disabilities; (5) limiting people with terminal disabilities in the enjoyment of rights, privileges, advantage, or opportunities enjoyed by others, including the benefits of public and behavioral

health services; and (6) using criteria or methods of administration that have the effect of discriminating against people with terminal disabilities and substantially impairing accomplishment of the objectives of these public entities with respect to individuals with terminal disabilities. *See* 45 C.F.R. § 84.4(b)(1)(i)-(iv), (b)(1)(vii), (b)(4).

185.   EOLOA is preempted because it conflicts with federal anti-discrimination law, and supplants it with a State policy permitting physician-assisted suicide, in violation of Section 504. *Cf. Barber ex rel. Barber v. Colorado Dep't of Revenue*, 562 F.3d 1222, 1234 (10th Cir. 2009) ("the demands of the federal Rehabilitation Act do not yield to state laws that discriminate against the disabled; it works the other way around") (Gorsuch, J., concurring).

186.   Plaintiffs have no adequate remedy at law, and unless the relief herein is granted, Plaintiffs and their members will suffer irreparable harm in that they will continue to be discriminated against and denied equal access to the program or activity operated and overseen by Defendants.  Consequently, Plaintiffs are entitled to injunctive relief and attorneys' fees pursuant to 29 U.S.C. § 794(a).

**THIRD CLAIM FOR RELIEF**
**(14th Amendment Equal Protection, 42 U.S.C. § 1983)**
**(Against Defendants Governor Newsom, Attorney General Bonta, Aragón, Baass, Lawson, Madrigal-Weiss, and District Attorney Gascón, in their Official Capacities)**

187.   Plaintiffs reallege and hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

188.   The Equal Protection Clause of the Fourteenth Amendment provides that no State may deny any person within its jurisdiction the equal protection of the laws.

189.   It is a fundamental, long-standing principle that the government has important, legitimate, fundamental, and compelling interests in preventing suicide. In addition the "unqualified interest in the preservation of life," the U.S. Supreme Court has identified four additional and related State interests in the context of

assisted suicide.[184]  First, "the State has an interest in preventing suicide and in studying, identifying, and treating its causes."[185]  Second, the State "has an interest in protecting the integrity and ethics of the medical profession."[186]  Third, the State "has an interest in protecting vulnerable groups—including the poor, the elderly, and disabled persons—from abuse, neglect, and mistakes," recognizing "the real risk of subtle coercion and undue influence in end-of-life situations."[187]  This interest "goes beyond protecting the vulnerable from coercion; it extends to protecting disabled and terminally ill people from prejudice, negative and inaccurate stereotypes, and "societal indifference.""[188]  Finally, the State has an interest in avoiding opening the door to "voluntary and perhaps even involuntary euthanasia."[189]

190.   Plaintiffs' constituents and/or members include, and Plaintiffs are, individuals with disabilities who are likely to die at some future time if they cease or fail to receive treatment or care necessary to the operation of major bodily functions, and therefore, are likely to be diagnosed by physicians as having a "terminal disease" under EOLOA.

191.   EOLOA facially and intentionally discriminates on the basis of physical health, denying protections and safeguards to those diagnosed with a "terminally disease," all of whom are persons with disabilities, without any rational

---

[184] *Glucksberg*, 521 U.S. at 728 (finding no constitutional right to assisted suicide).

[185] *Id.* at 730.

[186] *Id.* at 731 (citing American Medical Association, Code of Ethics § 2.211 (1994) ("[p]physician-assisted suicide is fundamentally incompatible with the physician's role as healer."); Council on Ethical and Judicial Affairs, Decisions Near the End of Life, 267 JAMA 2229, 2233 (1992) ("[T]he societal risks of involving physicians in medical interventions to cause patients' deaths is too great").

[187] *Glucksberg*, 521 U.S. at 731-32.

[188] *Id.* at 732.

[189] *Id.*

basis.  The Act undermines and interferes with the State's interest in suicide prevention by sanctioning the act of helping someone else kill themselves based on the perceived nature and duration of their physical health and disability.  By singling out only people with terminal disabilities for State-sanctioned assisted suicide, the Act sends a powerful message that their decision to die is the right choice and not worthy of the resources devoted to preserve all other lives.  In doing so, the Act draws an irrational distinction based on physical health and certain terminal disabilities, is both over and under-inclusive by allowing certain individuals to choose assisted suicide while denying that choice to others, and does not advance or otherwise further legitimate governmental interests.  There is no compelling or even rational basis to treat the lives of people with terminal diseases any different from other groups of people ineligible to participate in EOLOA who nevertheless share similar concerns about losing autonomy, the loss of dignity, losing control of bodily functions, becoming a burden on caregivers, pain, and/or the financial costs associated with continued living.

192.   Because EOLOA implicates a fundamental right—the right to live—the discrimination perpetuated by the Act warrants a heightened level of review.

193.   Defendant Governor Newsom is responsible for enacting, executing, and overseeing the enforcement and implementation of the laws of the State, including EOLOA.  Defendants Lawson, Attorney General Bonta, District Attorney Gascón are responsible for enforcing the laws and regulations of the State, but fail to discharge their duties to enforce these laws, pursuant to EOLOA.  Defendants Aragón, Baass, and Madrigal-Weiss are responsible for implementing and administering the State's suicide prevention programs and EOLOA.  Through their actions and omissions related to EOLOA, Defendants Governor Newsom, Attorney General Bonta, Aragón, Baass, Lawson, Madrigal-Weiss, and District Attorney Gascón violate the Equal Protection Clause by offering protection and public services to people without terminal disabilities who become suicidal, while

simultaneously justifying, validating, steering, and assisting the suicide of those with terminal disabilities when they become suicidal.  This disparate treatment, which implicates the fundamental right to protection and security for the right to live, perpetuates harmful bias and stereotypes about the quality of life for people with terminal disabilities and the idea that their lives are less worthy of protection and preservation.  These constitutional violations inflict ongoing harm upon Plaintiffs.

