ROB BONTA
Attorney General of California
EDWARD KIM, State Bar No. 195729
DARRELL W. SPENCE, State Bar No. 248011
Supervising Deputy Attorneys General
MARSHA E. BARR-FERNANDEZ, State Bar No. 200896
CHRISTINE FRIAR WALTON, State Bar No. 228421
KEVIN L. QUADE, State Bar No. 285197
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone:  (916) 210-7693
  Fax:  (916) 324-5567
  E-mail:  Kevin.Quade@doj.ca.gov
          Christine.Walton@doj.ca.gov
          Marsha.BarrFernandez@doj.ca.gov
*Attorneys for the State Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED SPINAL ASSOCIATION; NOT DEAD YET; INSTITUTE FOR PATIENTS' RIGHTS; COMMUNITIES ACTIVELY LIVING INDEPENDENT AND FREE; LONNIE VANHOOK; and INGRID TISCHER,<br><br>Plaintiffs,<br><br>v.<br><br>STATE OF CALIFORNIA; GAVIN NEWSOM, in his official capacity as Governor; ROBERT BONTA in his official capacity as Attorney General; CALIFORNIA DEPARTMENT OF PUBLIC HEALTH; TOMÁS J. ARAGON, in his official capacity as Director and State Public Health Officer; CALIFORNIA DEPARTMENT OF HEALTH CARE SERVICES; MICHELLE BAASS, in her official capacity as Director; MENTAL HEALTH SERVICES OVERSIGHT AND ACCOUNTABILITY COMMISSION; MARA MADRIGAL-WEISS, in her official | 2:23-cv-03107-FLA (GJSx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**<br><br>Date:          September 22, 2023<br>Time:          1:30 p.m.<br>Courtroom:  Courtroom 6<br>Judge:        The Honorable Fernando L. Aenlle-Rocha<br>Trial Date:   n/a<br>Action Filed: April 25, 2023 |

1   capacity as Chair; MEDICAL
    BOARD OF CALIFORNIA;
2   KRISTINA D. LAWSON, in her
    official capacity as President;
3   DISTRICT ATTORNEY'S OFFICE
    FOR LOS ANGELES COUNTY;
4   GEORGE GASCON, in his official
    capacity as District Attorney; and
5   DOES 1 through 20, inclusive,

6                           Defendants.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Introduction ....................................................................................................... 1

Background ......................................................................................................... 3

Applicable Legal Standards ............................................................................... 5

Argument ........................................................................................................... 6

    I.     This Court Lacks Subject Matter Jurisdiction ....................................... 6

         A.     The Individual Patient Plaintiffs Lack Standing ....................... 6

         B.     The Organizational Plaintiffs Lack Standing .......................... 11

             1.     Direct standing ............................................................. 11

             2.     Associational standing ................................................. 14

         C.     Eleventh Amendment Immunity Bars Plaintiffs' Constitutional Claims Against Some of the State Defendants .............................................................................. 15

    II.    Plaintiffs Fail to State Viable Claims for Relief ................................. 17

         A.     Plaintiffs Fail to State Viable Claims Under the ADA and Section 504 of the Rehabilitation Act ..................................... 17

             1.     ADA and Section 504 background ............................... 17

             2.     Plaintiffs cannot demonstrate that the EOLOA violates the ADA and Section 504 in all circumstances ............................................................... 18

         B.     Plaintiffs Fail to State a Viable Equal Protection Claim .......... 21

         C.     Plaintiffs Fail to State a Viable Due Process Claim ................. 24

Conclusion ....................................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

CASES

*Aleman v. Glickman*
   217 F.3d 1191 (9th Cir. 2000) ................................................................ 23

*Am. Fed'n of Gov't Emps. Local 1 v. Stone*
   502 F.3d 1027 (9th Cir. 2007) ................................................................ 12

*Anderson v. Edwards*
   514 U.S. 143 (1995) ................................................................................ 6

*Arato v. Avedon*
   5 Cal. 4th 1172 (1993) ............................................................................ 4

*Ashcroft v. Iqbal*
   556 U.S. 662 (2009) ................................................................................ 6

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*
   729 F.3d 937 (9th Cir. 2013) .................................................................. 16

*Bd. of Trustees of Univ. of Ala. v. Garrett*
   531 U.S. 356 (2001) .............................................................................. 23

*Cal. Pro-Life Council, Inc. v. Getman*
   328 F.3d 1088 (9th Cir. 2003) ................................................................ 10

*California v. Texas*
   141 S. Ct. 2104 (2021) ............................................................................ 14

*Cholla Ready Mix, Inc. v. Civish*
   382 F.3d 969 (9th Cir. 2004) ............................................................... 6, 7

*Christian Med. and Dental Ass'n v. Bonta*
   625 F. Supp. 3d 1018 (C.D. Cal. 2022) ................................................. 25

*City of Cleburne v. Cleburne Living Ctr.*
   473 U.S. 432 (1985) .............................................................................. 21

*City of Los Angeles v. Lyons*
   461 U.S. 95 (1983) ............................................................................ 6, 10

ii

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Clapper v. Amnesty Int'l USA*
    568 U.S. 398 (2013) ..................................................................... 7, 8

*Coal. to Defend Affirm. Action v. Brown*
    674 F.3d 1128 (9th Cir. 2012) ................................................. 16, 17

*Dep't of Commerce v. New York*
    139 S. Ct. 2551 (2019) ..................................................................... 11

*E. Bay Sanctuary Covenant v. Biden*
    993 F.3d 640 (9th Cir. 2021) ......................................................... 12

*Engquist v. Or. Dep't of Ag.*
    553 U.S. 591 (2008) ......................................................................... 21

*Fla. Dep't of State v. Treasure Salvors, Inc.*
    458 U.S. 670 (1982) ......................................................................... 15

*Havens Realty Corp. v. Coleman*
    455 U.S. 363 (1982) ................................................................. 12, 13

*Hunt v. Wash. State Apple Adver. Comm'n*
    432 U.S. 333 (1977) ......................................................................... 15

*Johnson by Johnson v. Thompson*
    971 F.2d 1487 (10th Cir. 1992) ..................................................... 20

*K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*
    725 F.3d 1088 (9th Cir. 2013) ....................................................... 17

*Kokkonen v. Guardian Life Ins. Co. of Am.*
    511 U.S. 375 (1994) ........................................................................... 5

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*
    624 F.3d 1083 (9th Cir. 2010) ........................................... 11, 13, 14

*Lee v. Oregon*
    107 F.3d 1382 (9th Cir. 1997) ................................................ passim

*Lujan v. Defenders of Wildlife*
    504 U.S. 555 (1992) ................................................................ passim

1
2

**TABLE OF AUTHORITIES**
**(continued)**

Page

3
4
*Lyng v. Castillo*
    477 U.S. 635 (1986) ............................................................... 23

5
6
*Mark H. v. Lemahieu*
    513 F.3d 922 (9th Cir. 2008) ................................................. 19

7
8
*Martin v. Cal. Dep't of Veterans Affairs*
    560 F.3d 1042 (9th Cir. 2009) ........................................ 17, 18

9
*Martinez v. City of Clovis*
    943 F.3d 1260 (9th Cir. 2019) ....................................... 24, 25

10
11
*McCarthy v. United States*
    850 F.2d 558 (9th Cir. 1988) ................................................... 5

12
13
*McGugan v. Aldana-Bernier*
    752 F.3d 224 (2d Cir. 2014) ................................................. 20

14
15
*Memmer v. Marin Cnty. Cts.*
    169 F.3d 630 (9th Cir. 1999) ............................................... 19

16
17
*Nordlinger v. Hahn*
    505 U.S. 1 (1992) ................................................................. 22