194.   The actions and omissions of Defendants Governor Newsom, Attorney General Bonta, Aragón, Baass, Lawson, Madrigal-Weiss, and District Attorney Gascón violate Plaintiffs' rights to equal protection guaranteed by the Fourteenth Amendment to the United States Constitution, and these violations inflict ongoing harm upon Plaintiffs.

### FOURTH CLAIM FOR RELIEF
**(14th Amendment Due Process, 42 U.S.C. § 1983)**
**(Against Defendants Governor Newsom, Attorney General Bonta, Aragón, Baass, Lawson, Madrigal-Weiss, and District Attorney Gascón, in their Official Capacities)**

195.   Plaintiffs reallege and hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

196.   The Due Process Clause of the Fourteenth Amendment provides that no State shall deprive any person of life, liberty, or property without due process of law.

197.   Plaintiffs' constituents and/or members, and Plaintiffs themselves, have a fundamental right under the Due Process Clause to protections and security for their right to live, and this fundamental right cannot be waived without due process. This fundamental right is grounded in the nation's history and legal traditions, which have punished or otherwise disapproved of assisting suicide and generally rendered such assistance a crime.  The U.S. Supreme Court recognized in *Washington v. Glucksberg*, 521 U.S. 702, 732 (1997) that physician-assisted suicide laws pose a "risk of harm [that] is greatest for the many individuals in our society

whose autonomy and well-being are already compromised by poverty, lack of access to good medical care, advanced age, or membership in a stigmatized social group." EOLOA violates the Due Process Clause by denying the fundamental interest in the preservation of life to individuals whose doctors diagnose them with terminal diseases and prescribe lethal drugs on that basis. The Act depends on predictions of imminency that are inherently unknowable, highly unreliable, and plainly discriminatory. EOLOA deprives due process and protection from State actors employing their power to steer individuals to prematurely end their lives, including people with disabilities. The Act implicates the state-created danger doctrine, *id.*, under which "the state may be constitutionally required to protect a plaintiff that it affirmatively places in danger by acting with deliberate indifference to a known or obvious danger." *Martinez v. City of Clovis*, 943 F.3d 1260, 1271 (9th Cir. 2019) (internal quotations omitted). Here, Defendants Governor Newsom, Attorney General Bonta, Aragón, Baass, Lawson, Madrigal-Weiss, and District Attorney Gascón have been deliberately indifferent in creating and/or exposing individuals with terminal disabilities to the foreseeable dangers of physician-assisted suicide that otherwise would have not existed but for their enforcement, implementation, and administration of EOLOA.

198. The Act also violates the Due Process Clause, as elucidated by U.S. Supreme Court in *Glucksberg*, by lacking sufficient safeguards to ensure that an individual's waiver of their fundamental right to live is made with adequate due process. EOLOA's failure to require that people meaningfully consider, exhaust, and/or knowingly reject less restrictive alternatives to assisted suicide, including suicide prevention services, medical and nursing support services, hospice care, and other personal support services currently provided by California violates the Due Process Clause of the Fourteen Amendment.

199. Defendant Governor Newsom is responsible for enacting, executing, and overseeing the enforcement and implementation of the laws of the State,

1    including EOLOA.  Defendants Lawson, Attorney General Bonta, and District

2    Attorney Gascón are responsible for enforcing the laws and regulations of the State,

3    but fail to discharge their duties to enforce these laws pursuant to EOLOA.

4    Defendants Aragón, Baass, and Madrigal-Weiss are responsible for implementing

5    and administering EOLOA.  By participating in these activities related to EOLOA,

6    Defendants Governor Newsom, Attorney General Bonta, Aragón, Baass, Lawson,

7    Madrigal-Weiss, and District Attorney Gascón violate the Due Process Clause.

8        200.   The actions of Defendants Governor Newsom, Attorney General Bonta,

9    Aragón, Baass, Lawson, Madrigal-Weiss, and District Attorney Gascón violate

10   Plaintiffs' rights to due process guaranteed by the Fourteenth Amendment to the

11   United States Constitution, and these violations inflict ongoing harm upon Plaintiffs.

12                              **PRAYER FOR RELIEF**

13       WHEREFORE Plaintiffs pray for relief and judgment against Defendants,

14   and each of them, as follows:

15       1.     Declaring that EOLOA violates Title II of the Americans with

16   Disabilities Act;

17       2.     Declaring that EOLOA violates Section 504 of the Rehabilitation Act;

18       3.     Declaring EOLOA unconstitutional under the Fourteenth Amendment's

19   Equal Protection Clause;

20       4.     Declaring EOLOA unconstitutional under the Fourteenth Amendment's

21   Due Process Clause;

22       5.     Preliminarily and permanently enjoining Defendants from enforcing

23   EOLOA; and

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

6.     Granting such other and further relief as this Court may deem just and proper, including an award to Plaintiffs of the costs of this suit and reasonable attorneys' fees and litigation expenses.

DATED:  April 25, 2023                    Respectfully submitted,

                                         ROSEN BIEN GALVAN & GRUNFELD LLP

                                         By: */s/ Michael W. Bien*

                                             Michael W. Bien

                                         Attorneys for Plaintiffs