18
19
*Pennhurst State Sch. and Hosp. v. Helderman*
    465 U.S. 89 (1983) ............................................................... 15

20
21
*Pierce v. Ducey*
    965 F.3d 1085 (9th Cir. 2020) ............................................. 12

22
*Plyler v. Doe*
    457 U.S. 202 (1982) ............................................................. 21

23
24
*Project Sentinel v. Evergreen Ridge Aparts.*
    40 F. Supp. 2d 1136 (N.D. Cal. 1999) ................................. 13

25
26
*Rodriguez v. City of San Jose*
    930 F.3d 1123 (9th Cir. 2019) .................................. 12, 13, 14

27
28
*Roy v. Barr*
    960 F.3d 1175 (9th Cir. 2020) ....................................... 21, 23

# TABLE OF AUTHORITIES
## (continued)

**Page**

*S.D. Myers, Inc. v. City and Cnty. of San Francisco*
253 F.3d 461 (9th Cir. 2001) ............................................................... 6, 21

*Sabra v. Maricopa Cnty. Comm. Coll. Dist.*
44 F.4th 867 (9th Cir. 2022) .................................................................. 11

*Shavelson v. Bonta*
608 F. Supp. 3d 919 (N.D. Cal. 2022) ............................................... 19, 25

*Simmons v. Navajo Cnty.*
609 F.3d 1011 (9th Cir. 2010) ................................................................ 20

*Sprint Telephony PCS, L.P. v. Cnty. of San Diego*
543 F.3d 571 (9th Cir. 2008) (en banc) ............................................... 6, 18

*Steel Co. v. Citizens for a Better Environment*
523 U.S. 83 (1998) .................................................................................. 6

*United States v. Salerno*
481 U.S. 739 (1987) .................................................................. 6, 19, 20, 24

*Walker v. City of Lakewood*
272 F.3d 1114 (9th Cir. 2001) ................................................................ 12

*Wash. Env't Council v. Bellon*
732 F.3d 1131 (9th Cir. 2013) ........................................................... 10, 11

*Williams v. Field*
416 F.2d 483 (9th Cir. 1969) ............................................................. 21, 22

*Witzke v. Idaho State Bar*
__ F. Supp. 3d __ (D. Idaho, Nov. 29, 2022) ........................................... 6

*Ex parte Young*
209 U.S. 123 (1908) ........................................................................... 15, 16

*Zamani v. Carnes*
491 F.3d 990 (9th Cir. 2007) ................................................................... 6

*Zukle v. Regents of the Univ. of Cal.*
166 F.3d 1041 (9th Cir. 1999) ................................................................ 17

# TABLE OF AUTHORITIES
## (continued)

**Page**

### STATUTES

29 United States Code
§ 794(a) .................................................................................. 17

42 United States Code
§ 12102(1) .............................................................................. 18
§ 12132 .................................................................................. 17

California Health and Safety Code
§ 443.1(e) ................................................................................. 3
§ 443.1(j) .................................................................................. 4
§ 443.1(q) ................................................................................. 5
§ 443.1(r) ............................................................................ 7, 22
§ 443.2 .................................................................................. 3, 9
§ 443.3 ................................................................................ 3, 19
§ 443.3(a) ............................................................................. 3, 9
§ 443.4 ................................................................................ 3, 19
§ 443.4(a) ................................................................................. 4
§ 443.4(b) ............................................................................... 10
§ 443.5 ................................................................................ 3, 19
§ 443.5(a) ............................................................................... 10
§ 443.5(a)(1) ...................................................................... 3, 9, 11
§ 443.5(a)(1)(A) ........................................................................ 4
§ 443.5(a)(1)(A)(ii) .................................................................... 9
§ 443.5(a)(1)(A)(iii) ............................................................... 4, 9
§ 443.5(a)(2) ...................................................................... 9, 11
§ 443.5(a)(3) ................................................................... 5, 9, 11
§ 443.5(a)(7) ............................................................................. 5
§ 443.5(a)(8) ......................................................................... 5, 10
§ 443.5(b) ................................................................................. 5
§ 443.6 ............................................................................ 3, 5, 19
§ 443.6(a) ............................................................................. 5, 10
§ 443.6(b) ............................................................................. 5, 10

# TABLE OF AUTHORITIES
## (continued)

**Page**

§ 443.6(c) ................................................................................ 9
§ 443.6(d) ................................................................................ 5
§ 443.7 .................................................................................... 4
§ 443.7(a) .............................................................................. 10
§ 443.9 .................................................................................... 3
§ 443.11 .................................................................................. 3

California Probate Code
§ 2355 .................................................................................... 8
§ 4609 .................................................................................... 3
§ 4650 .................................................................................... 8

**CONSTITUTIONAL PROVISIONS**

Eleventh Amendment ................................................ 2, 15, 17

**COURT RULES**

California Rules of Court
Rule 12(b)(1) ........................................................................ 5
Rule 12(b)(6) ........................................................................ 5

**INTRODUCTION**

This lawsuit seeks to invalidate and permanently enjoin California's End of Life Option Act (EOLOA or Act). Enacted in 2015 and reauthorized in 2021, the EOLOA provides Californians suffering from a terminal illness, who satisfy strict criteria and complete a thorough, multi-step assessment process, the ability to obtain aid-in-dying (AID) medication.

The EOLOA's statutory scheme is organized around the central principle that an eligible patient's decision to obtain and take an AID drug must be voluntary. Every step of the Act's rigorous process is geared toward ensuring a patient's voluntary and informed consent. An AID medication cannot be prescribed absent, among other things, multiple oral and written requests by an eligible patient, attestation by multiple witnesses concerning the patient's mental state, and evaluation for capacity and voluntariness by multiple physicians.

Plaintiffs—four disability rights organizations and two individuals—disagree with the State's legislative decision to afford certain Californians the option of AID medication. Their Complaint alleges that the EOLOA creates a risk that terminally-ill disabled patients will be steered towards AID medication, ultimately leading to involuntary deaths. As a result, operation of the EOLOA allegedly constitutes unlawful disability discrimination under Title II of the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act (Section 504), and that it violates the federal constitutional rights to equal protection and due process.

Plaintiffs' lawsuit should be dismissed without leave to amend. This Court lacks jurisdiction because Plaintiffs lack standing. The individual patient Plaintiffs cannot establish a cognizable injury as they are not currently eligible for an AID drug and their allegations are too remote and dependent on too many contingencies. The organizational Plaintiffs cannot demonstrate that the Act has any tangible direct effect on their operations or ability to pursue their missions. To the extent these

1

organizations elected to divert funding, that choice was not forced by any particularized threat to the organization and, thus, is not fairly traceable to the alleged conduct of any State Defendant.  Additionally, as to some of the public officials named in their constitutional challenges, Plaintiffs have not shown that they have the type of direct connection to enforcement of the EOLOA that would justify an exception to the State's immunity under the Eleventh Amendment.

Plaintiffs also fail to state viable claims for relief.  Their claims of unlawful discrimination under the ADA and Section 504 cannot succeed because the Act does not exclude or disadvantage terminally ill disabled persons in any way.  To the contrary, the law affords eligible patients an additional, yet fully voluntary, option for end-of-life care.  To the extent a terminally ill patient seeking AID medication experiences differential medical treatment, any disparity flows from the patient's voluntary request for such treatment as appropriate for their unique medical circumstances, not unlawful discrimination based on disability.

Plaintiffs' equal protection claim fails because terminally ill patients eligible for AID medication are not similarly situated to other members of the population. Only these individuals face the imminent and irreversible prospect of death, along with the pain, suffering, and mental anguish associated with the dying process. Even if Plaintiffs could establish similarly situated classifications, the EOLOA's affording this uniquely narrow group of patients the option of utilizing AID medication rationally serves California's legitimate interest in protecting the physical and mental well-being of its people.

Finally, Plaintiffs fail to state a due process claim.  Plaintiffs allege that the EOLOA contains insufficient safeguards and creates an untenable risk that patients will utilize the Act in an involuntary manner.  But the law was crafted to prevent the risk that Plaintiffs articulate, and its procedural requirements ensure a patient's voluntary consent at every step.  Plaintiffs have not pled and cannot establish the

deliberate State indifference to a foreseeable danger necessary for a due process claim. The Court should dismiss this entire action with prejudice.

## BACKGROUND

The EOLOA authorizes a mentally competent adult, diagnosed by their attending physician with an irreversible terminal disease, to request AID medication. Cal. Health & Safety Code § 443.2. The Act's structure and process is designed to ensure that a patient's decision to obtain and self-administer an AID drug is voluntary.

To that end, the EOLOA mandates compliance with stringent protocols and procedures by patients and health care providers. *See* Cal. Health & Safety Code §§ 443.2-443.11. A patient seeking AID medication must make two oral requests, at least 48 hours apart, along with a written request on a legislatively specified form. *Id.* § 443.3(a). The written request must be executed in the presence of two adult witnesses who also must execute the form attesting that they know the patient, the form was voluntarily signed in their presence, and that the patient is of sound mind and not under duress, fraud, or undue influence. *Id.* § 443.3(b)(3).

Before prescribing an AID drug, the attending physician who receives the patient's request must confirm the terminal disease diagnosis, and then assess the patient's mental state to determine: (1) whether the patient has capacity to make medical decisions; (2) whether the decision to seek AID medication has been voluntarily made; and (3) whether the patient's decision is an informed one. Cal. Health & Safety Code § 443.5(a)(1)-(2). In defining "capacity to make medical decisions," the Act draws from the California Probate Code's well-established definition, requiring a determination that "the individual has the ability to understand the nature and consequences of a health care decision, the ability to understand its significant benefits, risks, and alternatives, and the ability to make and communicate an informed decision to health care providers." *Id.* § 443.1(e); *see* Cal. Prob. Code § 4609. An "informed decision," in turn, is defined as "a

1   decision by an individual with a terminal disease to request and obtain a

2   prescription for a drug that the individual may self-administer to end the

3   individual's life, that is based on an understanding and acknowledgment of the

4   relevant facts, and that is made after being fully informed by the attending

5   physician" of the following information:

> (1) The individual's medical diagnosis and prognosis. (2) The potential risks associated with taking the drug to be prescribed. (3) The probable result of taking the drug to be prescribed. (4) The possibility that the individual may choose not to obtain the drug or may obtain the drug but may decide not to ingest it. (5) The feasible alternatives or additional treatment opportunities, including, but not limited to, comfort care, hospice care, palliative care, and pain control.

10  *Id.* §§ 443.1(j), 443.5(a)(2); *see Arato v. Avedon*, 5 Cal. 4th 1172, 1183, 1187

11  (1993) (outlining California's standard for informed consent).

12      If the attending physician perceives *any* indication of a mental disorder, the

13  physician must refer the patient for a mental health specialist assessment.  Cal.

14  Health & Safety Code § 443.5(a)(1)(A).  In that case, no AID drug can be

15  prescribed unless the mental health specialist determines that the patient has

16  capacity to make medical decisions, has made a voluntary decision to request AID

17  medication, and is not suffering from impaired judgment due to a mental disorder.

18  *Id.* §§ 443.5(a)(1)(A)(iii), 443.7.  The attending physician must also discuss the

19  request with the patient privately—with no others present—to determine whether

20  the patient is feeling coerced or unduly influenced by another person, and to

21  counsel the patient about the importance of, among other things, participating in a

22  hospice program, and informing the individual that they may withdraw or rescind

23  their request for AID medication at any time.  *Id.* § 443.5(a)(4)-(6).

24      If the attending physician determines that the patient is eligible for AID

25  medication, the patient must be referred to a consulting physician for an

26  independent evaluation.  The patient is not eligible for AID medication unless that

27  second physician separately medically confirms the patient's terminal disease

28  diagnosis and prognosis, determines that the patient has capacity to make medical

decisions under the standards detailed above, and finds compliance with all necessary procedures.  Cal. Health & Safety §§ 443.5(a)(3), 443.6.  The consulting physician's evaluation includes a review of relevant medical records and an independent determination that the patient's request is voluntary and constitutes an informed decision.  *Id.* § 443.6(a)-(c).  As with the attending physician, the consulting physician must refer the patient to a mental health specialist if there is any indication impaired judgment caused by a mental disorder.  *Id.* § 443.6(d).

After the consulting physician completes their evaluation, and before the attending physician can actually prescribe an AID drug, the attending physician must explicitly offer the patient an opportunity to withdraw their request.  Cal. Health & Safety Code § 443.5(a)(7).  The attending physician must then verify yet again that the patient is making an informed decision.  *Id.* §§ 443.5(a)(8), 443.10. Only after all of these steps have been satisfied, may the attending physician prescribe an AID drug for later dispensing at the patient's request or deliver the drug to the patient directly.  *Id.* § 443.5(b).  The patient then may choose to ingest or not ingest the AID drug at their own discretion, but any ingestion must be "self-administer[ed]" by the patient, which is defined as an "affirmative, conscious, and physical act of administering and ingesting the aid-in-dying drug to bring about their own death."  *Id.* § 443.1(q).

## APPLICABLE LEGAL STANDARDS

Under Rule 12(b)(1), the party asserting federal subject-matter jurisdiction bears the burden of establishing its existence.  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  The court must dismiss a claim where it lacks subject-matter jurisdiction, and may review evidence, such as affidavits and testimony, concerning facts bearing on the existence of jurisdiction.  *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988).  Under Rule 12(b)(6), a complaint should be dismissed for failure to state a claim "where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal

theory." *Zamani v. Carnes*, 491 F.3d 990, 996 (9th Cir. 2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The court must accept as true the factual allegations in the complaint, but not conclusory allegations, unwarranted factual deductions, or unreasonable inferences.  *Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969, 973 (9th Cir. 2004).

Where, as here, a plaintiff asserts facial challenges to a state law, they must establish "that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *S.D. Myers, Inc. v. City and Cnty. of San Francisco*, 253 F.3d 461, 467-68 (9th Cir. 2001).  The *Salerno* standard applies not only to facial constitutional challenges, but also where a challenged law or ordinance is claimed facially invalid under a federal statute.  *See Anderson v. Edwards*, 514 U.S. 143, 155 n.6 (1995); *Sprint Telephony PCS, L.P. v. Cnty. of San Diego*, 543 F.3d 571, 579 (9th Cir. 2008) (en banc); *Witzke v. Idaho State Bar*, __ F. Supp. 3d __, 2022 WL 17340272 at *13 (D. Idaho, Nov. 29, 2022) (applying *Salerno* standard to facial ADA challenge).

## ARGUMENT

### I.   THIS COURT LACKS SUBJECT MATTER JURISDICTION

#### A.   The Individual Patient Plaintiffs Lack Standing

Plaintiffs VanHook and Tischer cannot establish Article III standing to assert claims against any Defendants.  Standing requires: (1) an injury in fact; (2) that is fairly traceable to the challenged conduct of the defendant; and (3) is likely to be redressed by a favorable judicial decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Failure to establish all three components of standing deprives the court of jurisdiction to entertain the case.  *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 109-10 (1998).

To demonstrate injury, a plaintiff must make a "clear showing" of injury in fact that is actual and concrete, not conjectural or hypothetical.  *Lujan*, 504 U.S. at 560.  "Abstract injury is not enough."  *City of Los Angeles v. Lyons*, 461 U.S. 95,

101 (1983).  Where prospective injunctive and declaratory relief is sought, an alleged threatened injury must be "'certainly impending.'"  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

Initially, the allegations in the Complaint make clear that neither individual Plaintiff is currently eligible for AID medication under the EOLOA.  As such, these Plaintiffs lack standing.  *See Lee v. Oregon*, 107 F.3d 1382, 1388, 1390 n.2 (9th Cir. 1997) (recognizing that ineligibility under AID prescription scheme deprives patient plaintiff of a cognizable injury, but assuming eligibility in analysis).

Though Plaintiffs VanHook and Tischer assert that they have qualifying "terminal disease[s]," Dkt. 1 ¶¶ 34, 38, such conclusory allegations are not supported by the balance of the Complaint and cannot be accepted as true.  *Cholla Ready Mix, Inc.*, 382 F.3d at 973.  The EOLOA defines "terminal disease" for the purpose of eligibility to mean "an incurable and irreversible disease that has been medically confirmed and will, within reasonable medical judgment, result in death within six months."  Cal. Health & Safety Code § 443.1(r).  The Complaint makes unequivocally clear that both Plaintiffs have lived with their medical disabilities for many years.  *See* Dkt. 1 ¶¶ 36 (referencing post-depression support provided by a "long-time physician who has followed Plaintiff VanHook's medical care for over 33 years."), 37-38 (alleging that Plaintiff Tischer was born with muscular dystrophy and referencing past experiences with discrimination based on her disabilities).  The Complaint does not allege that either Plaintiffs VanHook or Tischer have been deemed eligible for AID medication by a doctor, or that their medical conditions are no longer susceptible to the same treatments that have sustained them throughout their lives.

Plaintiffs assert that, notwithstanding their apparent long history of life-sustaining treatment, they nevertheless qualify for AID medication because they would die within six months without their medical supports.  Dkt. 1 ¶¶ 34, 38; *see id.* ¶ 190 (Plaintiffs are "likely to die at some future time if they cease or fail to

7

receive treatment"). But this allegation does not alter their current status. Critically, the Complaint does not allege that either Plaintiff has received a prognosis that their disease will, within reasonable medical judgment, result in their death within six months. Nor does the Complaint allege that either Plaintiff has or will be deprived of access to their medical treatments.

In asserting a theory of eligibility (and, thus, injury) premised on cessation of their medical supports, Plaintiffs allege a hypothetical harm that would necessarily flow from their own choices to terminate treatment. But a plaintiff cannot create standing by causing their own injury. *Clapper*, 568 U.S. at 415-18. To the extent Plaintiffs' allegations go even further, positing a theory of injury that their threshold decision to discontinue life-sustaining treatment (thereby rendering them eligible for AID medication) could itself be an involuntary, that decision is not subject to or affected by the EOLOA in any way. Wholly separate principles of law govern when a patient is competent to choose to discontinue life-sustaining treatment. *See Conserv. of Wendland*, 26 Cal. 4th 519, 535 (2001); *see also* Cal. Prob. Code §§ 2355, 4650. The claims for relief in this lawsuit do not speak to this necessary component of Plaintiffs' theory of eligibility under the Act.

Nevertheless, even if it were assumed that the individual Plaintiffs are currently eligible, standing is squarely foreclosed by *Lee*, 107 F.3d at 1388-90. In *Lee*, a plaintiff patient with progressive muscular dystrophy sought to invalidate Oregon's AID medication law, specifically alleging that her history of clinical depression and prior ambivalence to continuing her life created a risk that she would ultimately succumb to her mental state and use the law to involuntarily end her life. *Id.* at 1388. The Ninth Circuit held that the asserted injury was dependent on a "chain of speculative contingencies" too remote and uncertain to justify Article III standing. *Lee*, 107 F.3d at 1388-89. Since at least seven distinct contingencies were necessary for the plaintiff's alleged injury to manifest, the allegations failed to demonstrate an "'*individualized* showing that there is a very significant possibility

that the future harm will ensue.'" *Id.* (quoting *Nelson v. King Cnty.*, 895 F.2d 1248, 1250 (9th Cir. 1990)).

*Lee* controls here. Plaintiffs VanHook and Tischer allege an identical injury to that alleged in *Lee* and, as in that case, a nearly identical chain of speculative contingencies would have to occur in order for that injury to manifest. *See Lee*, 107 F.3d at 1388 (listing contingencies). Specifically, an individual Plaintiff would have to (1) become so depressed that they would be unable to make an informed decision about whether to take their own life; (2) make an oral request to their attending physician for AID medication, Cal. Health & Safety Code § 443.3(a); (3) submit a written request to their physician, Cal. Health & Safety Code § 443.3(a)-(c); (4) both witnesses to this written request would have to fail to recognize that the Plaintiff's decision is not the product of a sound mind, but rather, the duress caused by depressive mental illness, Cal. Health & Safety Code § 443.3(b)(3); (5) the attending physician, after discussing with the Plaintiff, among other things, the diagnosis, prognosis, and feasible alternative treatments and end-of-life options, would have to mistakenly conclude that the Plaintiff had capacity, had made a voluntary decision, and that the decision is not the product of a mental disorder, Cal. Health & Safety Code § 443.5(a)(1)-(2);[1] (6) a consulting physician, after examining the Plaintiff and relevant medical records, would have to mistakenly conclude that the Plaintiff had capacity, had made a voluntary decision, and that the decision is not the product of a mental disorder, Cal. Health & Safety Code §§ 443.5(a)(3), 443.6(c); (7) at least 48 hours after the initial oral and written requests, the Plaintiff would have to be still suffering in a debilitating mental state and make a second oral request to their attending physician, Cal. Health & Safety Code §

---

[1] If the attending physician did identify indications of a mental disorder, the Plaintiff would be referred for assessment by a mental health specialist. No AID drug could then be prescribed unless and until the mental health specialist determined that the Plaintiff had capacity to make medical decisions and was not suffering from impaired judgment due to a mental disorder. *See* Cal. Health & Safety Code § 443.5(a)(1)(A)(ii)-(iii).

443.3(a); (8) immediately prior to writing the prescription, the attending physician would have to again fail to recognize that the Plaintiff was not making an informed and voluntary decision, Cal. Health & Safety Code § 443.5(a)(8); (9) immediately prior to receiving the prescription, the Plaintiff would have to persist in their request, despite being explicitly offered an opportunity to withdraw or rescind the request, Cal. Health & Safety Code §§ 443.4(b), 443.5(a)(6)-(7); and (10) after receiving the prescription and obtaining an AID medication, the Plaintiff would have to self-administer the medication, taking their own life against their true wishes.  Since non-satisfaction of any link in this lengthy chain of contingencies would render Plaintiffs' theory of injury impossible, Plaintiffs' allegations are nothing more than speculation and conjecture.  *Lee*, 107 F.3d at 1388-90; *see Lyons*, 461 U.S. at 108 (finding no standing, notwithstanding the fact that someone could be killed by an unconstitutional chokehold, because it was only speculation that plaintiff would be killed).[2]

The individual Plaintiffs similarly cannot establish that their alleged injury is (or will be) fairly traceable to any conduct of the State Defendants.  *See Lujan*, 504 U.S. at 560.  To satisfy the causality element of Article III standing, the line of causation between a defendant's action and the plaintiff's harm must be more than attenuated.  *Wash. Env't Council v. Bellon*, 732 F.3d 1131, 1141 (9th Cir. 2013).  In this case, however, Plaintiffs have not alleged that any of the State Defendants have anything more than a peripheral, second-hand connection to the EOLOA's process.  Plaintiffs' allegations concerning the State Defendants' conduct range from bare assertions of generalized supervisory authority and blanket obligations to enforce all laws, to ministerial tasks that have no impact whatsoever on the EOLOA's substantive operation, as well as basic claims about the State's administrations of

---

[2] Plaintiffs' inability to plead a sufficient injury in fact also establishes that their claims are not ripe for adjudication.  *See Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094 n. 2 (9th Cir. 2003) ("The constitutional component of ripeness is synonymous with the injury-in-fact prong of the standing inquiry.").

its vast health care service programs and regime for regulating physician conduct. *See* Dkt. 1 ¶¶ 40-50. The through line in all of these allegations is that none of the alleged government conduct has any direct relationship to Plaintiffs' purported injuries. *See Lujan*, 504 U.S. at 562 (where injury arises from government's action or inaction on someone else, "much more is needed" to show causation).

Moreover, in a case like this, where the theory of injury depends on a casual chain that involves numerous third parties whose independent conduct collectively has significant bearing on the alleged injury, courts have recognized the absence of traceability. *Bellon*, 732 F.3d at 1142; *see Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019) (a plaintiff's theory of standing cannot "rest on mere speculation about the decisions of third parties"). Here, as explained, the individual Plaintiffs' alleged injuries are entirely contingent on the possible conduct of multiple independent third parties—mistaken attestations by personal witnesses and errant evaluations by multiple doctors. *See* Cal. Health & Safety Code §§ 443.3(b)(3), 443.5(a)(1)-(3), 443.6(c). The highly unlikely probability of this chain of conduct by third parties necessarily severs any casual chain between the alleged injury and any conduct of the State Defendants. *Dep't of Commerce*, 139 S. Ct. at 2566 (where causation is dependent on third party actions, a plaintiff must show that those third parties are "likely to react in predictable ways").

### B. The Organizational Plaintiffs Lack Standing

#### 1. Direct standing

The organizational Plaintiffs also lack standing. As with individual plaintiffs, an organizational plaintiff must establish the "irreducible constitutional minimum" of injury in fact, causation, and redressability. *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982)).

An organization suing on its own behalf can establish an injury in fact when it suffers *both* frustration of its mission *and* diversion of its resources. *Sabra v.*

1   *Maricopa Cnty. Comm. Coll. Dist.*, 44 F.4th 867, 879 (9th Cir. 2022).  Yet, an

2   organization cannot manufacture an injury by "simply choosing to spend money

3   fixing a problem that otherwise would not affect the organization at all."  *E. Bay*

4   *Sanctuary Covenant v. Biden*, 993 F.3d 640, 663 (9th Cir. 2021) (internal quotation

5   marks and citations omitted).  Instead, the organization must demonstrate that it

6   would have suffered some other injury had it not diverted resources to

7   counteracting the problem.  *Id.*

8        Under ordinary standing principles, this "other injury" must be actual and

9   concrete.  *Pierce v. Ducey*, 965 F.3d 1085, 1089 (9th Cir. 2020) (per curiam).  The

10  defendant's conduct must do more than offend or setback the priorities and values

11  of the organization; it must result in an actual impediment to the organization's

12  real-world efforts on behalf of such principles.  *See Havens*, 455 U.S. at 378-79

13  (organization suffered injury in fact where defendant's practices "perceptibly

14  impaired" the organization's ability to provide counseling and referral services);

15  *Rodriguez v. City of San Jose*, 930 F.3d 1123, 1135 (9th Cir. 2019) ("The

16  organizational plaintiffs have not explained how the City's retention of Lori's guns

17  either impedes their ability to carry out their mission or requires them to divert

18  substantial resources away from the organizations' preferred uses—let alone

19  both.").  The defendant's actions, in other words, must impair the organization's

20  ability to function as an organization.  *See, e.g.*, *Am. Fed'n of Gov't Emps. Local 1*

21  *v. Stone*, 502 F.3d 1027, 1033 (9th Cir. 2007) (defendant's conduct increased

22  difficulty in recruiting members); *Walker v. City of Lakewood*, 272 F.3d 1114,

23  1124-25 (9th Cir. 2001) (defendant's conduct delayed and canceled contracts,

24  making it difficult to obtain funding).

25        An organizational plaintiff's alleged diversion of resources must be tied to this

26  concrete threat to the organization's operations.  The organization must establish

27  that the defendant's conduct (which, allegedly burdens the organization's purpose),

28  in fact, forced the organization to divert resources to defend its ability to operate

1    and fulfill its mission.  *See, e.g.*, *Rodriguez*, 930 F.3d at 1136 (must find the issue

2    "requires" diverting resources); *La Asociacion de Trabajadores*, 624 F.3d at 1088

3    n.4 (organization must be "forced to choose" between suffering actual injury to its

4    purpose or diverting resources to counteract the injury).  This flows from the

5    requirement that a plaintiff's injury be "fairly traceable" to the challenged conduct.

6    *See Lujan*, 504 U.S. at 560.  Where a defendant's conduct did not force the plaintiff

7    to divert resources to defend its ability to fulfill its mission, any diversion injury

8    comes from the plaintiff's own actions, and a self-inflicted injury cannot be fairly

9    traceable to the defendant.  *La Asociacion de Trabajadores*, 624 F.3d at 1088 n.4.

10       Here, the organizational Plaintiffs claim direct injury from diversion of

11   resources in response to the EOLOA.  Dkt. 1 ¶¶ 22, 25, 27, 32.  But they do not

12   sufficiently allege that Defendants' EOLOA-related conduct actually impedes and

13   frustrates their stated missions.  The EOLOA does not criminalize, regulate, restrict,

14   or have any impact whatsoever on the operations of these Plaintiffs.  The

15   organizations allege that permitting terminally ill persons to obtain AID medication

16   under the EOLOA is inconsistent with their missions of seeking to empower,

17   advocate for, or serve persons with disabilities.  *See* Dkt. 1 ¶¶ 19, 23, 26, 29.  But

18   none of the organizational Plaintiffs assert that the Act, or the State Defendants'

19   conduct related to the Act, specifically harms their abilities to function as

20   organizations or to fulfil their organizational mission.  *See Havens*, 455 U.S. at 379.

21   Plaintiffs remain unencumbered in their advocacy for the lives and conditions of

22   people with disabilities, as well as their activism in opposition to laws that permit

23   AID medication for certain terminally ill persons.  Absent allegations that the State

24   Defendants' conduct actually interferes with these organizations' ability to operate

25   and further the purposes for which they were formed, the alleged frustration of

26   mission in this case amounts to nothing more than an insufficient assertion that the

27   EOLOA offends their organizational principles.  *Id.* at 378-79; *Rodriguez*, 930 F.3d

28   at 1135; *Project Sentinel v. Evergreen Ridge Aparts.*, 40 F. Supp. 2d 1136, 1139

(N.D. Cal. 1999) (allegations "nothing more than a setback to the organization's abstract social interest in gaining compliance with fair housing laws").

Necessarily then, the diversions of resources alleged in the Complaint fail to demonstrate the type of injury warranting organizational standing.  Since the organizational Plaintiffs were not put to a forced choice—i.e., accept an EOLOA-based interference on your ability to further your organizational mission or divert resources away from other initiatives to counter this injury—any diversion of resources was not caused by or fairly traceable to any conduct of the Defendants in the way required to establish standing.  *La Asociacion de Trabajadores*, 624 F.3d at 1088 & n.4; *accord Rodriguez*, 930 F.3d at 1136.  Any alleged diversions of resources are self-inflicted, the result of the organizational Plaintiffs' internal policy decisions and discretionary spending choices.  *See California v. Texas*, 141 S. Ct. 2104, 2114-15 (2021) (alleged monetary injuries based on the cost of buying insurance were purely voluntary and not fairly traceable to government action absent a government enforcement mechanism).[3]

## 2. Associational standing

Plaintiff United Spinal Association (United Spinal) likewise cannot establish associational standing to sue on behalf of its members.[4]  An association has standing to sue on behalf of its members when: (1) its members would otherwise

_____

[3] Concerning Plaintiff Communities Actively Living Independent and Free (CALIF), the Complaint alleges that EOLOA will "further[] the deaths of constituents that would have sought out and benefitted from CALIF's services." Dkt. 1 ¶ 32.  The balance of CALIF injury allegations, however, concern similar alleged diversion of resources to those asserted by the other organizational Plaintiffs and the Complaint does not specifically allege that any CALIF consumer has or will end their life pursuant to the EOLOA, thus diminishing CALIF's ability to provide its offered services.  Yet, even assuming CALIF intended to make such an allegation, as explained above, this theory of injury in fact necessarily depends on far too many contingent events to establish a concrete, non-speculative injury. *Lujan*, 504 U.S. at 560; *Lee*, 107 F.3d at 1388-90.

[4] United Spinal is the only organizational Plaintiff alleged to have members and the only Plaintiff for which associational standing is alleged.  *See* Dkt. 1 ¶ 21.  However, to the extent CALIF is also alleged to have members for the purpose of associational standing, the deficiencies in United Spinal's claim for standing apply with equal force.

have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted, nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

Here, members of United Spinal would not have standing to sue in their own right. *Lee*, 107 F.3d at 1388-90. As explained above, the theory of injury for an individual—that an EOLOA-eligible person will succumb to a mental disorder, request AID medication, navigate the many hurdles of the EOLOA without obstruction, and obtain and involuntarily take an AID drug—is far too speculative and contingent to confer standing. *Lee*, 107 F.3d at 1388-90. Indeed, the Ninth Circuit in *Lee* explicitly rejected the theory of associational standing now asserted, explaining that residential care facilities in that case "would be asserting the interest of unnamed patients who are no closer to suffering the asserted injury" than the named plaintiff. *Id.* at 1390.

### C. Eleventh Amendment Immunity Bars Plaintiffs' Constitutional Claims Against Some of the State Defendants

As to Plaintiffs' constitutional claims, California's immunity under the Eleventh Amendment forecloses litigation against some State Defendants. *Pennhurst State Sch. and Hosp. v. Helderman*, 465 U.S. 89, 98-100 (1983) (Eleventh Amendment bars a citizen from bringing suit against his own state, in federal court, without the state's consent); *Fla. Dep't of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 684 (1982) (immunity applies to state agencies).

*Ex parte Young*, 209 U.S. 123, 155-56 (1908) permits claims for prospective declaratory and injunctive relief against state officials for alleged violations of federal law. Yet that exception only applies where the state officer sued has "some connection with the enforcement of the act." *Ex parte Young*, 209 U.S. at 157. "[T]hat connection 'must be fairly direct; a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the

challenged provision will not subject an official to suit.'" *Coal. to Defend Affirm. Action v. Brown*, 674 F.3d 1128, 1134 (9th Cir. 2012) (quoting *L.A. Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992)).

Here, as to some of the named public officials, Plaintiffs have alleged nothing than an attenuated and generalized connection to the EOLOA.  For instance, Governor Newsom is alleged to be "vested with the supreme executive power of the State and has the duty to see that the State's laws are faithfully executed."  Dkt. 1 ¶ 40 (citing Cal. Const. art. V, § 1)  The Governor is also alleged to direct specific actions of the Attorney General, to supervise and assign functions of executive agencies, and to appoint members of the Medical Board of California (MBC) and the Mental Health Services Oversight and Accountability Commission (MHSOAC).  *Id.*  But none of these allegations concern the type of direct involvement in enforcement that is necessary for application of the *Ex parte Young* exception.  *See Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 943 (9th Cir. 2013) (insufficient enforcement connection for Governor).

DPH Director Aragòn and MHSOAC Chair Madrigal-Weiss, as the leaders of their agencies, are alleged to coordinate statewide suicide prevention efforts consistent with implementation of California's Strategic Plan for Suicide Prevention 2020-2025.  Dkt. 1 ¶¶ 42, 47.  DPH is further alleged to facilitate the EOLOA by providing forms, collecting data, and publishing an annual repor documenting the prescription and use of AID medication.  Dkt. 1 ¶ 43.  These allegations, however, failed to show the type of association with the Act's operation required for *Ex parte Young*.  DPH's collection and publishing of data is purely ministerial and bears only a secondary, after-the-fact relation to the Act's process.  Moreover, although DPH and MHSOAC (and their respective leaders) manage certain suicide prevention initiatives, the availability of AID medication under the EOLOA does not operate to exclude any person from any program administered by these agencies.  Thus, as to these public officials, Plaintiffs have failed to allege a

substantive connection to the EOLOA that would justify an exception to Eleventh Amendment immunity. *Coal. to Defend Affirm. Action*, 674 F.3d at 1134.

## II. PLAINTIFFS FAIL TO STATE VIABLE CLAIMS FOR RELIEF

This case should also be dismissed because Plaintiffs fail to state any viable claim for relief. The facts, as alleged in the Complaint, do not support a cognizable legal theory of liability under Title II of the ADA, Section 504 of the Rehabilitation Act, or the Equal Protection and Due Process Clauses.

### A. Plaintiffs Fail to State Viable Claims Under the ADA and Section 504 of the Rehabilitation Act

#### 1. ADA and Section 504 background

Title II of the ADA, which prohibits disability discrimination by public entities or in public programs, was expressly modeled on Section 504 of the Rehabilitation Act. *Zukle v. Regents of the Univ. of Cal.*, 166 F.3d 1041, 1045 (9th Cir. 1999). Title II specifically provides that "[s]ubject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 similarly provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).[5]

To establish a violation of either statute, a plaintiff must show that: (1) they are disabled within the meaning of the statutes; (2) they are otherwise qualified to participate in or receive the benefit of the government services, programs, or

---

[5] Since "there is no significant difference in the analysis of rights and obligations create by [ADA and Section 504], *K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1098 (9th Cir. 2013), courts routinely address claims under both statutes together, *see Martin v. Cal. Dep't of Veterans Affairs*, 560 F.3d 1042, 1047 n.7 (9th Cir. 2009). The State Defendants will do the same.

activities at issue; (3) they were excluded from participation in or denied the benefit of the services, programs, or activities, or otherwise discriminated against, because of their disability; and (4) the entity denying services or discriminating received federal financial assistance (for the Section 504 claim) or was a public entity (for the Title II ADA claim).  *Martin*, 560 F.3d at 1047.[6]

### 2.    Plaintiffs cannot demonstrate that the EOLOA violates the ADA and Section 504 in all circumstances

In their ADA and Section 504 claims, Plaintiffs allege that the State Defendants facially discriminate against all EOLOA-eligible disabled persons by denying them the benefits of various State laws, public services, and programs, which collectively aim to prevent suicide.  Dkt. 1 ¶¶ 170-72, 174, 182-84, 185 (citing *Bay Area Addiction Rsch. & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 735 (9th Cir. 1999) (facial disability discrimination is a per se violation of the ADA)).  Plaintiffs thus bear the heavy pleading burden of demonstrating that "'no set of circumstances exist'" under which the EOLOA does not conflict with these federal statutes.  *Sprint Telephony PCS, L.P.*, 543 F.3d at 597 (quoting *Salerno*, 481 U.S. at 745).  Plaintiffs do not satisfy this substantial burden.

Fatal to Plaintiffs' claim is that the EOLOA does not exclude any person from participating in any other government program.  Where medically appropriate in an individual case, all government services at issue remain open and available for terminally-ill patients.  Indeed, rather than excluding such patients, the Act and its process unequivocally confers on terminally-ill disabled persons *more rights and*

---

[6] A person is "disabled" under the ADA and Section 504 if he or she has "a physical or mental impairment that substantially limits one or more major life activities of such individual . . . ." 42 U.S.C. § 12102(1).  Major life activities include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* § 12102(2)(A).  Major life activities also include the operation of major bodily functions, such as "functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." *Id.* § 12102(2)(B).

1   *services*—an additional voluntary option for end-of-life care—than non-terminally-

2   ill and non-disabled Californians.  The EOLOA, on its face and in its operation,

3   thus cannot be credibly alleged to disadvantage a class of disabled individuals,

4   which is the fundamental gravamen of any viable ADA or Section 504 claim.  *See*

5   *Mark H. v. Lemahieu*, 513 F.3d 922, 939 (9th Cir. 2008) (recognizing that Section

6   504 prohibits "disability-based disadvantage"); *Memmer v. Marin Cnty. Cts.*, 169

7   F.3d 630, 633 (9th Cir. 1999) (no viable ADA claim where record established that

8   plaintiff was not "disadvantaged in any way by her disability" and the failure to

9   provide an accommodation).

10          Plaintiffs characterize the additional rights provided by the EOLOA as

11   discriminatory, asserting that the availability of AID medication actually harms

12   terminally-ill disabled persons.  But this characterization is wholly predicated on

13   the speculative allegation that the EOLOA can result in involuntary deaths.  As

14   explained in detail above, the statutory scheme fully accounts for and mandates

15   compliance with multiple safeguards put in place to eliminate this possibility.  In

16   order for an eligible terminally-ill person to obtain an AID drug, they must strictly

17   comply with a bevy of stringent requirements, all of which serve to flesh out

18   whether the person's decision is voluntary.  *See* Cal. Health & Safety Code §§

19   443.3-443.6.  The Act was explicitly designed with "numerous safeguards . . . to

20   ensure that, at every stage of the process, a person demonstrates their voluntary

21   consent."  *Shavelson v. Bonta*, 608 F. Supp. 3d 919, 928 (N.D. Cal. 2022).  Still,

22   even if Plaintiffs could credibly allege that involuntary death was possible under the

23   EOLOA, they cannot show that *all applications* of the Act result in involuntary

24   death.  *Salerno*, 481 U.S. at 745.

25          Plaintiffs additionally contend that the effect of the law is that a terminally-ill

26   disabled person's expression of suicidal ideation is treated one way, while a non-

27   disabled person's expression of suicidal ideation receives a different, more-

28   protective response.  *See* Dkt. 1 ¶¶ 170-72, 182-84.  But such differential treatment

19

is the product of a patient's voluntary choice and, as explained, Plaintiffs cannot demonstrate that all such decisions are involuntary. *Salerno*, 481 U.S. at 745. In any event, Plaintiffs' arguments fundamentally misunderstand the intersection of the medical field and federal disability law. Individual patients necessarily have differing interactions with their doctors and receive different medical interventions based on their unique medical circumstances. Not every medical treatment is appropriate for every patient, even those with the same condition. For this reason, courts have long recognized in the ADA and Section 504 context that, "[w]here the handicapping condition is related to the condition(s) to be treated, it will rarely, if ever, be possible to say . . . that a particular decision was discriminatory." *Johnson by Johnson v. Thompson*, 971 F.2d 1487, 1494 (10th Cir. 1992) (medical decisions concerning appropriate treatment for spina bifida, made based on the fact and degree of patient's disability, did not violate Section 504); *see McGugan v. Aldana-Bernier*, 752 F.3d 224, 234 (2d Cir. 2014) (ADA and Section 504 prohibit discrimination against a disabled person only where the disability is unrelated to, and thus improper to consideration of, the treatment decisions in question); *see also Simmons v. Navajo Cnty.*, 609 F.3d 1011, 1022 (9th Cir. 2010) (ADA does not create remedy concerning specific treatment for a disability), *overruled on other ground by Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (en banc).

This fundamental flaw in Plaintiffs' claims is clearly illustrated in their allegations that the EOLOA works to deny terminally-ill disabled Californians the enforcement benefit of protective criminal and civil laws. Plaintiffs argue that the Act discriminates because doctors who legally prescribe AID medication are not subject to criminal prosecution and civil sanctions. Dkt. 1 ¶¶ 171, 183. But this conception of ADA and Section 504 liability would seemingly apply in a host of other medical scenarios. For instance, under Plaintiffs' theory, a diabetes patient who undergoes surgery to remove an extremity infected with gangrene would be identically unprotected by criminal and civil protections against battery. But non-

20

enforcement of these sanctions against the patient's surgeon by State officials, of course, does not give rise to ADA or Section 504 liability, even though the doctor, by conducting the surgery, has treated the diabetes patient different than other patients and done so on the basis of the patient's disability.  In this case, Plaintiffs have not and cannot allege a viable claim for disability discrimination.

### B.   Plaintiffs Fail to State a Viable Equal Protection Claim

Plaintiffs also cannot establish liability under the Equal Protection Clause.  To prevail on an equal protection claim, a plaintiff "must show that a class that is similarly situated has been treated disparately."  *Roy v. Barr*, 960 F.3d 1175, 1181 (9th Cir. 2020).  A court must first "identify the [government's] classification of groups" in a statute, and then search for a comparative group "composed of individuals who are similarly situated to those in the classified group in respects that are relevant to the [government's] challenged policy."  *Id*.  Proposed classifications are similarly situated if they are shown to be "'arguably indistinguishable.'"  *Engquist v. Or. Dep't of Ag.*, 553 U.S. 591, 601 (2008).  The inquiry turns on an analysis of the purposes of the law in question.  *Williams v. Field*, 416 F.2d 483, 486 (9th Cir. 1969).

Where a plaintiff demonstrates similarly situated groups, "the Court determines the appropriate level of scrutiny and then appl[ies] it."  *Roy*, 960 F.3d at 1181.  Classifications based on a suspect characteristic, such as race, alienage, or national origin, along with those that burden a fundamental right, will be sustained only if narrowly tailored to serve a compelling state interest.  *Plyler v. Doe*, 457 U.S. 202, 216-17 (1982).  Classifications not concerning a protected group or fundamental right are constitutional if shown to be rationally related to a legitimate state interest.  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).

For their facial challenge to survive, Plaintiffs' allegations would have to establish "that no set of circumstances exists" under which the Act would not violate equal protection principles.  *S.D. Myers, Inc.*, 253 F.3d at 467-68.  Plaintiffs

21

1   have made no such showing.  Indeed, their claim fails at the threshold because the

2   EOLOA does not create similarly situated classes for equal protection purposes.  As

3   noted, whether proposed classifications are similarly situated turns on the purposes

4   of the challenged law.  *Williams*, 416 F.2d at 486.  Here, Plaintiffs' proposed

5   classes appear to be, on the one hand, terminally-ill patients eligible for the

6   EOLOA, and, on the other hand, "other groups of people ineligible to participate in

7   EOLOA who nevertheless share similar concerns about losing autonomy, the loss

8   of dignity, losing control of bodily functions, becoming a burden on caregivers,

9   pain, and/or financial costs associated with continued living."  Dkt. 1 ¶ 191.

10   However, patients with a "terminal disease" under the Act are fundamentally

11   different, for purposes of the law, than all other individuals in Plaintiffs' alternative

12   classification.  *See Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (equal protection

13   "keeps governmental decisionmakers from treating differently persons who are in

14   all relevant respects alike.").  Only the former have "an incurable and irreversible

15   disease that has been medically confirmed and will, within reasonable medical

16   judgment, result in death within six months.  *See* Cal. Health & Safety Code §

17   443.1(r).  Such patients face an imminent and distinctive prospect of pain and

18   suffering associated with the dying process, along with heightened emotional

19   anxiety related to that process.  All individuals in Plaintiffs' comparative class do

20   not.  This fundamental difference, as viewed through the balancing of competing

21   interests and considerations struck by the Legislature, renders individuals with a

22   "terminal disease" differently situated than all other persons, even those with

23   debilitating and painful disabilities or terminal illnesses with more positive, longer-

24   term prognoses.  That the EOLOA affords these uniquely situated patients the

25   additional right to obtain AID medication does not violate equal protection.

26   Further, even if Plaintiffs could establish similarly situated classifications, the

27   disparate treatment alleged easily passes constitutional muster.  As pled in the

28   Complaint, the EOLOA's purported discrimination is "based on physical health,"

22

Dkt. 1 ¶ 191, a non-suspect classification that must be sustained if rationally related to a legitimate state interest, *see Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 367-68 (2001).  Plaintiffs allege that strict scrutiny nevertheless applies because the EOLOA "implicates a fundamental right—the right to live."  Dkt. 1 ¶ 192.  Where a classification scheme has only an incidental or marginal effect on fundamental rights, however, the appropriate analytical standard remains rational basis.  *See Lyng v. Castillo*, 477 U.S. 635, 638-39 (1986) (statutory classification did not directly and substantially interfere with fundamental right to family living arrangements); *accord Aleman v. Glickman*, 217 F.3d 1191, 1200 (9th Cir. 2000).  In this case, while the end result of the EOLOA's stringent process is the death of the terminally ill patient, as explained above, that treatment is fully voluntarily at every step and, to the extent Plaintiffs allege a risk of involuntary death, the chain of contingencies necessary for such a result renders that assertion impossibly speculative.  Accordingly, the Act cannot be said to directly and substantially burden the fundamental right to life.  *See Lyng*, 477 U.S. at 638-39.

Under rational basis scrutiny, the EOLOA's differential treatment serves California's undoubtedly legitimate interest in providing for the general welfare of its citizens, which rationally includes ensuring that certain terminally ill patients at the end of their disease progression have an option to avoid suffering a prolonged and painful dying process if they so choose.  Indeed, rather than discriminate, the Act affords this group the "extra" option of AID medication not afforded to others in the population.  *See Roy*, 960 F.3d at 1184.  The Act also serves California's interests in providing terminally ill patients with the personal autonomy to dictate the terms of their own lives and the peace of mind of knowing they will have an option to forego an otherwise painful death.  And, even under strict scrutiny, all of these State interests are compelling and achieved through EOLOA's creation of a narrowly tailored classification of terminally ill patients who, upon multiple

1   voluntary requests and with assessment of witnesses and concurrence of their

2   doctors, may be prescribed an AID drug.

3   ### C.   Plaintiffs Fail to State a Viable Due Process Claim

4   Finally, Plaintiffs cannot state a claim for violation of due process.  In essence,

5   they allege that the EOLOA provides insufficient safeguards to ensure that a

6   terminally ill patient's decision is truly voluntarily, thus permitting patients to

7   relinquish their fundamental right to life in violation of their due process rights.

8   Dkt. 1 ¶¶ 197-98.

9   Here again, Plaintiffs' claim fails under the demanding pleading requirements

10  for a facial challenge.  Even if Plaintiffs could establish that that the EOLOA was

11  capable of resulting in some involuntary deaths (they cannot), they have not alleged

12  and cannot demonstrate that in *all* applications of the EOLOA the terminally ill

13  patient's decision to end their life would be involuntary.  And that forecloses their

14  facial challenge.  *Salerno*, 481 U.S. at 745.

15  Moreover, Plaintiffs' due process claim is logically foreclosed by circuit

16  precedent.  As explained above, the Ninth Circuit, in *Lee*, held that allegations

17  about the possibility of a patient involuntarily using Oregon's AID medication law

18  were too speculative and contingent to establish the concrete injury needed for

19  standing.  *Lee*, 107 F.3d at 1388-90.  Here, Plaintiffs' due process claim is founded

20  on an identical theory of constitutional harm.  If allegations about the potential for

21  involuntary application were too speculative to support standing as to the particular

22  plaintiffs in *Lee*, they are *a fortiori* insufficient to establish that a violation will

23  happen as to *every* person to whom the law might be applied.

24  Plaintiffs contend that the EOLOA constitutes a "state-created danger" that

25  obligates the State to affirmatively protect terminally ill patients that the Act places

26  in danger.  Dkt. 1 ¶ 197 (citing *Martinez v. City of Clovis*, 943 F.3d 1260, 1271 (9th

27  Cir. 2019)).  To succeed on a claim under the state-created danger doctrine, a

28  plaintiff must establish: (1) that state officials' affirmative actions created or

1  exposed the plaintiff to actual, particularized danger that the plaintiff would not

2  have otherwise faced; (2) that the injury suffered by the plaintiff was foreseeable;

3  and (3) that the state officials were deliberately indifferent to the known danger.

4  *Martinez*, 943 F.3d at 1271.

5       Plaintiffs cannot establish any one of these elements, let alone all three.  Given

6  the many contingencies necessary for an involuntary death to actually occur under

7  the EOLOA, Plaintiffs cannot demonstrate an actual, particularized danger, and

8  certainly not one that is reasonably foreseeable.  Even if prescription of AID

9  medication as an abstract concept were capable of the type of foreseeable danger

10  alleged, in this instance, California has not acted with deliberate indifference to that

11  danger.  To the contrary, the EOLOA's "numerous safeguards . . . ensure that, at

12  every stage of the process, a person demonstrates their voluntary consent."

13  *Shavelson*, 608 F. Supp. 3d at 928.  The State has designed its AID medication

14  scheme around the guiding principle that a patient's decision must be affirmatively

15  and conclusively shown to be voluntary.  As this Court implicitly recognized in a

16  prior case, prescription of AID medication under the EOLOA requires "the

17  individual's informed medical decisions regarding his or her treatment."  *See*

18  *Christian Med. and Dental Ass'n v. Bonta*, 625 F. Supp. 3d 1018, 1038 (C.D. Cal.

19  2022) (rejecting due process challenge to the definition of "terminal disease").

20                         **CONCLUSION**

21       For the foregoing reasons, this Court should dismiss Plaintiffs' Complaint

22  with prejudice and without leave to amend.

23

24

25

26

27

28

Dated:  July 20, 2023

Respectfully submitted,

ROB BONTA
Attorney General of California
EDWARD KIM
DARRELL W. SPENCE
Supervising Deputy Attorneys General

KEVIN L. QUADE
CHRISTINE FRIAR WALTON
MARSHA E. BARR-FERNANDEZ
Deputy Attorneys General
*Attorneys for the State Defendants*

26

1

**CERTIFICATE OF COMPLIANCE**

2       The undersigned, counsel of record for Kevin L. Quade, certifies that this brief

3  contains 8,419 words, which:

4       __ complies with the word limit of L.R. 11-6.1.[7]

5  Dated:  July 20, 2023                          Respectfully submitted,

6                                                 ROB BONTA
                                                  Attorney General of California
7

8

9                                                 KEVIN L. QUADE
                                                  Deputy Attorney General
10                                                *Attorneys for the State Defendants*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27       _____

         [7] The State Defendants concurrently filed an *ex parte* application to file an
28  oversized memorandum of points and authorities in support of their motion to
    dismiss.